### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **Case No. 5:21-cr-17-JA-PRL**

**VALENTINA ESTEBAN-GARCIA**
_____/

### MOTION TO SUPPLEMENT DEFENDANT'S MOTION TO DISMISS AND TO WITHDRAW REQUEST FOR EVIDENTIARY HEARING

**NOW COMES** Defendant, Mr. Valentina Esteban-Garcia by and through undersigned counsel, and moves this Court to permit him to supplement his motion to dismiss (Doc. 19) with the four exhibits enclosed with this motion, and to withdraw his request for an evidentiary hearing (Doc. 21).

### MEMORANDUM OF LAW

Mr. Esteban-Garcia filed a motion to dismiss challenging the constitutionality of 8 U.S.C. § 1326 under the equal protection principles of the Fifth Amendment. (Doc. 19). Mr. Esteban-Garcia also filed a request for an evidentiary hearing on the motion to dismiss. (Doc. 21). At a status conference, the parties and the Court discussed the filing of additional exhibits to supplement the motion, in order to avoid the need for an evidentiary hearing.

Enclosed with this motion are four additional exhibits offered to supplement to the motion to dismiss, Exhibits Q through T. They include a declaration by a Defense expert, a transcript of the Defense experts' testimony in another case, and

the experts' *CV*s.  Separately, the Defense will file a memorandum explaining its use of U.S. Sentencing Commission data.  If the Court grants this motion to supplement, the Defense would then request to withdraw his request for an evidentiary hearing on that basis.

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER
MIDDLE DISTRICT OF FLORIDA

*/s **Samuel E. Landes***
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Fax: (813) 228-2562
Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th of November 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to AUSA William Hamilton.

*/s **Samuel E. Landes***
Samuel E. Landes, Esq.
Assistant Federal Defender

2

# EXHIBIT Q

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

BEFORE THE HONORABLE MIRANDA M. DU, CHIEF DISTRICT JUDGE

---o0o---

| | |
|---|---|
| United States of America, | : |
| | : No. 3:20-cr-026-MMD-WGC |
| | : |
| Plaintiff, | : February 2, 2021 |
| | : |
| -vs- | : |
| | : United States District Court |
| Gustavo Carrillo-Lopez, | : 400 S. Virginia Street |
| | : Reno, Nevada  89501 |
| Defendant. | : |

**TRANSCRIPT OF**
**EVIDENTIARY HEARING**

A P P E A R A N C E S:

FOR THE GOVERNMENT:        Peter Walkingshaw
                          Assist. United States Attorney


FOR THE DEFENDANT:         Lauren Gorman
                          Assist. Federal Public Defender



Proceedings recorded by mechanical stenography produced by computer-aided transcript



Reported by:               KATHRYN M. FRENCH, RPR, CCR
                          NEVADA LICENSE NO. 392
                          CALIFORNIA LICENSE NO. 8536

```
1        Reno, Nevada, Tuesday, February 2, 2021, 9:00 a.m.

2                           ---OoO---

3

4             THE COURT:  Good morning.

5             Are you ready to proceed?

6             THE CLERK:  This is the date and

7   time set for evidentiary hearing in case number

8   3:20criminal-026-MMD-WGC, United States of America

9   versus Gustavo Carrillo-Lopez.

10            Present via video conference for the

11  government is Peter Walkingshaw.

12            Present via video conference for the

13  defendant is Lauren Gorman.

14            Defendant is not present.  Ms. Gorman

15  will place on the record the reasons why he is not

16  present.

17            The Spanish interpreters, Judy Jenner and

18  Olivia Reinshagen-Hernandez, have been released for

19  the day.

20            THE COURT:  Thank you, Miss Clerk.

21            Ms. Gorman, I understand there was an issue

22  with the transportation of Mr. Carrillo-Lopez, and that

23  he is waiving his appearance at this evidentiary hearing

24  this morning.

25            Is that correct?
```

```
 1              MS. GORMAN:  That's correct, Your Honor.

 2              I'll also note that a waiver is not even

 3    formally required under Rule 43, uh, because it's not

 4    one of those hearings where he is actually required to

 5    be present.

 6              THE COURT:  Even assuming that, he has a

 7    right to appear and that a waiver is required, are you

 8    representing that he is waiving his right to appear?

 9              MS. GORMAN:  I am, Your Honor.

10              THE COURT:  All right.  Thank you,

11    Ms. Gorman.

12              And I agree, given that this is an

13    evidentiary hearing where I'm expecting to hear expert

14    testimony, I think that Mr. Carrillo-Lopez's appearance

15    is not required.  And assuming it is, I will accept the

16    waiver and we'll proceed.

17              MS. GORMAN:  Thank you, Your Honor.

18              And Your Honor, possibly, can I just make

19    some sort of preliminary remarks to kind of streamline

20    this presentation?

21              THE COURT:  What preliminary remarks do you

22    have to offer?

23              MS. GORMAN:  One, I understand that there

24    were multiple motions and supplements filed.  I would

25    just ask for the purpose of a streamlined presentation,
```

1     for those to be incorporated into the record, rather

2     than admitted independently as exhibits.

3             And then with respect to the two experts

4     testifying, I understand that the government would

5     like to invoke the Rule of Exclusion.  While that is

6     entirely within this Court's discretion, the Rule of

7     Exclusion does not necessarily apply to experts; and

8     particularly in this case, where I think it would

9     avoid duplication of testimony.  And where these are

10    experts who generally rely upon each other and in

11    their respective fields and draw on each other's

12    scholarship, just in general, I don't think the Rule

13    of Exclusion is necessary and I think it could

14    streamline the proceeding not to have it, whereas one

15    expert could comment on another's and, et cetera.

16           THE COURT:  Well, I would note that for

17    purposes of the motion, counsel, you know -- both of

18    you know -- that the Local Rules provide for a motion, a

19    response, and a reply.  And in this case, there's been

20    multiple notices supplementing what's been filed.

21    I've allowed it without any party requesting leave,

22    primarily, because some of the filings, I think are --

23    would have been allowed anyway, given the reason --

24    the case law that's been developing.  And given the

25    importance of the issue here, I want to make sure that

1    the record is thorough, which is another reason why I

2    haven't intervened to let you know that you shouldn't

3    continue to keep filing notices of supplementation.

4            It's not easy for me, or my law clerk,

5    when I am reviewing the filings and then discover, the

6    next morning or the next evening, that there's a new

7    supplement.  I hope that this hasn't happened before I

8    issued the order.  Regardless, I'm going to accept the

9    filings.  It's part of the record.  If you want to

10   refer to the ECF number for the filing as part of the

11   evidentiary hearing today, I don't have an issue with

12   that.

13           With respect to the Rule of Exclusion, I'll

14   let Mr. Walkingshaw respond as to why he believes that

15   the Court should permit the rule to be invoked for the

16   two expert witnesses.

17           MR. WALKINGSHAW:  Thank you, Your Honor.

18           And if I can also briefly be heard on the

19   supplementation issue as well.  But to answer the

20   Court's first question, the two experts are both going

21   to be testifying, in large part, to historical facts.

22   They rely on similar methods and methodologies.  The

23   purpose of the Rule of Exclusion is to avoid having one

24   witness tailor their testimony based on what they've

25   heard other witnesses say.  While experts are sometimes

6

```
 1    allowed -- or exempt from the rule of exclusion, I
 2    believe the case cited by Ms. Gorman, in correspondence
 3    with Ms. Vannozzi, refers to experts that are essential
 4    to the management of litigation, which doesn't appear
 5    to be applicable in this case.  And I believe there's
 6    representation as to some ambivalence as to whether or
 7    not the rule is invoked.
 8              So for those reasons, I think this is
 9    a fairly classic instance in which I think the rules
10    should be observed, given the historical facts that we
11    expect to have entered into the record today.
12              THE COURT:  So is there a concern that
13    somehow the -- I want to understand the argument that
14    the "experts may tailor their testimony."  So generally
15    with fact witnesses, there's concern that one's
16    recollection may be influenced by hearing what
17    another's recollection is.  But, here, the witnesses
18    are offering their testimony as to their expertise.  So,
19    I'm trying to understand how they would tailor their
20    testimony that would present a concern that one would
21    normally find with fact witnesses.
22              MR. WALKINGSHAW:  Well, Your Honor, I
23    believe that not only will the witnesses be testifying
24    to historical facts, but also will be commenting on
25    scholarship associated with the history of immigration.
```

1    I believe Mae Ngai is cited by both of them fairly

2    extensively.  And to the extent that those discussions,

3    either on direct or on cross, you know, may influence

4    the way that that scholarship is framed or presented, I

5    really think that the expert should be testifying from

6    their own expertise, as opposed to what they've heard in

7    prior testimony.

8                    THE COURT:  All right.

9                    I'm going do deny the government's request

10   to invoke the Rule of Exclusion.  This is an evidentiary

11   hearing.  The evidentiary rules are more relaxed.  In

12   addition, I'm hearing testimony from expert witnesses

13   who I would expect to testify and present their own

14   expertise.  So to the extent that they their testimony

15   reveals that they're influenced by each other's

16   testimony, I will take that into account and consider

17   the weight of the testimony.  But in terms of concern

18   that they may be somehow tailoring their testimony

19   and adopting each other's testimony, I don't think

20   that's a concern here, at least as -- based on just my

21   general understanding as to how experts present their

22   testimony.  For those reasons, I'm going to deny the

23   request.

24                    And so if the other expert is in the waiting

25   room and wants to sign into the video conference, he

1    may do so.

2              THE CLERK:  Your Honor, I'm admitting them

3    into the main conference right now.

4              THE COURT:  And Mr. Walkingshaw, you wanted

5    to be heard on the issue of supplementation.

6              MR. WALKINGSHAW:  Thank you, Your Honor.

7              THE COURT:  Is there something else you want

8    to add other than what you indicated in the response

9    that's filed as -- which is the last document filed as

10   ECF 46?

11             MR. WALKINGSHAW:  Yes, Your Honor.

12             I do believe, in terms of the notices

13   filed, there is fairly substantial substantive

14   difference.  The notice that I filed on Thursday was

15   case law that's developed since briefing ended.  And

16   appears based on the two notices filed on Friday,

17   that the defendant is coming to the hearing with a

18   substantially different theory of an equal protection

19   claim than what was fairly presented in the briefs.

20             The briefs refer, entirely, to a failure

21   to reckon with the 1929 law.  It appears, now, that a

22   theory is being put forward that the 1952 law was

23   independently motivated by racial animus.  Your Honor,

24   I would ask for post-hearing briefing hearing on that

25   issue, to the extent the Court is going to consider it.

9

```
 1    I believe the Court's comments were entirely correct
 2    that the record here should be fulsome so the Court
 3    should be given as much opportunity as possible to fully
 4    deliberate on the issues.  I think post-hearing briefing
 5    would properly frame and present them.
 6              I'll also note that the pretrial motion
 7    deadline has been extended until June of this year.
 8    Trial is not until August.  So I think in order to,
 9    you know, promote a fulsome record, I think post-hearing
10    briefing is really the appropriate course in this
11    case.
12              MS. GORMAN:  Your Honor, may I respond?
13              THE COURT:  Yes.
14              MS. GORMAN:  Your Honor, to be very
15    clear, my position is that the legislative body that
16    deliberated about this law is the legislator whose
17    intent matters.  But based on the government's response,
18    and particularly based on the supplementation in
19    addition, sort of calling the Court's attention that
20    the judges who have ruled on 1326, specifically have
21    done two things:  Both refused to allow having an
22    evidentiary hearing which witnesses could testify on,
23    and then rely upon the codification of this law in 1952,
24    without allowing evidence that there's no evidence of
25    animus.  So, I think this record should be as complete
```

1  as possible.

2          It's not a deviation from the original

3  position.  But in the event that this court finds

4  that the legislative intent regarding, particularly,

5  1952 is relevant -- which is the government's,

6  essentially, exclusive position, is that the Court

7  should not rely on 1929 when eugenics was, I think,

8  undisputedly a motivating factor in the passage of

9  illegal re-entry, then, you know, testimony regarding

10 1952 is certainly appropriate.

11         And going forward, I just want to be

12 very clear that this law was passed in 1929.  It was

13 recodified in 1952.  And subsequently, there's been

14 various amendments.  So I don't think the amendments,

15 necessarily, have the legislative intent regarding these

16 amendments, and I don't think are necessarily legally

17 relevant.  But, I do think what's very important is for

18 this court to have a full a record as possible, going

19 from the events leading up to 1929, up until the last

20 amendment, though our original position remains the

21 same.  And if this court intends to rely on 1952, it

22 should have an evidentiary record and history to support

23 that, and that has, historically, been the government's

24 position, that we should just ignore 1929, even though

25 the law has been in continual effect since 1929.  And

 1  so I guess -- I have no opposition to post-hearing

 2  briefing if the Court should find it appropriate,

 3  but these supplements, and particularly testimony

 4  regarding 1952, and even beyond, are in response to

 5  the government's position that that is sort of the

 6  relevant legislative context.

 7  THE COURT:  But, to be fair, the government

 8  took that position in its response to the initial motion

 9  and you did not offer these additional supplementations

10  in the reply.  It was after briefing closed and after

11  the last hearing that the supplementations were filed.

12  Is that correct?

13  MS. GORMAN:  I mean --

14  THE COURT:  So, in other words, the

15  government's position has not been a mystery.  It

16  stated its position in its response to the motion,

17  that the Court should focus on the 1952 codification.

18  MS. GORMAN:  So we intend to present

19  evidence that both addresses the government's

20  position, which I think is perfectly permissible in

21  any litigation, but, particularly --

22  THE COURT:  But Mr. Walkingshaw's point

23  is that you didn't do that in the reply brief.  That

24  was the opportunity to respond to the government's

25  position, in the reply brief.  Instead, you waited

1    until after briefing closed, after the hearing, to

2    provide these additional supplemental authorities.

3    That's his point.

4              MS. GORMAN:  Yes, Your Honor.  And I, as

5    I said before, our original position is the same; that

6    it's the legislative body that initially deliberated

7    about and then passed this law, that is the legislator

8    that matters.

9              The government's supplements, in

10   particular, call attention to cases where the Court

11   says, okay, Arlington Heights applies, but you've

12   shown no legislative animus with regard to 1952,

13   so we're going to deny on that basis.  Hence, the

14   supplementation.  So it's not a concession that

15   1952's legislative intent is the legislative intent

16   that matters, but I do think for the Court to consider,

17   fairly, the government's position, and our position,

18   the Court should have as full an evidentiary record

19   as possible.

20             So while we're not conceding that point,

21   these are a historian and a political scientist who

22   are both eminent scholars that can speak to the

23   government's position as well as the defense's position.

24   And I think -- we are not afraid of this legislative

25   history or this historical context, and the Court can,

 1    essentially, use the expertise to evaluate the

 2    government's position and the defense's position.  And

 3    whichever way the Court rules, I think that these

 4    experts -- in particular Professor Lytle Hernandez,

 5    is going to focus on the events leading up to 1929.

 6    Professor Gonzalez O'Brien can speak to that, but also,

 7    sort of, his expertise is more contemporary as well,

 8    and I think the Court should have as complete a record

 9    as possible.

10              THE COURT:  Ms. Gorman, that's the reason

11    why I granted the evidentiary hearing request.  I

12    just made an observation that the government stated

13    its position in its response, not just in the

14    supplementation that was filed, and so I believe --

15    and I find that Mr. Walkingshaw's point is a fair

16    one; and that is, that defendant did not offer these

17    additional authorities in its reply brief.  It's only

18    after briefing closed, and after the hearing, that these

19    additional authorities were offered -- this additional

20    evidence of the legislative history from the 1952

21    codification was offered.

22              I'm just making a note that I agree with

23    him, and so I'm going to grant -- because -- well, I

24    start with the premise that the issue is important

25    enough, but I want the parties to have the full

```
 1    opportunity to present briefing and any expert
 2    testimony.  So to the extent that the government
 3    requests additional briefing after the hearing, I'm
 4    going to grant it because, as I said, I find the
 5    defendant could have offered these additional
 6    authorities in the reply brief, in response to the
 7    government's position in its response brief.
 8                I would have to say that I'm not going to
 9    take any additional evidence after today's hearing.
10    The post-hearing brief will be for you to present legal
11    arguments so that -- I do need to close the briefing
12    period so I can decide the motion, which has to be
13    decided at some point.  I'm not going to keep leaving
14    the briefing period open.
15                With that, I'll hear from the expert
16    testimony.
17                MR. WALKINGSHAW:  Your Honor --
18                MS. GORMAN:  And Your Honor, just to --
19    okay.  Pardon me.
20                Just to be clear, you know, some of
21    the expert testimony, particularly Professor Gonzalez
22    O'Brien, I think then should particularly speak to 1952,
23    et cetera, and there's, obviously, been no opposition
24    to the scope of his testimony and it was filed with the
25    Court.
```

```
 1                    THE COURT:  I'm going to permit it.

 2                    Mr. Walkingshaw, what's your point?

 3                    MR. WALKINGSHAW:  Your Honor, just before

 4     testimony gets underway, I do want to make sure that

 5     the government's position is clear -- and there was a

 6     bit of an exchange between the Court and Ms. Gorman.

 7                    The government's position is not that 1952

 8     is the exclusive determination that the Court should

 9     consider.  The government's position is that the, the

10     history of this law begins with 1952, but it continues

11     through the amended versions that were subsequently

12     passed.

13                    I bring this only up so that there's no

14     confusion when the experts present testimony, such

15     that -- I just don't -- I believe this is more than

16     fairly presented in our briefs, but I don't want there

17     to be any claim of unfair surprise as to what our

18     position actually is.  Ms. Gorman said that she believes

19     that the amendments are not legally relevant.  We don't

20     agree.  We think they are.  So I just thought I would

21     put that on the record before testimony commences.

22                    THE COURT:  At the last hearing, the

23     government conceded that the passage of the 1929

24     law was made -- motivated, was motivated by racial

25     animus, at least to satisfy the Arlington Hill (sic.)
```

1    factors, is that right -- Arlington Heights factors.

2         MR. WALKINGSHAW:  The Arlington Heights.

3    Motivated in part-

4         THE COURT:  Arlington Heights.  I say

5    Arlington Heights in my mind so often, I only think of

6    Arlington.  But, Arlington Heights.

7         MR. WALKINGSHAW:  Yes, Your Honor.

8         But as the Court may recall, the government

9    also put forth the position that Congress gets a clean

10    slate when it passes new legislation or recodifies or

11    re-adopts legislation in the absence of racial animus.

12         THE COURT:  And given the government's

13    concession, I had initially thought that an evidentiary

14    hearing was not required.  But after hearing additional

15    arguments, I granted Ms. Gorman's request to offer

16    testimony to provide context.

17         And so with that, Ms. Gorman, I don't

18    think that the experts need to necessarily focus too

19    many details on the legislative history in 1929, except

20    to the extent that -- I know what you're trying to do.

21    You're trying to present this additional testimony to

22    show that there should not be a -- that that history

23    and that environment permeated and led to the 1952

24    codification, and Congress should not be able to just

25    distance itself from the prior history.  I know that's

1   the defendant's position.  Nevertheless, I don't think

2   that the experts needs to spend an exhaustive amount

3   of their testimony relating to the history in 1929.

4   But, I'll give you enough leave to present testimony.

5            MS. GORMAN:  Thank you, Your Honor.

6            We expect Professor Lytle Hernandez's

7   testimony to be briefer, particularly in light of that

8   previous concession.  But, thank you, Your Honor.

9            THE COURT:  All right.

10           Let's proceed then.

11           THE CLERK:  Will the witness, Professor

12   Lytle Hernandez -- thank you very much.

13
                    **KELLY LYTLE HERNANDEZ,**
14       called as a witness on behalf of the Defendant,
                was sworn and testified as follows:
15

16           THE CLERK:  Please state for the record your

17   full name and spell your last name.

18           THE WITNESS:  Kelly Lytle Hernandez.

19   It's two last names:  L-y-t, as in Tom, l-e.

20   H-e-r-n-a-n-d-e-z.

21           THE COURT:  And please spell your first name

22   as well.

23           THE WITNESS:  K-e-l-l-y.

24           THE CLERK:  Thank you.

25           MS. GORMAN:  May I proceed, Your Honor?

1          THE COURT:  Yes.

2                  **DIRECT EXAMINATION**

3  BY MS. GORMAN:

4     Q.   Thank you for coming, Professor Hernandez.

5          And I want to just jump right in by talking

6  about your expertise and your qualifications by

7  training.  So can you please describe your knowledge,

8  training, and education, and as it relates to the

9  history of the criminalization of immigration

10 enforcement in particular.

11    A.   Sure.

12         Well, I have my Ph.D in U.S. History from UCLA,

13 with, really, areas of specialization in policing and

14 immigration.  And I've written two books on this

15 subject:  Migra!:, A History of the U.S. Border Patrol,

16 which is focused on the story of how the U.S. Border

17 Patrol became the focus on the -- Mexican -- U.S.

18 southern border.  That was published by the University

19 of --

20         (Zoom audio interruption.)

21         THE CLERK:  Professor Hernandez, you are

22 cutting in and out.  Please make sure you're close to

23 your microphone.

24         THE COURT:  And it seems like you trail at

25 the end of your sentences, so -- I don't know if it's

1 because of the mic or because you are not sitting as

2 close to the mic.

3           THE WITNESS:  I'll move closer.

4           Does that help?

5           MS. GORMAN:  Yes.  We'll try it.

6           THE WITNESS:  Should I resume?

7           THE COURT:  Yes.

8           THE WITNESS:  Okay.

9           So, _Migra_ was published by University of

10 California Press, an academic peer review press.

11           My second book, City of Inmates:  Conquest,

12 Rebellion, and the Rise of Human Caging in Los Angeles,

13 is the book that really has a chapter that focuses on

14 the criminalization of unlawful entry and re-entry into

15 the United States.  That, too, was published by a peer

16 reviewed academic press, University of North Carolina.

17 And it won multiple prizes, which is you can think of

18 that as another form of peer review.

19 BY MS. GORMAN:

20    Q.  So, and to be specific, you hold an endowed chair

21 currently at UCLA, is that correct?

22    A.  Sure.  I hold the Tom Lifka Endowed Chair in

23 history at UCLA.  I was also awarded a MacArthur Genius

24 Fellowship for my historical and contemporary work.

25 And I sit on the Pulitzer Prize Board as the historian.

1    Q.   Thank you, Professor Hernandez.

2         And Professor Hernandez, I know this is probably

3    an obvious question, but are you familiar with the

4    Declaration that was drafted in connection with this

5    case by you?

6    A.   Yes.  That Declaration is based on my work from

7    *Migra* and *City of Inmates*.

8    Q.   And can you, additionally, and to the best of

9    your knowledge, is everything that you presented in

10   that Declaration true and correct, to the best of your

11   knowledge?

12   A.   To the best of my knowledge, yes.

13   Q.   And in terms of additional, sort of, credentials,

14   do you attend any academic conferences, present

15   comments, chair panels, and -- in the department of

16   history or regarding immigration law enforcement?

17   A.   Sure.  I'm quite active in the scholarly circles

18   around immigration, so I attend the Western Historical

19   Association meeting regularly, the Organization of

20   American Historians' annual meeting regularly.  I'm an

21   elected member of the Society of American Historians.

22   I've been a member of the Immigration and Ethnic History

23   Society.  I regularly present at universities across the

24   country on this topic and subject, and regularly engage

25   with my colleagues across the country, and in Mexico

1    and around the world, on immigration and policing.

2        Q.   Thank you, Professor Lytle Hernandez.

3            And then just sort of briefly -- I will focus

4    your testimony on the events leading up to 1929 -- but

5    can you explain to the Court your understanding how

6    the 1929 Act is connected to the Section 1326 offense

7    at issue in this case?

8        A.   Sure.

9            So it's my understanding that the 1929 Act

10   is the very first time that Congress criminalized

11   unauthorized entry and re-entry, post-deportation, into

12   the United States.  And, that the basic framework of

13   that statute carries forward into 1952 and beyond.

14       Q.   Thank you.

15           And I just want to get into the historical

16   sweep leading up to this 1929 piece of legislation,

17   so can you give me just a summary timeline of the

18   developments in U.S. Mexico relation, just the

19   historical developments in immigration policy in

20   the late 19th and early 20th century preceding the

21   1929 Act?

22               THE COURT:  I'm going to intervene for

23   a moment, Ms. Gorman.

24               Because you're presenting Professor

25   Hernandez as an expert witness, do you want the Court

1    to certify her as an expert in any particular area?

2              MS. GORMAN:  Oh.  Sorry.  Yes, Your Honor.

3    And I skipped over that part.

4              Would this court certify Professor Lytle

5    Hernandez specifically as a historian, but as an

6    expert in history, with particular expertise in

7    criminalization, and the criminalization of migration?

8              THE COURT:  Does the government have any

9    objection?

10             MR. WALKINGSHAW:  Your Honor, we have no

11   objection to Professor Hernandez being certified as an

12   expert in the history of immigration or the history of

13   border -- border immigration enforcement.

14             If I recall correctly, I believe there

15   was, uh -- she said a chapter in her book City of

16   Inmates dealt with the criminalization of immigration.

17   And I believe the Court is the expert in the law and its

18   history, so we would ask that the Court sort of -- I

19   think that designation would not be appropriate, but

20   that a slightly different one would be.

21             THE COURT:  I'm sorry.  I'm trying to

22   understand what is the objection to Professor

23   Hernandez's expertise.

24             So Ms. Gorman asked the Court certify

25   Professor Hernandez as an expert in history, with a

1     particular emphasis on criminalization of immigration

2     and -- well, I think that's where she ended it.

3              MR. WALKINGSHAW:  Yes.

4              THE COURT:  And what's your objection?  Do

5     you object that Professor Hernandez does not have this

6     expertise?

7              MR. WALKINGSHAW:  I believe it would be

8     more appropriately characterized as an expertise in

9     the history of border enforcements, immigration

10     enforcements, immigration.  But criminal -- I didn't

11     really catch criminalization of immigration in the

12     discussion that was had.

13              MS. GORMAN:  Your Honor, it may be easier to

14     ask Professor Hernandez where -- where are your areas of

15     expertise, particularly as a historian?  Where have you

16     emphasized your work?

17              THE WITNESS:  Sure.

18              So I often describe myself as a historian

19     of race, immigration, and police and incarceration in

20     the United States.  More broadly, I have spent most

21     of my 15, 20 years as a professional scholar looking

22     really deeply at the intersection between immigration

23     control and the criminal justice system.

24              MS. GORMAN:  So, Your Honor, I think

25     that maybe Professor Lytle Hernandez description of

```
 1    her own expertise might be a more appropriate basis
 2    for the Court to certify Professor Lytle Hernandez as
 3    an expert, rather than my characterization.
 4              THE COURT:  Well, for the purposes of
 5    the hearing that's going to be presented -- so, of
 6    course, Professor Hernandez seems to have a wide area
 7    of expertise.  I want to focus on the area at issue
 8    here.
 9              So, which of her characterizations as to
10    her expertise would you want the Court to certify,
11    Ms. Gorman?
12              MS. GORMAN:  And I think Professor Lytle
13    Hernandez said it perfectly, when she talked about the
14    history in terms of race, policing, and immigration
15    because those are the three facets that are at issue
16    in this case.  And immigration, of course, I think would
17    have to include migration, and so -- but I think that
18    is encompassed, at least, by the word "immigration."
19              MR. WALKINGSHAW:  Yeah, that's fine with the
20    government, Your Honor.
21              THE COURT:  All right.
22              What's the request again, Ms. Gorman?
23              MS. GORMAN:  I think the Court can tether
24    the expertise of Professor Lytle Hernandez to her
25    areas of expertise, specifically with respect to
```

1    race, policing, and immigration.  And that would

2    encompass border enforcement.  I'm using "policing"

3    very broadly.

4            THE COURT:  So is the request that the

5    Court certify Professor Hernandez as an expert in the

6    history -- in history, with a particular emphasis

7    between the intersection between race, policing, and

8    immigration?

9            MS. GORMAN:  Correct, Your Honor.

10           THE COURT:  All right.  The request is

11   granted and the Court will so certify.

12   BY MS. GORMAN:

13     Q.  Professor Lytle Hernandez, can you give this

14   court just a historical sweep leading up to this

15   legislative enactment in 1929?  So, a summary of

16   the timeline and developments in immigration and

17   immigration policy between the late 19th and early

18   20th century preceding the Act?

19     A.  Sure.  I'd be happy to.  That's a massive

20   question.  I will try --

21     Q.  Sorry.

22     A.  -- to keep my answer here around the issues of

23   how racial animus motivated the passes of immigration

24   law in the late 19th and early 20th century, leading up

25   to the 1924 Act in particular.

1      So, the federal government first began to take

2  the reigns of immigration control in the 1870s and there

3  were a variety of pressures at play during that time.

4  One of the most important ones was coming out of the

5  American west and California, with a concern about

6  the large number of Chinese immigrants who had arrived

7  in California during the Gold Rush and during the

8  construction of the transcontinental railroad.

9      White workers, white settlers in California

10 opposed the arrival of Chinese immigrants; and, more

11 important, the notion that Chinese immigrants would

12 remain permanently in the state and become Chinese

13 Americans.  And so it's really California that pushes

14 for the first set of racially targeted and explicit

15 immigration laws, which is the infamous Chinese

16 Exclusion Act of 1882, which banned the arrival of

17 Chinese laborers into the United States for 10 years.

18     That same year, Congress passes a series of

19 other restrictions that are, you know, much more

20 around contractors or prostitution.  And moving out

21 of the Chinese Exclusion Act, Congress passes a series

22 of exclusions targeting multiple populations; um,

23 epileptics, illiterates, people likely to become a

24 public charge, anarchists and so on.  But this

25 racial animus component remains a driving force in the

1   construction and implementation of immigration law, and

2   it hits a high fever pitch in 1917, around World War I,

3   where we passed the 1917 Immigration Act.  And that's

4   an important piece because it introduces the Asiatic Bar

5   Zone, which bans all persons of Asian origins from

6   entering the United States, and institutes a literacy

7   test for all people entering the United States.

8        Now, this is a nice comparison because the

9   Asiatic Bar Zone clearly racialized.  It's explicitly

10  racialized and it's born out of the Chinese exclusion

11  period.  But, the literacy test is inexplicitly

12  racialized.  It is developed and intended to keep

13  out southeastern -- southern and eastern Europeans,

14  in particular, who are presumed to be unable to pass

15  the literacy test.  So, there are two examples there

16  that are kind of implicit and explicit forms of

17  racialized control.

18       Then we head into the 1920s, where it becomes

19  even more intense, the racial animus.  The 1920s, in

20  the Declaration, is a moment in the United States that

21  people often refer to as the "Tribal Twenties;" that

22  Arianism is really at a high pitch.  Eugenics is a

23  very popular science of, quote, racial betterment.  And

24  this broader cultural environment pushes toward the

25  passage of the 1924 Immigration Act, which affirmed the

Asiatic Bar Zone, which introduces a new set of
quotas, national quotas, that effectively restrict
immigration to the United States from southern and
eastern Europe.

The thing that's interesting about the
national quotas is that they only apply to the Eastern
Hemisphere, and that an exemption was written in for
the Western Hemisphere immigrants.  And where that
exemption comes from is this debate that's happening
in the world of white supremacy in the United States;
that there are some folks who believe in, sort of, a
more ethno-racial for of white supremacy, that we only
want to have, sort of, a "whites only" nation.  And
those are the nativists.

And there's another set of folks who say, well,
we certainly want to have a white dominant society,
but we need marginalized non-white workers to come and
to go, to do the things that we don't want to do.

So scholars, like, Lisa Low, and others, talk
about this as there's the dualing sides of White
Supremacy, between the more capitalist and cultural
emphases of that initiative.

And so, um, after you get the passage of the
1924 legislation with restrictions on southern, eastern
Europe -- it's called a Nordic victory -- with the

1    Western Hemisphere exemption, you see a pretty rapid

2    turn to focusing on getting Mexican immigrants included

3    on the quota that system, or somehow restricted from

4    entering the United States.

5          And this is sort of the debate in the 1920s

6    that's circulating around Mexican immigration in

7    particular, that something leads us into the 1929

8    legislation.

9    Q.   Then talk to me about -- so the Western

10   Hemisphere is then exempted from this quota, and

11   you talked about the, sort of, American corporate

12   interests -- talk to me more about, I guess, how that

13   animated the legislative history that ultimately

14   resulted in illegal re-entry in 1929, or how that

15   tension manifested itself in that legislative history.

16   A.   Sure.

17         So after the passage of the 1924 law,

18   immediately, nativists and Congress begin to lobby

19   and to forward legislation to get Mexican immigrants,

20   in particular -- the Western Hemisphere in general,

21   but Mexican immigrants in particular -- added to the

22   national quota system.  There's two major pieces

23   of legislation, one in 1926 and one in 1928, that

24   proposed to do just this.  The debates in Congress are

25   intense.  Major employers and industries across the

1  person west go to Congress, hold hearings in protest

2  to adding Mexican immigrants to the quota.

3       Why?

4       At this moment, they're concerned that they

5  will be cut off from access to Mexican workers.  And

6  they want Mexican workers, yes, as laborers, but they

7  want Mexican workers as a particularly racialized

8  and marginalized and, understood, as a controllable

9  form, temporary form of labor.

10      And in the end, that lobby wins out and the

11  nativists are furious in Congress.  And Albert Johnson,

12  who is one of the leading members of Congress pushing

13  for immigration control and adding Mexicans to the quota

14  system, you know, by 1928, he just said, look, we're

15  not going to be able to get Mexicans added to the quota

16  system.  The debates have been too intense.  So, we're

17  going to have to pursue this through other means.  And

18  the next year you get the 1929 Act, which criminalizes

19  unauthorized entry and re-entry into the United States.

20      Now, I want to add something here.  This is

21  really important about how this scheme was developed

22  with Mexican immigrants, sort of, in mind as being the

23  primary targets of that legislation.  There were a

24  series of studies conducted by the Immigration Service

25  in the 1920s, which found or asserted that about half

1  of the Mexican immigrants who enter the United States

2  entered without authorization, if not more.

3      In 1928, the Department of State discourages

4  counselor officials, U.S. counselor officials in

5  the United States from issuing visas to Mexican

6  immigrants, so it becomes extraordinarily difficult

7  for Mexican immigrants, in particular workers, to get

8  a visa into the United States, around 1928 and 1929.

9      And by the late 1920s, the U.S. Border Patrol,

10  which had been established in 1924, had really recast

11  the popular image of the so-called, quote, illegal

12  immigrant.  In the late 19th century, that iconic

13  illegal was a Chinese immigrant.  Border Patrol

14  practice -- which if you want to get into, we can

15  certainly do -- shifted that notion.  So the people,

16  when they sort of conjured up the image of who was

17  undocumented, by the late 1920s, they would conjure

18  up an image of a Mexican immigrant.

19      All this comes together to create a logic of

20  the moment that, if we criminalized unauthorized entry

21  into the United States, we could be assured that the

22  bodies that are going to be delivered up are going

23  to be Mexican immigrants in particular, as opposed to

24  unauthorized immigrants in general.

25      Q.  When you talk about the desire to have a

1    temporary labor force, what is it about Mexican

2    migrants that makes them desirable as workers?  What

3    is -- I mean, is it there vulnerability?  Their -- I

4    mean, what -- is it stereotypes?  What is it about the

5    migrants from south of the border that makes them such

6    a desirable labor force, that you have such intense

7    tension between, I guess, the eugenics and corporate

8    interests?

9       A.   That's a good question.

10       I would say that there's nothing about them

11    in particular as human beings.  It's about the social

12    structure into which they're entering.  So by the

13    1920s you have, across the southwest, a social system

14    in place, a racialized subjugation system in place

15    that mirrors what's happening in the American South.

16       So what we know in the American south as the

17    Jim Crow system is becoming, in the southwest, what we

18    call the Juan Crow system, where Mexican children are

19    separated in the public school system; where Mexican

20    immigrants are unwelcome, and sometimes in explicit

21    forms, especially in Texas, not allowed to sit in

22    the restaurant, right, police systems across the

23    southwest disparately target Mexican immigrants, or

24    policing Mexican Americans as well.

25       So this Juan Crow regime, and you read it, I

1  believe, in the Declaration -- let me find the page

2  number for you -- uh, was something that the employers

3  believed in across the southwest as their mechanism for,

4  quote, we can and do control them.  So, it's the forms

5  of racialized subjugation that Mexican immigrants

6  enter into that makes them the desirable laboring

7  population.

8     Q.  So were Mexican immigrants, did they have any

9  sort of protections; or, did they have less protections

10  then, let's say, American citizens?

11     A.  Do you mean as sort of labor protections, formal

12  labor protection or -- could you clarify yourself.

13     Q.  Yes.

14     A.  Yeah.  Uh, no, they don't have any more

15  protections.  I mean, I would say that they are more

16  vulnerable to policing, whether it be local policing,

17  border patrol policing in particular.  Uh, that -- you

18  know, I think that would be my answer.

19     Q.  So you started talking about, I think, two

20  things.  One is, like, the ability to exclude.  And

21  one is the ability to control.  Is that, like, a fair,

22  accurate -- or sort of a fair representation of at least

23  your understanding?

24     A.  Yeah.  I like the way you put that.

25        So the nativists are looking to exclude.  The

1    agribusiness, the railroad, the employers across the

2    southwest, they're looking to control.  And they really

3    kind of -- they come to a compromise.  And one of the

4    things that's really interesting that happens in

5    the 1920s, is the employers are learning the power of

6    deportability.  And they say this expressly in the

7    Congressional Record, when they go to Congress, like,

8    uh, they're saying -- it's in the Declaration -- one

9    of the things we like about Mexican workers is that

10   they're, quote, deportable.  They won't stick around.

11   If we have trouble with them, we can always, you know,

12   pick them up and kick them out.

13        Agribusinees flips that and says, well, what

14   do you want us to do, invite African Americans or black

15   Puerto Ricans in the U.S. to do this work?  Well,

16   they're not deportable, and that's not the kind of

17   labor that we want.  They're not even -- we want to

18   make sure that they can be removed.

19        So there's, absolutely, an explicit dynamic of

20   racialized labor control that is happening during this

21   time period.

22   Q.   Then is it your opinion that the illegal re-entry

23   provision of the 1929 law was intended to target

24   Latinos?

25   A.   That is my professional opinion.  Yes.

1    Q.  And I know that I -- I don't want to go -- you

2  know, I understand your expertise is largely 1929, but

3  I also want to talk about did they have to accommodate

4  illegal re-entry or the criminalization of this

5  migration?  Do they have do anything, like build prisons

6  or jails or places to hold people?

7    A.  Well, the impact of this new legislation was

8  immediate.  And I write about this in my book City of

9  Inmates.  The number of prosecutions increase.  The

10  number of Mexican immigrants in particular being

11  imprisoned on this charge.  And that's in the Bureau

12  of Prisons annual reports, the attorney general annual

13  reports.  But, it's also in the Bureau of Prisons

14  internal correspondence records, where a lot of this

15  material is available.

16      And so they build three new prisons, largely to

17  accommodate the number of Mexican immigrants being

18  incarcerated on what would become 1326.

19      You know, it's really interesting -- and I

20  believe it's the Attorney General's annual report of

21  1930 -- they take a moment and pause and say, you know,

22  prior to 1929, we just had about a 1,000 prosecutions

23  per year.  Post-1929, immediately, we've got about 7,000

24  prosecutions this year.  And they write that is due to

25  the passage of the Immigration Act of March 4th, 1929.

1     And so they build a Latino prison, the Tucson

2   Prison Camp, which is outside of Tucson, and,

3   eventually, Terminal Island, outside of Los Angeles.

4   Largely motivated by the need to incarcerate people

5   on immigrations offenses.

6         THE COURT:  Ms. Gorman, would you -- I'm

7   going to intervene for one moment.  Give me one moment

8   to take a short break here.  I need to repair or to

9   fix a problem.

10         MS. GORMAN:  I'm going to stop my video

11   for a second because I'm getting sounds from my son's

12   room.

13         THE COURT:  All right.  Thank you, counsel.

14         MS. GORMAN:  Sorry, Your Honor.  I don't

15   know if anyone could hear, but I could hear my son.

16   He's in school.

17         THE COURT:  I'm ready to resume then, if

18   you are.

19         MS. GORMAN:  Well, unless this court has

20   specific questions for Professor Lytle Hernandez, you

21   know, I can pass this witness.

22         THE COURT:  I'm sorry.  What was the

23   question?

24         MS. GORMAN:  I said unless the Court -- and

25   I wanted -- and I meant to say this at the beginning,

1  that the Court should feel free to interrupt me because

2  I think what's relevant is also what the Court wants

3  to consider in this hearing.  But unless the Court has

4  additional questions for Professor Lytle Hernandez, I

5  would pass the witness.

6            THE COURT:  All right.  Thank you.  I do

7  not.

8            Mr. Walkingshaw.

9            MR. WALKINGSHAW:  May I proceed?

10            THE COURT:  Yes.

11            MR. WALKINGSHAW:  Thank you, Your Honor.

12                  **CROSS-EXAMINATION**

13  BY MR. WALKINGSHAW:

14     Q.  Good morning, Professor.

15     A.  Good morning.

16     Q.  And I apologize, I've heard it both ways.  Do you

17  prefer Professor Lytle Hernandez or Professor Hernandez?

18     A.  Lytle Hernandez, please.

19     Q.  It's not everyday that I get to speak with a

20  MacArthur Genius, so I want to make sure I get it

21  right.

22            So are you familiar with the motion that's been

23  filed in this case?

24     A.  Yes.

25     Q.  And it cites your work in a number of places,

1  correct?

2      A.  I believe so.

3      Q.  Both Migra, and your book, City of Inmates.

4      A.  I believe so.

5      Q.  Yeah.  So -- and you referenced a little bit

6  ago the Attorney General reports regarding enforcement

7  post-1929, correct?

8      A.  Correct.

9      Q.  Okay.

10         So I'd like to ask you about a few things related

11  to that.  In -- in the motion, it quotes your work as

12  saying:  "Within a year of the 1929 law's passage, the

13  government had prosecuted 7,001 border crossing crimes.

14  By 1939, that number rose to over 44,000."

15         You were speaking about that a bit ago, correct?

16      A.  Correct.

17      Q.  So that statistic you cite, what does "border

18  crossing crimes" mean?  Is there a particular statute?

19  Is it divided up?  Uh --

20      A.  Yeah.  It's described in the record, especially

21  in the annual reports, as Immigration Act crimes.

22  That's sort of the quote.  When you look more deeply

23  into the narrative of the annual reports -- for example,

24  I cited the 1930 annual report in which it's attributed

25  -- that rise is attributed to the enforcement of the

1    Immigration Act of March 4, 1929.

2         And then also when you look really closely to the

3    Bureau of Prisons' records, it's clear that they're

4    talking about people who are arrested in prison for

5    unlawful re-entry in particular.

6         Q.   Okay.

7              And the decade between 1929 and 1939 largely

8    corresponds to the Great Depression, correct?

9         A.   That's correct.

10        Q.   And jobs in the United States were largely

11   understood to be scarce in this period, correct?

12        A.   Very correct.

13        Q.   And you've written in your book _Migra_, that:

14   "Mexican labor immigration surged with the massive

15   expansion of southwestern agribusiness in this period,"

16   correct?

17        A.   The surge happened during the 1920s.

18        Q.   Okay.  So -- and you've cited statistics in

19   that period suggesting that "border crossings undertaken

20   by Mexican nationals skyrocketed to over a million in

21   that decade."

22             Yes?

23        A.   During the 1920s; correct.

24        Q.   Yes.

25             And you stated in the past -- I believe as

1    recently as last week in another hearing -- "immigration

2    requires a push, a pull, and a process," correct?

3       A.   Correct.

4       Q.   Can you explain a little bit what you mean by

5    that?

6       A.   Sure.

7       Well, this is established in immigration theory

8    that you need a reason why people want to leave their

9    homes, right?  That's a pretty deep and profound need

10    to leave your home.  And that could be many things.  It

11    could be war or violence or it could be the need for

12    labor.  Um, it could be a family needs to reconnect with

13    someone who has left.  The needs could be many.  That

14    push can come from many factors.

15       A pull factor is why do you choose to go where

16    you go?  And a pull factor can be your family is in

17    this other place or better jobs are in that other place

18    or safety and security seems to be in that other place.

19    Those are all kind of pull factors.

20       The other piece that's really important that, you

21    know, the last, really, 20, 30 years, that migration

22    scholars have taken a more closer look at is that

23    process piece, right?  There has to be some way for

24    you to get from point A to point B, so that you'll

25    go there.  And during this time period for Mexican

1 immigrants, that process was largely the railroad,

2 right, which had been built by U.S. investors in Mexico.

3 It could also be by foot, but, largely, the railroad

4 played a big role.

5     Q.  Okay.  So fair to say in this period the -- as

6 far as Mexican labor immigrants went, the push from

7 Mexico would be a dearth of economic opportunity,

8 correct?

9     A.  Yes.

10     Q.  And then a pull from the United States would be

11 a severer economic opportunity, correct?

12     A.  Yeah.  That's correct.

13       And I would frame that as a more integrated

14 story, in the sense that what creates the push factors

15 in Mexico is the increasing integration of the U.S.

16 in Mexican economies that begins, um, late 19th century,

17 but it really escalates as you move into 1910, the

18 1920s, and continued, even, into the 1930s.

19       And so it's the rise of U.S. investment in

20 Mexico, with the railroads and the mines and cotton

21 and whatnot, that displaces a rural population, forces

22 them to find work which is insufficient and which has

23 segregated, uh, protocols, even within Mexico, according

24 to, sort of, U.S. Gemco (phonetic) law.  And then people

25 begin to take those railroads north.  And, they're often

1  invited into the United States by labor recruiters.

2      Q.  And they're looking for jobs, correct?

3      A.  Yes.  Certainly.

4      Q.  Yeah.  And it's fair to say that this pull,

5  this looking for jobs is the trend that remained a

6  factor driving labor migration from Mexico to the

7  United States in the decades following the 1920s,

8  correct?

9      A.  That is correct.

10     Q.  Okay.

11         In fact, undocumented immigration also rose

12  during the 1940s, correct?

13     A.  That's correct, alongside the Bracero program.

14     Q.  Right.

15         And workers in America who competed with these

16  immigrants for jobs, typically, opposed this migration,

17  correct?

18     A.  Yeah, until the 1970s, labor option was opposed

19  to immigrate in general.

20     Q.  And you wrote in your book Migra, specifically,

21  "Leaders of the Mexican American middle class --" so

22  these are people of Mexican descent, who are American

23  citizens "-- in the 1950s, supported aggressive

24  immigration enforcement," correct?

25     A.  Yeah.  I mean, that goes back to the 1920s.

1    Certainly, you see that at politics and in place.

2       Q.   And one of the reasons they did that I believe

3    you wrote in <u>Migra</u>, is because they thought that

4    increased border enforcement would improve job security

5    and living conditions for Mexican-American workers,

6    correct?

7       A.   Yeah.   There was a notion that there was a, sort

8    of, zero sum game of jobs, right, and that people of

9    Mexican descent, largely because of segregation in the

10   United States and because of that racial subrogation,

11   gave this notion that Mexican-origin folks had to fight

12   for the same jobs as to opposed to having all jobs open

13   to them, and that certainly helped to create this notion

14   that they were in competition with each other.

15        There was this really great labor organizer -- I

16   know.   I'm getting a little off-topic -- named Ernesto

17   Galarza during this time period.   He tested that.

18      Q.   Thank you.

19        Although fair to say that this hostility to

20   labor competition isn't unique to the Mexican-American

21   community in spirit, correct?

22      A.   Correct.

23      Q.   Right.

24        It's generally people who, who believe that

25   Mexican immigrant laborers might compete with them

1  for jobs, typically, are hostile to that proposition.

2  Yeah?

3     A.  It -- this is correct.  It's more complicated.

4       Of course there's another side to the story,

5  that there's an emerging immigrant right to movement.

6  There's an emerging analysis about what's the connection

7  between why Mexican immigrants leave Mexico, and why

8  they come to the United States, and that we're all,

9  actually, part of the same economic system, as opposed

10  to on, sort of, separate sides; when people need to go

11  back to their place.  It's all the same place.  It's all

12  the same economic system.

13     Q.  Turning to some other maybe drivers of

14  enforcement, you also wrote in Migra, you went down

15  to the archive in Mexico and you learned, uh, that

16  there was a Mexican Department of Migration that started

17  in, I believe, 1926, correct?

18     A.  That's correct.

19     Q.  And this is actually a bit of a surprise to

20  you at the time, if I'm not mistaken.  It was something

21  you didn't know about before -- other story -- and I

22  apologize.  You're not -- and I'm kind of rambling on --

23  but it was something that you didn't know prior to your

24  trip to Mexico, correct?

25     A.  Well, I went there because I'd seen in the

1    archive little hints that that might be the case.  And

2    I was persistent because I'd seen those things.

3         But, yes, that was relatively new to me.

4    Q.  All right.

5         And this Department of Mexican migration,

6    its focus was trying to prevent Mexican workers from

7    illegally crossing into the U.S., right?

8    A.  From crossing, period, largely, there was a

9    strong opposition.  For Mexican national reasons, you

10   know, concerns about how Mexican immigrants were treated

11   north of the border.  There were concerns by Mexican

12   employers, or U.S. employers in Mexico, about losing

13   access to labor.

14        Those are, sort of, the general politics of that

15   time period.

16   Q.  But if the U.S. Border Patrol can be understood

17   as serving a function to keep outsiders out, the Mexican

18   Department of Migration's function was to keep Mexicans

19   in, correct?

20   A.  I think this comes back to how we understand

21   the inside and the outside, right?

22        So you have like a -- also in Migra, Ernesto

23   Galarza, and others, who are really thinking about --

24   and you have to understand the importance of Mexico in

25   the rise of the United States economy in the late

1    19th and through the 20th century; that these are

2    conjoined initiatives, economies, and so there is no

3    inside/outside.  There is an increasingly integrated

4    space for a laborer.  And that critique is developing

5    and growing stronger across the 20th century.

6        Q.  All right.

7        But you did also write in <u>Migra</u>, did you not,

8    that Mexican officials, including the Department of --

9    the Mexican Department of Migration, they lobbied

10   the U.S. Department of State, the U.S. Immigration and

11   Nationalization Service, and the U.S. Border Patrol to

12   improve border patrol control this period, correct?

13       A.  That is correct.

14       Q.  And, to deport Mexican nationals who broke

15   U.S. and Mexican law by illegally entering, correct?

16       A.  Yeah.  They wanted to control the flow, as well,

17   of Mexican immigrant laborers into the United States.

18   And if we're talking about the 1940s, that's where the

19   Bracero program comes from, is this bi-, trilateral

20   set of agreements about controlling the flow of

21   migrants.

22       Q.  All right.

23       And so fair to say that, in part, border

24   enforcement decisions or control of migration across

25   the southern U.S. border at this time was also impacted

1    by foreign policy?

2       A.   Foreign policy, certainly, is a player in this.

3            And I also go to, you know, lengths in Migra to

4    talk about the power relationship between the United

5    States and Mexico; that Mexico is a junior partner in

6    this partnership, and that they're not dictating, by

7    any means, to the United States Government about how

8    this is going to go.  Rather, the United States

9    Government is receptive because it's aligned with

10   their political, cultural interests.

11      Q.   Although you also write in Migra, do you not,

12   that in 1943 -- you mentioned a little ago the Bracero

13   program, which is a program through which Mexican

14   immigrant laborers can receive legal status in the

15   U.S. to work, correct?

16      A.   Yeah.  They're short term contracts, usually

17   six months.

18      Q.   So is it not true that in 1943, the Mexican

19   Embassy in Washington D.C., warned the U.S. Department

20   of State that if control was not established over

21   illegal immigration into the U.S., that Mexico would

22   cut off the Bracero program?

23      A.   This is true.

24      Q.   Okay.

25           Now it's also true that in the early years of

1      the -- well, actually, I beg your pardon.  Let me take

2      a brief step back.

3           Let's talk about the Bracero program for a

4      moment, if we could --

5                MS. GORMAN:  Your Honor, just to be

6      clear, I tried as much as possible to streamline the

7      presentation given our limitation and how, sort of,

8      Professor Lytle Hernandez focused on the periods leading

9      up to the periods of 1929.  So this is -- I mean, it's

10     up to Court whether to permit this line of inquiry, but

11     it is, certainly, beyond the scope of the direct.

12               MR. WALKINGSHAW:  With respect, Your Honor,

13     I believe there was commentary about enforcement

14     patterns following the passage of the 1929 laws act.

15     I think it's only fair that we inquire into some of the

16     other driving factors.  Obviously, racial animus has

17     been discussed in Professor Lytle Hernandez's testimony.

18     It's a complicated story.  I think the other factors

19     should -- are fairly discussed and are within the scope

20     of cross.

21               THE COURT:  Because Ms. Gorman's direct

22     examination did touch on enforcement, I'm going

23     to permit the government to explore the area of

24     enforcement.

25               Even if what was touched upon was brief, I

1  want, as I indicated earlier, to have a thorough record.

2  And I want to have the government be able to examine

3  the expert witness as well, not just with the scope

4  presented today, but with the scope of the content of

5  the Declaration that's been offered in support of the

6  motion.

7          So to the extent there's an objection, I

8  overrule the objection.

9          Mr. Walkingshaw, you want to repeat your

10  question?

11          MR. WALKINGSHAW:  Certainly.

12          Um -- might withdraw the question and start

13  anew, if that's all right, Your Honor.

14          THE COURT:  It is your question.  You may

15  rephrase if you would like or withdraw if you like.

16          MR. WALKINGSHAW:  Yeah.  I have a hard time

17  summing up what I said before.

18  BY MR. WALKINGSHAW:

19  Q.  Professor Lytle Hernandez, the Bracero program

20  that we discussed, started in 1942, correct?

21  A.  Right.

22  Q.  That was extended in 1951?

23  A.  Correct.

24  Q.  It ran until 1964, correct?

25  A.  Correct.

1    Q.  So the start of the Bracero program happened

2    roughly around the onset of World War II, correct?

3    A.  Yes.  Post-U.S. entry into the war.

4    Q.  Right.

5        And you wrote in <u>Migra</u> that this triggered

6    increased national security and geopolitical concerns,

7    given that the U.S. shared a 2000-mile border with

8    Mexico, correct?

9    A.  Correct.

10   Q.  And you wrote that the U.S. State Department put

11   pressure on the INS and Border Patrol to close the door

12   to undocumented migrants during this time, correct?

13   A.  Correct.

14   Q.  In part, because of the national security concern

15   presented by having a forced border during the world

16   war, correct?

17   A.  In part, yeah.

18   Q.  Yeah.

19   A.  Also, you know, to keep Mexico, you know, a solid

20   partner during this time period.

21   Q.  So, again, foreign policy concerns, in part,

22   correct?

23   A.  (No response.)

24   Q.  Now you also talked about how there's an

25   integrated system going on here, correct?

1    A.  The economy we're talking about?

2    Q.  Yes.  I apologize.  I suppose that's a bit

3 vague.

4     But the enforcement of a border control between

5 the U.S. and Mexico, that was also something in the

6 integrated system, incorporating institutions from the

7 United States, and institution from Mexico, correct?

8    A.  Yeah.  From the 1940s and '50s, you see

9 increasing integration in immigration control.

10    Q.  Right.  The U.S. Border Patrol and the Mexican

11 Department of Migration, they worked together during

12 this period.  Yes?

13    A.  Yes.  Uh-huh.

14    Q.  Okay.

15     Now, is it correct you wrote this in Migra

16 that: "By the late 1940s, one-third of all

17 apprehensions were of repeat offenders who had

18 previously been deported," correct?

19    A.  That's correct.

20    Q.  And some were repeat offenders who had been

21 apprehended and deported several times in a year,

22 correct?

23    A.  That's correct.

24    Q.  And others had been apprehended and deported

25 several times in a day, correct?

1    A.  Correct.

2    Q.  Is it correct in this period that the Border

3  Patrol tried all different kinds of strategies to deter

4  repeat offenders from returning?

5    A.  Yes.  That's correct.

6    Q.  All right.

7       They tried detention?

8    A.  (Nodding head affirmatively.)

9       Yeah.

10    Q.  And you have to -- thank you.

11       Just for the benefit of the court reporter, if

12  you could respond orally -- although I am going to go

13  through a list, so I could understand why you started

14  nodding.

15       But, uh, they do bus lifts?

16    A.  Correct.

17    Q.  They did boat lifts?

18    A.  Yes.  All this was happening integration.

19    Q.  They erected fences?

20    A.  Correct.

21    Q.  And they even took unsanctioned actions, like

22  shaving repeat offenders' heads, correct?

23    A.  Yes.

24    Q.  Uh, but border patrol officers would still find

25  previously deported migrants, even after going through

1  some of these procedures, correct?

2     A.  That is correct.

3        I mean, all of this activity is happening, you

4  know, I would argue, uh, yes, within foreign relations,

5  with an (unintelligible) of foreign relations, with an

6  integrated economy, around labor concerns, concerns

7  about what's emerging as the Cold War.

8        Racial animus is also at play.  There is no way

9  in which we can understand the politics of head shaving

10 as something that would have been tolerable for other

11 than Mexican immigrants in this time period.  And the

12 involvement of the Mexican government does not mean

13 that rational animus is not at play.  Mexico has a long

14 and deep history of race and subrogation, especially for

15 indigenous folks.

16       So, the story of race transcends the border.

17    Q.  Thank you, Professor Hernandez.  I do appreciate

18 the analysis, although in the interest of time, with

19 respect, if you wouldn't mind answering my questions,

20 I think the analysis was put forth in your testimony.

21 And I know Ms. Gorman will be making these arguments

22 to the Court.

23       So just for purposes of today's proceeding, if

24 you wouldn't mind answering the questions that I put to

25 you, I think things will go a little faster -- although

1    I don't believe I have a ton more -- but can we agree

2    that that's fair?

3        A.  Well, I just want to be full in my answers, so --

4    everything is complicated, so yes/no is not always the

5    accurate answer.  So when I think that I need to give a

6    little bit more context, I would like to be able to do

7    that.

8        Q.  Okay.  Understood.

9            So there's another citation, and I believe it's

10   to your work from City of Inmates, in the motion.  It

11   refers to the same -- it, basically, immediately follows

12   the sentence we were discussing at the beginning of

13   cross-examination.

14           So, from 1929 to 1939, it says:  In each of these

15   years, individuals from Mexico comprise no fewer than

16   84 percent of those convicted, and often made up as many

17   as 99 percent of defendants for illegal, uh, for border

18   crossing crimes, correct?

19       A.  Correct.

20       Q.  Now, the majority of undocumented migrants in

21   this period crossing the Mexican border were Mexicans

22   at that time, correct?

23       A.  Certainly a substantial number.  I would also --

24   it's really important to understand the role that the

25   U.S. Border Patrol plays in identifying and arresting

 1   people.  So this is why telling that law with the

 2   (unintelligible) Border Patrol is really, really

 3   significant, and why they came to focus on Mexican

 4   immigrants.

 5        So the 1924 Immigration Act, which dominates

 6   immigration control between 1924 and to 1965, really,

 7   there is a plethora of possibilities for immigration

 8   law enforcement, right?  People likely to become public

 9   charges.  People engaged in prostitution.  There's

10   lots of things that they could do.  But because of the

11   cultural and political dynamics of the establishment of

12   the Border Patrol, and who was hired as Border Patrol

13   officer, and where they worked, they made a set of,

14   sort of, granular decisions, at the local and regional

15   level, that shifted away from broad enforcement of the

16   immigration law, and all the possibilities, and targeted

17   their attention on Mexican immigrants.  This is the way

18   that they built power for themselves as immigration law

19   enforcement officers.

20        So, this is important because how you get from

21   a notion of all these different people crossing the

22   border -- people with trachoma who were kept out, people

23   likely to become public charges -- to just largely

24   Mexicans being delivered up as the undocumented, being

25   delivered up as the people who are arrested and

 1   imprisoned, that happens in the -- in the sort of

 2   vestibule of immigration law enforcement.  So, it's

 3   really, really important to see that how you go from

 4   law to law enforcement, to who gets imprisoned, happens

 5   at that juncture.

 6       Q.  Okay.  Thank you, Professor.

 7           I do want to make sure that my question did get

 8   answered.  The question is, yes, a substantial majority,

 9   they were Mexicans, correct?

10       A.  Well, a substantial number.  Right?

11       Q.  Okay.

12       A.  So you're talking about what we don't know about

13   unauthorized immigrants.

14       Q.  Okay.

15       A.  There's -- certainly, we don't know the number,

16   so "majority" is tough.  "Substantial number," certainly

17   is true.

18       Q.  Okay.

19           Now, you were speaking a little bit ago about

20   enforcement priorities.  Isn't it correct, as you

21   wrote in Migra, that by the mid to late 1930s, the

22   U.S./Mexico border was not the epicenter of border

23   control activity, correct?

24       A.  Yeah, it wasn't as early as the 1920s.  That

25   increases over time.

1    Q.  And by the point of the mid/late 1930s, there

2    were more officers on the U.S./Canadian border, than in

3    the U.S./ Mexico border, correct?

4    A.  Yeah.  That border is longer.  So when the

5    border was started, there were even more officers or

6    allocations for the northern border.  Slowly, for the

7    vast reasons I was just discussing about, sort of,

8    border patrol force in the U.S./Mexico border region,

9    that shifts allocations to the southern border, and

10   that that really ampli -- ramps up during World War II.

11   Q.  Now, roughly, in this same period, I believe

12   in Migra, you cite that mid 1920s, "80 to 95 percent

13   of California's laborers were people of Mexican origin,"

14   correct?

15   A.  Of the working class, right, of --

16   Q.  The laborers -- I beg your pardon.  I didn't mean

17   to interrupt you.

18        But the laborers -- yeah, so the working class.

19   Laborers, roughly, to use equivalent terms?

20   A.  Well, I mean, laborers could be highly skilled

21   laborers.  It's a general term.  But, certainly, the

22   agricultural workforces, street workers, all of that.

23   Yes, Mexicans are a substantial portion of that.

24   Q.  And during this same period, I believe you wrote

25   that 80 to 98 percent of Texas' working class were

1   Mexican, correct?

2       A.  Of the low wage workforce, yes.

3       Q.  Right.

4           And, again -- I believe we discussed before -- a

5   substantial pull for these people, these working class

6   people, is increased economic opportunity, correct?

7       A.  Jobs.  Yes.

8       Q.  Exactly.

9           Now, I believe you also wrote in <u>Migra</u>, so you

10  would agree then, that at least in the 1930s, when

11  prosecution for entry crimes increased, the fines and

12  incarceration that were imposed, uh, diminished the

13  basic pecuniary function of labor immigration, correct?

14      A.  Yeah.

15      Q.  If you get fined, you lose your money, correct?

16      A.  If you get fined, you lose your money.  If you

17  go to prison, you can't work.

18      Q.  Right.  So criminal penalties served as

19  a deterrent to some folks seeking these labor

20  opportunities, correct?

21      A.  It served as a deterrent in its actual form, but

22  it also served as a mechanism of making Mexican laborers

23  more vulnerable.  Right?  Because of the way the law was

24  racially enforced, Mexicans were more vulnerable to

25  arrest.  And so it's a tool that agribusiness,

1    especially during this 1930s period, is using in

2    conjunction with border patrol officers, to make

3    sure that Mexican workers remain temporary, so-called,

4    quote, docile, um, and controlled.

5        Q.  Yeah.

6            You testified on direct about a social structure

7    that rose up.

8        A.  Juan Crow.

9        Q.  Yes.

10           And I believe you said it made these workers

11   more desirable for certain kind of employers, correct?

12       A.  Yeah.  It was a racialized form of social

13   hierarchy that's known in the American south as

14   Jim Crow, in the America southwest is Juan Crow --

15       Q.  Right?

16       A.  -- and that's what creates them as a marginalized

17   workforce.  Yes.

18       Q.  Right.

19           You said that the undocumented status of

20   these folks allows them to be subject to increased

21   control by their employers, correct?

22       A.  Well, there's the racialized system, right,

23   which is that Juan Crow.  And then undocumented status

24   accentuates that, and I would say that the threat of

25   imprisonment only deepens that marginalization.

1    Q.  Right.

2       I believe you testified in the past that, you

3  know, for folks who are undocumented, there's always the

4  threat, "We can just call the Border Patrol," correct?

5    A.  That's correct.

6    Q.  It's a threat that can be made against these

7  people?

8    A.  Correct.

9    Q.  And, in effect, it makes them more exploitable,

10  correct?

11    A.  Correct.

12    Q.  You can pay them lower wages, correct?

13    A.  Yeah.

14    Q.  You could submit them to, uh, working conditions

15  that wouldn't be accepted, or might even be illegal in

16  terms of standards put forth for people with status,

17  correct?

18    A.  Yeah.  So, there's status and non-status.  But,

19  again, we have to understand all this -- and Migra goes

20  into this in depth, and so does City of Inmates -- that

21  that's a racialized concept of who is undocumented by

22  this time period, and who gets policed, who that threat

23  is meaningful for, is a racialized situation and scheme.

24    Q.  But as you just said, Professor, isn't it correct

25  that undocumented status for some of these people

1   accentuates that threat?

2       A.  Undocumented status, certainly.  The fact,

3   though, is also that that status has deeper meaning

4   for people who are more vulnerable to the enforcement.

5       Q.  And folks who are undocumented are necessarily

6   more vulnerable to enforcement, are they not, Professor?

7       A.  Racialized workers who are the targets of

8   policing are the most vulnerable to enforcement per

9   immigration law.

10      Q.  With respect, Professor, the answer to my

11  question is yes; undocumented people are more vulnerable

12  to these kinds of enforcement?

13      A.  Only within a racialized context.

14      Q.  So you do not agree that, um, in a context such

15  as, uh -- Canadian workers, for example.  The Canadian

16  worker, without -- in the U.S. illegally, without any

17  kind of status, you do not agree -- and let's say for

18  purposes of the example, that this person was white.

19  The person is not more vulnerable than a similarly

20  situated Canadian white worker who has a visa?

21      A.  Uh, that is certainly the case.

22          In addition to that, their sense of vulnerability

23  is deeply impacted by the likelihood of them being

24  targeted for arrest, of them being brought to the

25  consequences of that status.

1    Q.  Okay.

2         MR. WALKINGSHAW: I have no further

3    questions.

4         Thank you, Professor Lytle Hernandez, for

5    your testimony today.

6         I'll pass the witness.

7         THE COURT:  Ms. Gorman.

8         THE WITNESS:  You're welcome.

9                **REDIRECT EXAMINATION**

10   BY MS. GORMAN:

11   Q.  Professor Lytle Hernandez, I think there were so

12   many important points to hit on and I want to use your

13   time as wisely as possible, but one of the interesting,

14   sort of, differences that the government brought up was

15   related to Canada.

16        So, can you talk a little bit about the

17   differences between the treatment of Canadians, both

18   legally, like, you know, in terms of visa overstaying

19   or regularizing status, and people south of the border.

20   So, generally, Mexican people or Latinos?

21   A.   Yeah.  So there's scholar historian named

22   Mae Ngai, who has written a considerable amount on

23   this.  And one of the things that she helps us to

24   see and to understand is the development of something

25   that was called the Pre-examination program that was

1   available, I believe starting in late -- in the 1920s,

2   that people who did not have regular status or proper

3   paperwork, for whatever reason, could get pre-examined

4   in the United States, go back -- go to Canada, and then

5   re-enter legally into the United States.

6           So this is a scheme that's only available in

7   Canada, which is sort of setup for people who are -- for

8   immigrants who are close to the Canadian border, have

9   access to the Canadian border.  And, you know, largely,

10  it was European immigrants that crossed through Canada

11  who had access to the Pre-examination program.

12          So that's one example of how regularization

13  was made available to, disproportionately, European

14  immigrants.

15     Q.  And what were the differences in terms of

16  Mexico for -- what would be the analogous situation

17  in Mexico that was or was not available to those

18  individuals?

19     A.  There was no pre-examination process that was

20  available in Mexico or through Mexico.  And again, as

21  I had mentioned earlier, by 1928, consulate officials

22  in Mexico were systematically denying visas to Mexican

23  workers in particular.

24     Q.  So -- which actually brings up an interesting

25  point.

1      Did Congress ever decide to criminalize visa

2 overstaying?

3    A.  I am unaware of any such move.

4    Q.  But, Canadians did have access to visas that

5 Mexicans did not?

6    A.  It was not -- the Pre-examination program did not

7 have these national limits to it.  But, the way in which

8 it's set up, because you have to return to Canada to

9 cross, it meant that it was more available to people

10 who crossed the Canadian border as opposed to people who

11 crossed the Mexican border.

12    Q.  And a few times I noted you tried to provide a

13 racial context to some of the prosecutor's questions,

14 and I want you to be able to elaborate on that.

15      How do you, as a historian, suss out racial

16 animus, when you have so many competing interests,

17 right?  You have economic interests and foreign policy.

18 So, how do you conceptualize race?  And then how do

19 you suss out racial animus when you're studying this

20 issue?

21    A.  You know, that's a good question.  I mean, of

22 course, the world is always complicated and there are

23 many dynamics of play in any congressional decision.

24 Why is that, you know, I, as a scholar of race and

25 immigration policing, think that immigration law and

1   immigration control are highly racialized?

2       First, the entire body of scholarship of

3   immigration law, I'm within the mainstream of that

4   scholarship that's discussing, um, the rise of the

5   1924 Act and heading into the 1929.

6       Also, let's -- can I read you a couple things

7   from the, sort of, pre-1929 period about --

8   Q.  Sure.

9   A.  -- this distinction, from their own words, not

10  mine?

11      We can talk about racial capitalism and how

12  racial formation and class are always bound together.

13  That the way that you extract (unintelligible) from

14  people is by dehumanizing and subjugating, so that,

15  you know, that extra portion of profit comes through

16  that racialization process.  But, let's take the words

17  of a people who were passing immigration law themselves.

18      So, for example, we know eugenics was a primary

19  science that was utilized as we're heading into the

20  1924 Act, and the efforts to include Mexicans in the

21  quota.  After the 1924 Act, you get a Society of

22  America, which Howard Johnson was the President of

23  in the mid 1920s, and it issues a series of reports.

24  I want to read from a couple of those reports.

25      Why?

      1          Because they really hit on this issue of race

      2   versus the economy.

      3          So from a second report of the subcommittee on

      4   Selected Immigration of the Eugenics Committee of the

      5   United States of America, published by the Eugenics

      6   Society of America, quote:  "Immigration Act of 1924,

      7   established a new immigration policy.  It expressed

      8   the conviction of the American people that immigration

      9   is a long-time investment in family stocks, rather

     10   than a short term investment in productive labor.

     11   That is a question of future race character, and not

     12   primarily an economic problem."

     13          So, you know, this is the kind of thinking

     14   that the eugenicists were deploying as they were coming

     15   to develop the 1924 Act, the efforts to include Mexican

     16   immigrants on the quota system.  And when that failed,

     17   you have the development of the 1929 law.

     18   Q.  So -- and when you talk about race and when you

     19   talk about racial animus, how are you conceptualizing

     20   race as opposed to nationhood?

     21          So what is the -- so that was -- and that was the

     22   second part of my question.

     23          And I'm sorry.  I tend to ask compound questions

     24   and that's my problem.

     25   A.  Yeah.  I appreciate simple questions.  It's hard

1  to hold on to, like, multiple questions at a time.  So,

2  thank you for following up.

3      The concern, certainly during the 1920s, of

4  Mexican immigrants was not about a national concern.

5  The concern was about what was understood as non-white

6  immigrants coming from south of the U.S./Mexico border.

7      The way in which Mexicans were constructed as

8  racially undesirable, is that they were seen as being

9  majority indigenous, part black, mixed race; that they'd

10  be a threat to sort of the Nordic, particularly, of the

11  1924 legislation.

12      You know, James Davis, who was really, you know,

13  instrumental in the passage of the 1929 legislation.  He

14  was the Secretary of Labor and he worked very closely

15  with (unintelligible), I think the record is quite

16  clear was a ardent white supremacist.

17      James Davis commissioned a study in 1925 in

18  response to the 1924 Act, and he wrote -- or in that

19  study it's written, quote:  "In blood, the people of

20  the United States are mainly European and white.  In

21  blood, the people of Latin America and the West Indies

22  are mainly Asiatic.  And by that, they mean Indian or

23  African.  Mainly black or brown."

24      And it's that sort of notion about who is coming

25  from south of the border being, quote, unquote, the

1    sort of (unintelligible) Indian migration of history,

2    that makes Mexican immigrants seem racially unfit,

3    undesirable to the white population of the United

4    States.

5       Q.  And thank you.

6        You know, one thing I think you touched on, I

7    think, super briefly, was, um, there's a part of

8    history -- I will admit I knew nothing about before

9    this -- but sort of going into the 1920s, there were

10   certain, uh -- I think they were called the Juarez Riots

11   or the Bath Riots.

12       So there were -- there was this, sort of, system

13   at the border, sort of, going into the 1920s that, as I

14   understand it, people coming from south of the border

15   were subjected to, but north weren't.  And can you talk

16   a little bit more about that, or can you elaborate a

17   little bit more about that?

18       A.  Sure.

19       I mean, there's a scholar Alexandra Minna Stern,

20   who has written on this quite extensively on a the book

21   -- the book she has on Eugenics and Immigration, and

22   an article that she has on "Boundaries of Building and

23   Blood."  So, what happens is in 1917, U.S. Immigration

24   Service institutes a new process by which they're going

25   to quarantine and delouse all Mexican immigrants -- or

1   many Mexican immigrants crossing the U.S. and Mexico

2   border, that delousing consisted of, really, a kerosene

3   bath and a washing of the clothes, out of a fear that

4   they were going to bring Typhus fever into the United

5   States.  There was an uprising against this system, and

6   that's called the Juarez Riot, as you call it.  And,

7   yet, it continues through the 1920s, of the process of

8   sort of cleansing Mexican immigrants as they're entering

9   the United States.

10         People who had, sort of, border crossing cards

11  had to subject to these -- were subjected to these

12  weekly baths.  And people who were crossing to, you

13  know, go farther from the border were also subjected

14  on their way in.

15         And it's my understanding, uh, that, you know,

16  later on, some of the chemicals that were used in these

17  baths would become chemicals that were used, um, in the

18  genocidal campaigns in Nazi Germany.

19  Q.  And specifically the gas -- and I -- are you

20  referring to -- and I know I have it written down

21  somewhere -- but are you referring to the gas

22  specifically used in the gas chambers in Nazi Germany?

23  A.  I'm forgetting the title of the gas, but, yes.

24  Q.  Zyklon B.  Pardon me.  I had it written down

25  here somewhere.

1       So, is that what you're referring to is the gas

2  that was used in Nazi Germany?

3    A.  I am.  It just hurts so much to say that.

4       Uh, you know, Harry Laughlin, who was the

5  eugenics expert brought into Congress by Howard Johnson

6  in particular, uh, was heralded in Germany during the

7  1930s for the immigration laws and, um, studies.  And

8  there's a terribly close relationship between the two

9  regimes that developed.

10    Q.  All right.

11       And I notice you are -- I will give you a

12  moment because I, I didn't want to upset you with

13  that question.

14       But -- and so when we talk about the use of

15  this gas at the border, and the kerosene baths, um,

16  in addition, were individuals at the southern border

17  also required, including, you know, women and young

18  girls, to strip naked for inspection?

19    A.  That is correct.

20    Q.  And was anybody at the northern border, to your

21  understanding, ever subjected to this kind of, um,

22  treatment?

23    A.  No.

24       And, you know, the, the historical literature

25  is clear on this that about 99 percent of the people

1  who came through Ellis Island were allowed passage into

2  the United States, often with little more than, like,

3  an eye exam for trachoma.  And what was happening to

4  immigrants, mainly at the El Paso border, because that's

5  the main passage point on the southern border, and at

6  Angel Island in San Francisco, which is the main passage

7  point for Asian immigrants, were subjected to far

8  different procedures of immigration control than in

9  El Paso.

10          As you say, the delousing baths and the

11  quarantine were particularly harmful, enraging,

12  unhealthy to the point that, you know, they invited

13  the riots of 1917.

14      Q.  I believe there was a 17-year-old girl that

15  incited those riots.  Are you familiar with the name

16  Carmelita Torres?

17      A.  I know the case lightly.

18      Q.  Well, then I won't make you go into it.

19              MS. GORMAN:  And Your Honor, I would pass,

20  um -- I guess, ultimately, before I let you go, is it

21  your ultimate conclusion that racial animus was a strong

22  motivating -- motivating force in the passage of illegal

23  re-entry in 1929?

24              THE WITNESS:  Yes.  It is my professional

25  opinion that racial animus was a motivating factor, a

```
 1   significant motivating factor in the passage of the

 2   Immigration Act of March 4th of 1929.

 3              MS. GORMAN:  And is it your opinion that it

 4   continues to have a desperate impact on Latino or Latinx

 5   individuals?

 6              THE WITNESS:  It is my professional opinion

 7   that it was constructed to do just that, and that it

 8   continues to have a dispersate impact.  Yes.

 9              MS. GORMAN:  And are you aware of any

10   period, since 1929, when illegal re-entry has not been

11   on the books.

12              THE WITNESS:  I am not aware of any such

13   period.

14              MS. GORMAN:  Your Honor, I will pass the

15   witness.

16              MR. WALKINGSHAW:  Thank you.

17                    RECROSS EXAMINATION

18   BY MR. WALKINGSHAW:

19      Q.  Professor Hernandez, this will be as brief as I

20   can.

21              You testified on redirect that the opinion that

22   you just voiced is, I believe you used the phrase

23   "within the mainstream of immigration scholarship,"

24   is that correct?

25      A.  That racial animus was a driving factor in the
```

1  passage of immigration law, especially leading into

2  1924, and then the concerns, post-1924, around Mexican

3  immigration.  Yes.

4     Q.  So that opinion, you know, you testified is

5  within the mainstream of immigration scholarship,

6  correct?

7     A.  Yes.

8     Q.  And now you testified in a hearing in the

9  District of Oregon last week, correct?

10    A.  Correct.

11    Q.  At that hearing, uh, did you not say that, "in

12 the academy, you can always find differing opinions"?

13    A.  I, I don't recall saying that.  But, yes, I would

14 affirm that today.

15    Q.  It is true, correct?

16    A.  Of course.  Yes.

17    Q.  Yeah.

18       Then, briefly, we discussed, on redirect, some

19 differences between the enforcement at the Canadian

20 border and enforcement at the Mexican border.

21       Did Canada have anything remotely like the

22 Bracero program at any point in history?

23    A.  No.

24    Q.  Okay.  The Bracero program permitted -- I believe

25 you wrote in Migra -- two million Mexican laborers to

1    work illegally in the United States under the auspices

2    of the program, correct?

3        A.  Yes.  It also included West Indian laborers.

4    There's a strong sense of wanting to have, again,

5    non-white, racially marginalized populations included in

6    this workforce.  So, it wouldn't have been something

7    constituted for a majority white Canadian population.

8        The other distinction for the Canadian border

9    that's important is that under treaty rights, indigenous

10   folks, moving across the Canadian border, have free

11   passage.

12       Q.  All right.

13           And then just very briefly, I'd just like to make

14   sure I get some dates correctly.

15           I believe you said the Juarez Riot took place in

16   1917, is that correct?

17       A.  Uh-huh.

18       Q.  And the quotes that you wrote from the -- I'm

19   forgetting the term -- but the Eugenics Committee -- on

20   redirect, do you know the quotes I'm referring to?

21       A.  Yes.

22       Q.  Those are from 1920s, correct?

23       A.  Yes.  That's correct.

24       Q.  Okay.

25           MR. WALKINGSHAW:  Nothing further --

```
 1              THE WITNESS:  -- the 1924 Act.
 2              MR. WALKINGSHAW:  Nothing further.  Thank
 3   you.
 4              MS. GORMAN:    Your Honor --
 5                FURTHER REDIRECT EXAMINATION
 6   BY MS. GORMAN:
 7     Q.  Professor Hernandez, and I'll be brief because I
 8   know I want to touch on this with Professor Gonzalez
 9   O'Brien too, but in terms of the Bracero program, was
10   there -- can you talk to me about race and exploitation
11   in terms of that program; or, is that beyond the scope
12   of your -- I don't want to put you in a position where
13   you're talking, you know, where I'm asking you to talk
14   beyond the scope of your, you know, your specialization
15   or expertise.  So, feel free to turn me down.
16     A.  No.  That's fine.  I think, as Mr. Walkingshaw
17   has indicated, my book Migra, I spent a considerable
18   amount of time on the Bracero program.
19          So, first of all, you know, as I think I had just
20   mentioned, the fact that the bilateral agreements that
21   become known as the Bracero program are only effectuated
22   between the United States and Mexico and West Indian
23   countries, is one indication that there was a desire
24   to find a -- not just close, but a certain type of
25   population to come in and do this temporary labor.
```

1  So, non-white populations were targeted for these

2  agreements, and that was Mexico and the West Indies

3  in particular.  And so I think that that's one of the

4  key indicators of the dynamics at play, that it's not

5  just labor, it's a racialized labor form that people

6  wanted to have through the Bracero program.

7       You also have, just through the implementation

8  of the program -- you know, especially in Texas, but

9  elsewhere -- this constant struggle over how Mexican

10  Braceros are going to be treated in the communities.

11  Are they going to be given access to restaurants?

12  Are they going to be given access to dances?  And

13  pretty consistently, uh, they are subject to, uh,

14  Juan Crow.  And that becomes a real sticking point

15  in the relationship, the bilateral relationship, to

16  the point that, you know, that Texas is largely kicked

17  out of the program.

18  Q.  In terms of -- and in terms of the Bracero

19  program, you have talked, sort of, briefly, about the,

20  I guess what we would call delousing or the gassing that

21  had happened at the border going into the 1920s.  But,

22  are you aware of the Braceros being -- and this would

23  be a different chemical.  It would be DDT -- but sort of

24  being subjected to very similar nude inspections, um,

25  sort of being gassed with DDT during that process,

1  when they were, uh, brought to American, I guess,

2  agricultural industries?

3      A.   Yes.  The Bracero workers were gassed

4  systematically with DDT, and there's, you know, many

5  photos and studies on that process.

6      Q.  And subjected, also, to these nude and invasive

7  inspections?

8      A.  That is correct.

9      Q.  And when -- you know one of the, I guess,

10  more arresting images I've come across in the Bracero

11  was, sort of, inspections by agricultural, I guess, land

12  owners or farm owners, uh -- but Braceros, when they

13  were brought in to be used as migrant labor force,

14  was there -- were they able to, sort of, be picked for,

15  I guess, physical fitness, or the ability to toil well,

16  by American agricultural interests?

17      A.  Um, well, so that's certainly true.  There have

18  long been a stereotype at play that Mexican workers, as

19  a race, right, were fit for agricultural labor because

20  they were, I think, believed and thought, you know,

21  shorter to the ground and ready for stoop labor.

22        So, there's sort of a racialized (unintelligible)

23  of people's appearance to do this kind of work.  And,

24  you know, it's part of the reason -- you know, one of

25  the little trowels that Braceros were given to work

1  with, which forced them to sort of bend over constantly,

2  really, literally, broke backs, and became a really

3  important issue that people organized around.

4       You know, a lot of the reasons they were

5  given those trowels was the stereotype that they, as

6  a racial group, um, were more stout and close to the

7  ground and sort of fit for this kind of labor, and so

8  they didn't need the accoutrement that others did.

9   Q.  So -- and in terms of the Braceros, I guess

10 what little protections were afforded to them on paper,

11 did they -- were they generally violated by industry?

12  A.  Oh, I mean, that's where Operation Wetback

13 comes from in 1954, is the persistent violation of

14 the Bracero contracts.  In many ways, that's a campaign

15 that is simultaneously anti-Mexican, and meant to bend

16 employers to comply.

17  Q.  In your general opinion, were Braceros an

18 exploited labor force and racialized?

19  A.  Absolutely.

20      MS. GORMAN:  Your Honor, I think at this

21 point I would pass the witness.  I am worried about

22 going into too much overlap with Dr. Gonzalez O'Brien.

23      And Professor Lytle Hernandez has been

24 very generous with her time already, so I'll pass

25 the witness.

```
 1                    THE COURT:  Mr. Walkingshaw, do you have any
 2     additional questions based on the re-redirect?
 3                    MR. WALKINGSHAW:  No, Your Honor.  Thank
 4     you.
 5                    THE COURT:  All right.  Thank you.
 6                    Thank you, Professor Lytle Hernandez, for
 7     your time here this morning.
 8                    THE WITNESS:  Thank you for having me.
 9                    THE COURT:  Let's take a brief recess before
10     we resume with the next expert witness.
11                    THE CLERK:  Yes, Your Honor.
12                    THE COURT:  We'll take about 15 minutes.
13                    MR. WALKINGSHAW:  Beg your pardon, Your
14     Honor, how long should we -- I might excuse myself from
15     the room.
16                    THE COURT:  We'll take a 15-minute recess.
17                    MR. WALKINGSHAW:  All right.  Thank you,
18     Your Honor.
19                    (Recess taken.)
20                    THE CLERK:  Court is back in session.
21                    THE COURT:  All right.  Ms. Gorman, let's
22     resume with the defense's next witness.
23                    MS. GORMAN:  Your Honor, we call Professor
24     Gonzalez O'Brien.
25     \\\
```

```
 1                    BENJAMIN GONZALEZ O'BRIEN,
 2          called as a witness on behalf of the Defendant,
                     was sworn and testified as follows:
 3

 4                    THE CLERK:  Thank you.

 5                    Please state for the record your full name

 6    and spell both your first name and your last names.

 7                    THE WITNESS:  Benjamin Gonzalez O'Brien.

 8    Last names G-o-n-z-a-l-e-z; O, apostrophe, B-r-i-e-n.

 9    First name, B-e-n-j-a-m-i-n.

10                    MS. GORMAN:  May I, Your Honor?

11                    THE COURT:  Yes.

12                    MS. GORMAN:  Thank you.

13                        DIRECT EXAMINATION

14    BY MS. GORMAN:

15        Q.  Professor Gonzalez O'Brien, can you introduce

16    yourself to the Court, and explain a little bit about

17    your employment and your occupational background?

18        A.  Certainly.  I'm an Associate Professor of

19    Political Science at San Diego State University.  I'm

20    also the author of two books on U.S. immigration policy,

21    Handcuffs and Chain Link, Criminalizing the Undocumented

22    in America.  That came out in 2018, with the University

23    Virginia Press.  And also, Sanctuary Cities.  The

24    Policies of Refuge, that came out in 2019, with Oxford

25    University Press.
```

1          In addition to the two books that I have, uh,

2     I've also -- I'm also the author of a number of articles

3     that have been published in a range of journals.

4          Q.  Can you describe how you developed an expertise,

5     in particular in this area that we are talking about

6     today, in criminalization and migration?

7          A.  So my expertise is based on a reading of

8     committee reports, as well as congressional debate

9     over different pieces of immigration legislation,

10    including the 1929 Undesirable Aliens Act; the 1924

11    Johnson-Reed Act; the 1986 Immigration Reform and

12    Control Act; and the 1996 Illegal Immigration Reform

13    and Immigrant Responsibility Act.

14         I also do some quantitative work looking at

15    stereotypes of undocumented immigrants.  That was part

16    of my first book.  And also some quantitative work,

17    looking at things like crime rates in sanctuary and

18    non-sanctuary cities, which is part of that second.

19         Q.  And Professor, can you also talk about how, as

20    a political scientist, you sort of conceptualize or

21    understand history in your work.  Because I know there's

22    a distinction between the historian and a political

23    scientist, so I'm trying to, sort of, tease that out

24    because they're connected.

25         A.  Right.

1       So, you know, one of the connections that I draw

2  in my first book between the Undesirable Aliens Act

3  and the later Illegal Immigration Reform and Immigrant

4  Responsibility Act, is that -- is the influence of

5  initial decision -- policy-making decisions on future

6  choices, as well as, uh, how policy decisions at one

7  point in time, or policies themselves at one point

8  in time, can change how groups are characterized, can

9  change how groups are discussed; and how that, in

10  turn, influences future congressional debates, future

11  congressional decisions on policy in that area.

12    Q.  And is your work on these topics based on

13  principles and methodologies generally deemed reliable

14  in the field of political science?

15    A.  Yes.  Both of my books were peer reviewed by

16  both presses, and all of my articles, to date, have

17  been peer reviewed.  Sometimes multiple times.

18    Q.  And in your work, do you also -- do you

19  collaborate with other, sort of, notable academics on

20  these topics about immigration history and policy?

21    A.  Yeah.  I've collaborated with a number of other

22  academics at different institutions.  Uh, researchers

23  at the University of New Mexico; University of Oklahoma;

24  University of Washington, Tacoma; and then some work

25  in the past with, with a researcher at UCLA.

1    Q.  And I skipped over this, and I know you're a

2    professor, but just to be clear for the record, you

3    have a Ph.D in Political Science, is that correct?

4    A.  I do.  Not only a Ph.D, but also two master's

5    degrees.

6    Q.  Well, thank you.

7         MS. GORMAN:  And, Your Honor, I would ask

8    that the Court recognize Professor Gonzalez O'Brien as

9    an expert in political science, and particularly with

10   a focus on, um -- his words are going to be way better

11   than mine -- but on the intersection between criminal

12   law and immigration and policy, if -- unless Professor

13   Gonzalez O'Brien has a different characterization that

14   would be better.

15        THE WITNESS:  Um, I think the way that I

16   would characterize it would be between past policy

17   decisions and future policy choices when it comes to

18   law-making in Congress.

19        MS. GORMAN:  Your Honor -- and Your Honor, I

20   guess with that, would the Court --

21        THE WITNESS:  I see a wrinkled brow.

22        THE COURT:  I'm sorry.  So the request is

23   to recognize Professor Gonzalez O'Brien as an expert

24   in political science, with a focus on the intersection

25   between past policy decisions and its impact on future

1    choices and debate when it comes to legislation?

2              THE WITNESS:  If I may clarify, Your Honor.

3              I think political science, with expertise

4    in immigration policy, race, and public policy would

5    probably be a more accurate characterization of my

6    areas of expertise.

7              THE COURT:  All right.

8              Does the government have any objection?

9              MR. WALKINGSHAW:  Not -- beg your pardon,

10   Your Honor.  I'm having some microphone difficulties.

11             Can you hear me?

12             THE COURT:  Yes.

13             THE WITNESS:  Yes.

14             MR. WALKINGSHAW:  Apologies.

15             No objection to the expertise framed as it

16   was in that last instance.

17             THE COURT:  So the request is for the Court

18   to recognize Professor Gonzalez O'Brien as an expert

19   in political science, with a particular expertise in

20   immigration policy, race, and public policy.

21             Is that correct?

22             MS. GORMAN:  That sounds right to me,

23   Your Honor.

24             THE COURT:  All right.  The request is

25   granted.

```
 1            MR. WALKINGSHAW:  Um, yeah, I'm fine with
 2   that, Your Honor.  Thank you.
 3            THE COURT:  All right.  The request is
 4   granted and the Court will so certify.
 5   BY MS. GORMAN:
 6      Q.  So, Professor Gonzalez O'Brien, I don't want
 7   to be -- I'll try not to be duplicative, but -- and
 8   I wouldn't fault you if you didn't -- but were you
 9   present and were you able to listen to Professor Lytle
10   Hernandez's testimony that she just provided to the
11   Court?
12      A.  I was both present and over-caffeinated.
13      Q.  Great.  Me too.
14            So, Professor O'Brien, I guess I want to ask,
15   sort of, generally, you know, do you agree with,
16   uh, Professor Lytle Hernandez's characterizations,
17   particularly with reference to the historical and
18   legislative record that culminated in the 1929
19   Undesirable Aliens Act?
20      A.  I do.
21      Q.  And to the best of your knowledge, is 1939
22   the first criminalization of illegal re-entry in the
23   United States?
24      A.  1929, but --
25      Q.  Oh.  Sorry.  I don't know what I said.
```

1        So since 1929, has there ever been a time that
2    illegal re-entry was not on the books?
3        A.  No.
4        Q.  Okay.
5        So, Professor Gonzalez O'Brien, I wanted to try
6    to, as much as possible, provide a bridge between both
7    1929, and the events leading up to it, and 1952.  So I
8    want to start, I guess, so that I don't ask a million
9    questions in one question, would something that happened
10   after 1929 -- just to trace its, sort of, historical
11   origin -- but, is it your understanding that starting
12   at about the Great Depression era, there was what we
13   call, or what is called, sort of, the re-patronization
14   of Mexican people to Mexico and the United States during
15   the Great Depression?
16       A.  Yes.
17       Q.  Tell me what that is.
18       A.  So, the 1920s was a period of increasing
19   immigration restriction.  I don't want to retread
20   over a lot of the things that Dr. Lytle Hernandez has
21   already covered, but the passage of the Johnson-Reed,
22   the discussion over quotas being placed on Mexico in
23   the period between Johnson-Reed and the passage of the
24   Undesirable Aliens Act in 1929, and then in the period
25   following -- well, in the period -- in the same year as

1    the passage of the Undesirable Aliens Act, you also do

2    have the beginning of a program that's been referenced

3    as Mexican re-patronization, which was this push, as

4    the U.S. headed into the Great Depression, this push

5    to get Mexican immigrants to repatriate to Mexico.  And,

6    it was relatively successful.  The numbers vary in

7    terms of the number of immigrants -- or the number of

8    Mexicans -- let me clarify that -- the number of

9    Mexicans who left the United States, with, kind of,

10   the lowest estimates being around 400,000, and some of

11   the higher estimates being well over a million who

12   left for Mexico.  And some of the estimates of that

13   is, you know, that around 60 percent of those who

14   left -- who went back to the Mexico or went to Mexico

15   were, in fact, American citizens.

16        Now, there's a question of, well, why are

17   Mexican -- if they're American citizens, why are they

18   returning to Mexico?

19        And I think that part of the story here is that

20   this was a campaign that was meant to fuel voluntary

21   re-patronization.  But, that voluntary re-patronization

22   was, in some cases, driven by a sense of the threat of

23   deportation or the threat of additional penalties if

24   those individuals did not return to Mexico.  And in

25   particular, there was -- there were a number of raids

1　in Los Angeles.  And along with those raids, there was

2　publicity released announcing the raids in advance; that

3　there would be arrests; and that these raids were coming

4　to the area; and that, uh -- this idea that this would

5　create kind of a psychological push to get people to

6　leave for Mexico.

7　　　　And the majority of the people who are questioned

8　during these raids are, uh, are Mexicans.  A raid in

9　the El Monte area on February 13th, questioned about

10　300 people.  Only 13 were arrested.  But, 12 of the 13

11　were Mexicans.

12　　　　So you have this period of the Great Depression

13　where, in part, because of concerns about employment,

14　you have this push to force Mexicans out of the United

15　States and out of competition with American laborers.

16　And this runs, roughly, from 1929 to 1936.  And on the

17　heels of this, though, you have this, this change in

18　labor demands as the United States emerges from the

19　Great Depression.  And as this -- you have this change

20　in labor demands.  And as Dr. Lytle Hernandez has

21　already covered, you have the beginning of the Bracero

22　program.

23　　　　The Bracero program, I don't want to retread

24　the ground that Dr. Lytle Hernandez covered, but what

25　I would like to talk about a little bit is the parallel

 1  growth in the term of the undocumented population

 2  and also the characterization of that population as

 3  "wetbacks."  And that term "wetback" is one that is

 4  racially derogatory, was recognized as being racially

 5  derogatory at the time, and has roots that link back to

 6  some of the discussions around both the quotas being

 7  applied to Mexico, of discussions and debate of the

 8  Undesirable Aliens Act.

 9       And this term "wetback" is referenced in a number

10  of pieces of legislation at the time, including a Senate

11  Bill 1851 -- well, also known as the, uh, Act of March

12  20th, 1952, which is referenced in the Congressional

13  Record as the Wetback Bill.  And this was an empty

14  harboring Bill, but regularly referred to Mexicans as

15  wetbacks.

16       And the term with "wetback" comes from the idea

17  that individuals who are entering without inspection

18  have to do so at an area where there is no bridge

19  over the Rio Grande River and, therefore, they get wet

20  and, therefore, the term wetback.

21       But across the period of the 1940s and 1950s,

22  this term has -- is associated, and almost synonymous

23  with Mexicans.  And in addition to being synonymous with

24  Mexicans and racialized in much the same way, it also

25  has the attribution of a lot of the negative stereotypes

1    that were associated with Mexican immigrants in the

2    push, or quotas to be applied to immigration from Mexico

3    and south of the Rio Grande, as well as during debate

4    over the Undesirable Aliens Act.

5         So, I would like to talk a little bit about

6    that, unless you have -- unless you have any additional

7    questions or would like to redirect me.

8    Q.   One thing that struck me, because, you know, the

9    focus, I think, is on racial animus and the construction

10   of race, was -- I mean, one thing that you mentioned,

11   but sort of glossed over, was that during the Great

12   Depression, when you see this, I guess, competition

13   between, I guess, what's seen as American potential

14   employees and immigrant employees, this re-patronization

15   drive is not -- is targeting 60 percent of Mexican

16   Americans as in United States citizens, so how, sort

17   of, being Mexican becomes then associated with being in

18   competition with, quote, Americans, even though these

19   are Americans?

20   A.   Well, you know, Mexicans during this time -- and

21   Mexicans today, really, are, in the words of Mae Ngai,

22   the iconic illegal aliens.  So when you're making

23   this push for re-patronization, the idea is that a lot

24   of the -- you know, that anybody who is Mexican is also,

25   potentially, an illegal immigrant, or is someone who is

1   here competing with American workers for jobs and

2   working for lower wages, and a lot of that baggage

3   that goes hand-in-hand with that characterization of

4   the illegal work -- of the illegal immigrant.

5          And so the targeting during this period is

6   broadly aimed at Mexicans.  And, you know, most of

7   the -- most of the writing that I'd seen describing

8   some of those raids in L.A., the individuals who are

9   being questioned are individuals of Mexican descent.

10  And this is regardless of whether their American

11  citizens, or Mexican nationals who are here legally,

12  or illegal Mexican entrants.  They are being questioned

13  because they are being identified as, uh, potential --

14  of having potential illegality.  Illegality.  And

15  that is something that becomes attached to the, kind

16  of, racial identification of Americans under the

17  Undesirable Aliens Act, is this potential identification

18  of criminality, or this ascribing of a criminal identity

19  that is very much linked to a Mexican identity.

20         Now, there are distinctions that can be drawn,

21  right, between those who are here illegally or Mexican

22  Americans but, broadly speaking, if you are trying to

23  identify someone who could be an undocumented immigrant.

24  And we see this in some of the debates around Bills,

25  like, Arizona's SB-1070, and the question of if you are

1   saying that police officers can ask people who they
2   suspect of being an undocumented immigrant, they can
3   ask them for additional documentation.
4       Well, the problem is that that raises the
5   question of racial profiling because we know that in
6   this country, uh, being an illegal immigrant is also
7   seen as a racially -- it's seen as racially coded, as
8   being someone who is, uh -- appears to be a Latino.
9   Q.   So the term "wetback," even though it describes
10  people who have to cross via, uh, you know, non-ports
11  of entry, would apply to sort of, generally, to Latinos
12  or to Mexicans?
13  A.   Yeah, it would.  And there was a study, um,
14  titled the -- a 1951 study titled, "The Wetback In
15  the Lower Rio Grande Valley."  And in this study, what
16  the authors found is, and I quote:  "There are no
17  careful" -- "no careful distinctions are made between
18  illegal aliens and local citizens of Mexican descent.
19  They are lumped together as Mexicans.  And the
20  characteristics that are observed among the wetbacks
21  are, by extension, assigned to local people."  Again
22  saying that this term -- the illegality, this term
23  "wetback," and all the racial baggage that goes with
24  it, is ascribed broadly to anyone who could be seen as
25  being of Mexican descent.

 1    Q.  So when you're talking about Mexican

 2  re-patronization during the Great Depression -- I

 3  didn't mean to cut you off, but then you had also sort

 4  of transitioned and talked about the Bracero program.

 5  And I think it's important, particularly, because these

 6  are two events that sort of bridge 1929, and then the

 7  codification in 1952.

 8       So I didn't mean to cut you off, but following

 9  this, I guess -- I want -- it's not re-patronization, I

10  guess, to the extent that 60 percent were U.S. citizens,

11  and I'll refer to it, for ease of reference, as

12  re-patronization.  But then can you sort of go back

13  to talking about what the Braceros program was, and,

14  sort of, the ways that it sort of changed the debate

15  around Mexicans and Mexican Americans and Latinos in

16  general?

17    A.  Sure.

18       One of the things that happens with the Bracero

19  program -- and Dr. Lytle Hernandez already covered some

20  of this in her testimony, so I won't restate of all of

21  it -- but one of the things that happens alongside the

22  Bracero program is this (unintelligible) undocumented

23  population.  And that occurs for a number of reasons.

24  That occurs, again, because of some of the things that

25  had to be endured by individuals who wanted to be

1   Braceros.  It also is linked to the -- there being

2   more demand for spots in the Bracero program than there

3   were actual spots available.  And, it also goes to the

4   process that Braceros had to pursue, as well as the

5   process that some of the employers had to pursue.  And

6   employers, particularly those in border regions and in

7   border areas, oftentimes saw it easier just to recruit

8   an undocumented immigrant, than go through the red tape

9   of the Bracero program.

10          And so alongside the growth of the Bracero

11  program and the implementation of the Bracero program,

12  you also have -- you also have an increase and a growth

13  in the size of the undocumented population, and the

14  number of the undocumented entrants that is occurring

15  alongside this, and is also, um, sometimes seen as a

16  consequence of the Bracero program itself; that this

17  is acting as a -- this is spurring undocumented

18  immigration in some ways.  Both because there is

19  greater discussion of, you know, there are jobs

20  available, but also because of some of the conditions

21  under the Bracero program, which -- you know, it's a

22  bilateral agreement -- although as Dr. Lytle Hernandez

23  points out, Mexico is a -- or a trilateral agreement.

24  Excuse me -- although Mexico was a junior partner in

25  this.  And many of the protections that were supposed

1   to be in place for Mexican workers simply weren't

2   there.

3        And you know, of -- in 1956, there were 1631

4   employers who violated the program in some way, only

5   50 of those were removed from the (unintelligible) of

6   having future access to Bracero workers.

7        So alongside this, kind of, legal employment

8   program, you have the growth of the undocumented

9   population, and you also have increasing discussion of

10   the quote, unquote, wetback problem.  And this harkens

11   back, in many ways, to -- the discussion of wetbacks

12   harkens back, in many ways, to the racialized discussion

13   of Mexicans in the period following the passage of

14   Johnson-Reed, so in the discussion of quotas, but also

15   in the debate around the Undesirable Aliens Act.

16        So during the debate around the Undesirable

17   Aliens Act -- there we go.  Sometimes these names for

18   legislation are tongue twisters, especially if you say

19   them multiple times -- but, John Box of Texas, noted

20   that they are badly infected with tuberculosis and other

21   diseases.  There are many paupers among them.  There

22   are many criminals.  They work for lower wages.  They

23   are as objectionable as immigrants when tried by the

24   tests applied to other aliens.

25        Representative Green of Florida noted that the

1    (unintelligible) examine the criminal records, you

2    will find that the percentage of criminals is largely

3    foreign.

4         These were all attributions of criminality that

5    we know oftentimes -- that we know go hand-in-hand with

6    notions of racial superiority and inferiority.  And this

7    was part a big part of the debate around eugenics during

8    this period of the 1920s.

9         And this idea about one of the reason -- one of

10   the things that was inherent in racial inferiority was,

11   kind of, feeble-mindedness, a lack of impulse control

12   and, therefore, a greater tendency towards criminal

13   behavior.

14        So, we see this in the debate around the

15   Undesirable Aliens Act in 1929.  And then moving forward

16   and talking about the wetback problem, a 1956 paper

17   references a joint study by the GI form in Texas and

18   the Texas Federation of Labor.  And the question was

19   to look at the problem of undocumented entry and the

20   problem of wetbacks.  And they said that you could

21   divide wetbacks into two different groups.  And again,

22   these have a lot racialized traits ascribed to them.

23        So, one group was a docile group of agricultural

24   workers, who have accepted good or bad treatment,

25   starvation wages, diarrhea and other sicknesses for

1  his children, and unsanitary living conditions.  These

2  were individuals who came here, who were brought here

3  to work.

4      But then there's also a distinction that you

5  made between those individuals and the Chucos, who

6  were portrayed as criminals, the marijuana peddlers,

7  the users -- and users, the falsifiers of identity

8  documents, the smugglers, the prostitutes, and the

9  homosexuals.

10      So, you have this attribution to the term

11  wetback.  Of these racialized traits, of criminality, of

12  submissiveness, that trace back both to the discussion

13  around eugenics in the 1920s, but also trace back to

14  the general discussions around racial identities that

15  we see in that early part of the 20th century.

16      In 1952, prior to the passage of the

17  McCarran-Walter Act, you have a Bill that is introduced

18  and passed on March 20th that is nicknamed the

19  Wetback Bill.  And this is a piece of anti-harboring

20  legislature where, throughout the debate, Mexican

21  undocumented entrants are regularly referenced as

22  wetbacks.  And Senator McFarland, during the debate

23  over the Act of March 20th, 1952, notes that Senate

24  Bill 1851, a Bill known as the Wetback Bill, was going

25  to be debated.  Initially, this legislation was aimed

1    strictly at Mexicans.  It referenced Mexicans.

2        Now this was struck from -- or this was

3    struck from the Bill because Senator Aiken of

4    Vermont, questioned whether you could discriminate,

5    constitutionally, against the aliens of one

6    particular nation.  And he also noted that while

7    he felt it needed to apply to all aliens, that he

8    knew of no instances of the illegal employment of

9    Canadians.  And that, certainly, this isn't common.

10        And, again, we have this dual construction of

11    the two borders.  The construction of one border as,

12    kind of, a racialized threat to the nation.  The

13    construction of Mexican immigrants in 1920.  But then

14    by the 1950s, undocumented entrance, or wetbacks, as

15    criminal threats to the nation.  But then, on the other

16    hand, this construction of Canadians as individuals who

17    could be assimilated, individuals, ho posed no threat.

18    And that goes back to early debates, immigration

19    restriction league noted early on in the 1920s, that

20    we didn't need to worry about Canadians because,

21    racially, they're the same as Americans, and quotas

22    really needed to be applied to Mexico and other

23    countries of North and South America, because these

24    were the, kind of, mongrelized people that we didn't

25    want diluting the, kind of, Anglo bloodline in the

1    United States.

2        And so the debate around wetbacks is -- also

3    enters into the McCarran-Walter Act.  And with

4    McCarran-Walter, you don't have a lot of debate around

5    the recodification of 1326, right, that's initially

6    passed in 19 -- that initially becomes part of U.S.

7    law in 1929.  You don't have a lot of debate around

8    1326 in McCarran-Walter.  But what you do have is

9    that you do have this note that's entered in the

10   support for 1326 by the Department of Justice, and

11   it's a letter from the Deputy Attorney General,

12   Peyton Ford.  And in this letter, he specifically

13   notes that:  "Statutory clarification on the above

14   points will aid in taking action against the conveyors

15   and receivers of the wetback."

16       So, again, you have the use of this racialized

17   term to describe Mexican immigrants, even though you

18   don't have debate around Mexican immigration in the

19   McCarran-Walter Act itself, or during debate for the

20   McCarran-Walter Act, in part, because you have this

21   Bill that precedes it by two months, where much of

22   the debate is how do we limit the number of Mexican

23   immigrants and the trafficking of undocumented Mexican

24   immigrants into the United States?  And that Bill

25   also contained the Texas proviso, which gave workers

1 the kind of loophole of, you know, if you're employing

2 undocumented laborers, it doesn't constitute harboring.

3  Q. Now, when we're talking about -- so we're

4 talking about the, sort of, Wetback Bill in the

5 context of the McCarran-Walter -- I know, that various

6 (unintelligible), sort of, commented on the lack of,

7 sort of, deep discussion about 1326.  Um, is that --

8 but still in the Walter -- the McCarran-Walter Bill,  do

9 you have the -- so it seems like you have the term in

10 this -- even in the Congressional Record, they're using

11 this, sort of, racial slur of "wetback."

12  Is that fair?

13  A. That is fair.  Yes.

14  Q. And then in this, sort of, the legislation -- the

15 Wetback Bill that passes, I guess three months earlier,

16 you have this exemption of employers from those who

17 are, quote, harboring aliens.

18  Is that a fair characterization?

19  A. That is.

20  Q. So can you talk about -- so these are, sort

21 of the, sort of historical -- so, I guess is it a

22 fair characterization to sort of encompass both

23 the historical link between 1929 and the 1952

24 codification.  Was there also reference in the

25 legislative history of an explicit desire to carry

1  forward the 1929 Act?  Of course, making it more

2  easy to, to, um, establish venue, as you had discussed

3  before?

4     A.  Right.  That was part of Peyton -- a part of

5  Peyton Ford's letter, that this needed -- that this

6  should be carried forward.  But, it didn't receive any

7  debate during the, kind of, longer debate over the

8  McCarran-Walter Act, which was largely dedicated to a

9  question of the, uh, the revision of the quota system,

10  and some of the issues inherent in the McCarran-Walter

11  Act itself, and some of the racialized aspects, right,

12  that didn't have to do with Mexican immigrants, but did

13  have to do with the assigning of quotas to the age of

14  specific triangle.

15     Q.  In terms of the, sort of the addition to the

16  1929 legislation, is it your understanding that 1326

17  was also expanded so that -- I guess, in their words,

18  "wetbacks could be prosecuted with venue in any

19  jurisdiction where they existed"?

20     A.  Right.

21     Q.  So that they would not be limited to having --

22  to the jurisdiction where they re-entered, but rather

23  any place that you are living or existing in the United

24  States who are then, at that moment, subject to criminal

25  prosecution wherever you're found?

1    A.   That's correct.  And, again, there was no -- you

2    know, there was no substantial debate, or there was

3    no debate over the problematic way in which the original

4    codification of 1326 occurred in 1929.  This received

5    no attention in 1952, despite the fact that you do have

6    a relatively robust debate around the problematic, uh,

7    implementation, and the problematic aspects of the

8    Johnson-Reed Act that's passed in 1924.  But, yet,

9    Mexican immigration receives almost no attention.

10         And, again, if you go back three months, Mexican

11   immigration is now talked about in terms of the -- in

12   terms of wetbacks.  Instead of talking about this in

13   the very overtly racialized terms of the Undesirable

14   Aliens Act in 1929, where you have discussions of

15   the, kind of, mongrel -- mongrelized blood of Mexicans,

16   but this changes to now you're talking about wetbacks.

17         So you're sidestepping a little bit about talking

18   about racial purity, but you're assigning those, and

19   you're ascribing those same traits now to these

20   individuals that you're characterizing as wetbacks,

21   individuals who are not distinguishable in any way,

22   shape, or form from individuals of Mexican origin, or

23   people who look as if they could be individuals of

24   Mexican origin.

25    Q.   Now we talk about the -- so, I guess, is it fair

1   to say that there was an understanding of the 1920s

2   history of the legislation when we're going forward in

3   1952?

4       A.   There was.   And there was an understanding

5   of the problematic attributions of criminality to

6   Mexican immigrants.   The Wickersham Commission, just

7   together in 1929 by Herbert Hoover, to study the

8   question of the impact that immigrations had on the

9   United States, had an entire volume of their final

10  report, which was released in 1931, on criminality in

11  the foreign born.   And a substantial number of pages

12  of that was dedicated to the question of Mexican

13  criminality.   And, you know, with the -- because these

14  attributions had been made, there was this idea that

15  there was something about certain national groups

16  or certain races that made them predisposed towards

17  criminal behavior.

18          And over, I think it's around -- it's well

19  over 100 pages is dedicated to the, kind of, Mexican

20  question.   And they didn't find any support for this

21  in 1931, right?   And they say, well, you know, in some

22  areas Mexican immigrants offend at a higher rate, and

23  in some areas they offend at a lower rate.   And some

24  specific studies, so the study of the State of Texas,

25  finds no relationship there.   And yet, by the time you

1   move forward to the 1950s, you still have these

2   attributions of criminality.  Now you're talking about

3   wetbacks instead of Mexicans, but as the term was

4   understood, this was a racialized term that applied

5   to all individuals who looked as if they could be of

6   Mexican descent.  And going back to that comment I

7   mentioned earlier in that 1951 study of the wetback

8   in the lower Rio Grande, that this was broadly an

9   attribution of all of these negative stereotypes that

10   were made to the wetback, to all individuals of Mexican

11   descent or nationality.

12      Q.  Is there any --

13              THE COURT:  I'm sorry.  Ms. Gorman --

14              MS. GORMAN:  Pardon me.

15              THE COURT:  -- if I may interject.

16              I'm trying to understand because

17   Dr. Gonzalez O'Brien just testified that there was an

18   understanding of the -- and I'm -- I hope I'm quoting

19   right -- the problematic criminalization on Mexican

20   immigrants when the statute 1326 was codified in 1952.

21              Is that a fair statement of what your

22   opinion is?

23              THE WITNESS:  Yes.  There was a governmental

24   commission report from 1931, that looked at the question

25   of Mexican criminality, and found no relationship to --

1    between Mexican nationality or race and criminal

2    behavior.

3              MS. GORMAN:  And just, Professor Gonzalez --

4              THE COURT:  No, but --

5              MS. GORMAN:  Oh.  Sorry.

6              THE COURT:  I'm sorry.  I'm still trying

7    to understand.

8              When you said there was a general

9    understanding of this -- the problem of criminalizing

10   Mexican immigrants, in the discussion -- well, from -- I

11   thought what you meant was when the statute was codified

12   in 1952, there was that general understanding of that

13   aspect.  And I -- and so if I'm wrong, let me know

14   if I'm wrong.  If I'm correct, then I want to know

15   what evidence is there to show that there was such an

16   understanding.

17             THE WITNESS:  Well, the evidence -- I

18   mean, the evidence is that you have, you know, a

19   governmental report released in 1931, and one that

20   wasn't, you know -- I would expect wouldn't be unknown

21   to members of Congress serving on the Immigration and

22   Naturalization Committee, or to members of Congress

23   more broadly.  I mean, it is the duty of Congress to

24   be aware of, especially relatively significant reports.

25   I mean, this was the second large-scale study after

1 the Dillingham Commission in the earlier part of the

2 20th century.  This was the second big examination of

3 the impact of the immigration on the United States, as

4 well as the first to specifically look at the question

5 of immigrant criminality.

6 BY MS. GORMAN:

7    Q.  But to be clear, Professor Gonzalez -- and

8 I think maybe -- and maybe I'm misunderstanding

9 Chief Judge Du's question -- I think the question

10 went to was the association of criminality with

11 wetbacks, in spite of the fact that there was empirical

12 evidence of no criminality, or was it understood

13 that  it was problematic to associate wetbacks with

14 criminality?

15        And Chief Judge Du, am I understanding the

16 distinction correctly of your question?

17             THE COURT:  I think that -- well, based

18 on Professor Gonzalez O'Brien's answer, I think I

19 misunderstood his earlier testimony.  I think what

20 he meant to say is that by the time of the 1952

21 codification, there was a clear understanding there

22 was no connection between Mexican nationalities and

23 criminality.  And yet --

24             THE WITNESS:  Right.

25             THE COURT:  Right?  Is that -- so when you

1    said there was that general understanding, that's what

2    you were talking about?

3            THE WITNESS:  Yes.  That's what I'm talking

4    about.

5            And, you know, the, the point I'm trying to

6    make is despite the fact you have empirical evidence

7    that there is no association between these two things,

8    you have the continued referencing of criminality as

9    a reason for immigration restriction, either, as I

10    mentioned earlier, you know, through that study at

11    the GI form, but you also have individuals, like,

12    Senator Kilgore of West Virginia, who notes in debate

13    over the quote, unquote, Wetback Bill, that practically

14    every state in the Union has had the wetback problem.

15    Some of these people cannot meet the standards of

16    immigration.  They may be criminals because they are

17    wetbacks.  They can be kept in a state of peonage.

18            So this link between the, kind of,

19    undocumented identity or the Mexican identity --

20    because, again, this was kind of understood as a

21    racialized identity at the time -- is still being

22    linked to criminality, despite the evidence, the

23    empirical evidence that there are no linkages between

24    these two things.

25            THE COURT:  And Ms. Gorman, I think the

1  focus I would like for us to focus on is evidence of

2  the latter.

3           MS. GORMAN:  The latter?

4           Sorry.

5           THE COURT:  In other words --

6           MS. GORMAN:  What do you mean?

7           THE COURT:  I understand, Professor Gonzalez

8  O'Brien to testify that despite empirical evidence

9  that doesn't support this link, there continues to be,

10  I guess, a disregard for the empirical evidence,

11  when in -- at least surrounding the codification of

12  Section 1326.  So I'm looking for evidence of that

13  discussion, or lack thereof, which is, to me, the one

14  quintessential issue I have left in deciding the motion.

15  BY MS. GORMAN:

16    Q.  Professor Gonzalez O'Brien, then talk to me, I

17  guess, as a social scientist, about how you would suss

18  out racial animus and the codification of Section 19 --

19  or 1326.  I want to say 1926.

20           So how does a social scientists do that?

21    A.  Well, I think part of this is looking at,

22  you know, what were the justifications made for the

23  recodification of 1326 in 1952, but also going forward,

24  right?

25           I mean, the most recent codification of 1326 is

 1   in 1996 under the Illegal Immigration Reform and

 2   Immigrant Responsibility Act.  So if you are looking to

 3   establish that racial animus is kind of a motivating

 4   factor -- now I think we have relatively clear evidence

 5   that this the case in 1929, right?  You know, we have,

 6   we have these statements by members of the Immigration

 7   and Naturalization Committee, and leading proponents of

 8   this legislation, that part of the reason that you need

 9   this is as a control on Mexican entry into the United

10   States because Mexicans are of a, kind of, mongrelized

11   bloodline.

12        But also in addition to these notions of racial

13   purity, you also have these attributions of certain

14   inherent traits that go hand-in-hand with Mexican

15   identity:  Criminality, the tendency towards peonage,

16   some mentions of illiteracy, of potentially being

17   disease carriers.  Now that carries forward in

18   discussions over future immigrations legislation.

19   You do see that reflected in discussions of the

20   Wetback Bill in 1952, preceding McCarran-Walter.  You

21   have a recognition that the term "wetback" is used to

22   reference these individuals who are seen of being as --

23   of inferior quality, of having criminalistic tendencies.

24   And, you see references -- you see the use of that

25   term -- a racially derogatory term -- in that letter

from Peyton Ford, the Deputy Attorney General, that
was entered into the Congressional Record.  And so you
have that present in 1952, even if the McCarran-Walter
Act itself does not contain discussion of Mexican
immigration to the United States, because that was
not the thrust of the McCarran-Walter Act, right?  That
was the thrust of the earlier Senate Bill 1851, or the
Wetback Bill.

       But I think if you look at even debate over
the Illegal Immigration Reform and Immigrant
Responsibility Act, you still have these continued
attributions of criminality to illegal immigrants.
And by the time you get all the way up to 1996, it
is not just one governmental report by that point.  It
is two governmental reports:  The 1931 Wickersham
Commission and the 1994 U.S. Commission on Immigration
Reform, which preceded the passage of the Illegal
Immigration Reform and Immigrant Responsibility Act.
And despite that, you still have individuals, like
Lamar Smith, ranking member of the Judiciary Committee,
in debate over the Illegal Immigration Reform and
Responsibility Act, noting that illegal aliens are ten
times more likely than Americans, as a whole, to have
been convicted of a federal offense.  Think about the
cost, in pain and suffering, to the innocent victims

and families.

You have Representative Greg Laughlin of Texas
stating that because of the border fence, the rapes,
the robberies, the drug sales, the murders went down.

Spencer Abraham, in the Senate, noting that by
conservative estimates almost half-a-million felons
are living in this country illegally.  These aliens
have been convicted of murder, rape, drug trafficking,
potentially such crimes as espionage, sabotage, treason,
and a whole -- and a number of other serious crimes.

So, you have this continued attribution of
criminality to illegal immigrants, a racially coded
category.  And despite that, though, you have a raft
of evidence proving otherwise.  Evidence going back
to 1931, but evidence that grew in the periods following
that, and particularly across the 1990s and 2000s.

So, you have that U.S. Commission on Immigration
Reform report in 1994, that found that crime rates in
border cities were actually lower than crime rates --
than crime rates in cities in the interior.

Now, again, if you're making a -- if you're
arguing that undocumented immigrants are more
predisposed towards criminal behavior, then in those
border cities, which have a larger percentage of
undocumented immigrants, then -- or are likely to have a

 1  larger percentage of undocumented immigrants -- then

 2  you would expect crime rates to be higher.  And that's

 3  not what you're finding.

 4       A survey of all the literature to date, in 2000,

 5  found no empirical support in any of the published

 6  studies, either governmental or academic, for any

 7  linkage between illegal immigration, immigration, and

 8  criminal behavior.  And this is something -- and the

 9  Cato Institute has put out a whole host of studies also

10  looking at this question, which similarly have found

11  no support for the idea that illegal immigrants are

12  more predisposed towards criminal behavior.  And, yet,

13  we continue to see this reference.  And we continue to

14  see this reference because it is linked to these notions

15  of otherness, of racial otherness.  And it is something

16  that is synonymous in many ways with the construction of

17  the illegal immigrant in the, kind of, American psyche

18  at this point.

19       And some public opinion work, I -- you know, I

20  did back for my first book, looked at agreement among

21  the American public with this -- with the statement

22  that illegal immigrants are more likely to be involved

23  in drugs and gangs -- with drugs and gangs, and over

24  45 percent agreed.  And so you have this attribution of

25  a racialized trait that we see begin in 1929 -- because

1  you really don't see a great deal of discussion of

2  this in Mexican criminality prior to that -- but you

3  see that carried forward.  You see it carried forward

4  into the discussion of wetbacks in 1952, and the

5  construction of the, uh, the stereotype of what a

6  wetback was.  And then you see that carried forward

7  into 1996, where now we're taking about illegal

8  immigrants.  But, all of these are just reconstructions

9  of the same term.

10     Q.  When we talk about racial animus as a motivating

11  factor in the recodification in 1952, I guess is it

12  fair to summarize it -- as a social scientist, one of

13  the ways you suss out racial animus is, you know, this

14  sort of awareness of the eugenist history of the

15  legislation being codified; but, in addition to that,

16  the sort of racial slurs and the historical context

17  around it, including the re-patronization of Mexican

18  Americans, and the use of the term "wetback" and

19  discussion of the wetback in not just McCarran-Walter,

20  but in the Wetback Bill that preceded it by three

21  months?  So you see the same, sort of, eugenics tropes

22  and language being used to characterize Mexicans or

23  undocumented immigrants in 1952, as you did in,

24  essentially, 1929?

25     A.  Right.  And, you know, policy-making doesn't

1    occur in a vacuum.  I mean, it doesn't occur without

2    the influence of the policies that came before it, and

3    especially policies in related areas.  And so the

4    influence not only of the past policy decisions, but

5    of, uh, thinking on race at that period in time, and

6    also of the kind of long-term construction of racial

7    categories, and racial categorization in this country.

8    You know, the construction of racial categories is a

9    project.  It doesn't just occur at one point in time

10   and then never change.  It does change over time.  And

11   the attributions sometimes change over time.

12        But, you see many of the same references back

13   to ascribed inherent traits in the discussion of

14   wetbacks in the 1950s, or the discussion of illegal

15   aliens in the 1990s, despite the fact that, again,

16   especially with the -- with the notion that they're

17   more inclined towards criminal behavior -- which has

18   been something that has long been used to argue for

19   immigration restriction in this country -- um, you don't

20   have support for it.  And it's something that even, you

21   know, after 1996, we continue to see the attribution

22   of criminal -- of criminal tendencies to undocumented

23   immigrants or Mexican immigrants, depending on who is

24   speaking at the time.  But, we continue to see this

25   attribution.  It's a racial attribution.  It was in

1   1929.  It was in the 1950s.  And, it continues to be

2   today because it is applied broadly.

3        As the 1951 report noted, people can't tell if

4   someone is undocumented or not.  So we can split hairs

5   over, well, we're just saying these are the undocumented

6   folks.  But that racial categorization is applied -- or

7   that negative categorization is applied to all people

8   who look as if they could be of that group that is

9   characterized as the kind of iconic undocumented

10  immigrant, and that is the Mexican.

11  Q.  One of the things that sort of struck me in

12  thinking of about it, is that Truman -- who, I guess,

13  I didn't conceptualize as, you know, necessarily, a

14  progressive in any sense -- but he actually veto'd

15  the McCarran-Walter Act.  And can you talk a little

16  bit about that?

17  A.  Well, the McCarran-Walter Act is sometimes

18  pointed to as a piece of richly progressive legislation.

19  And it wasn't.  Now it's true it removed racial

20  restrictions on immigration.  So prior to

21  McCarran-Walter, and under the Johnson-Reed Act,

22  individuals of Asian descent, because they could

23  not become American citizens, they also could not

24  immigrate.  McCarran-Walter removes those racial

25  restrictions, so now Asian immigrants can come to

1   the United States.  But, the quota that is assigned to

2   all the Asian Pacific Triangle is 2,000 quota spots,

3   2,000 visas.  And I believe that was roughly equivalent

4   to the number of visas given to a single country like

5   Sweden at the time, and was dwarfed by the number of

6   visas given to, say, the United -- to the UK during this

7   period.

8       So McCarran-Walter is viewed as -- is sometimes

9   characterized as racially progressive because it removes

10  these restrictions, but Truman's veto explicitly notes

11  that there -- that the McCarran-Walter Act, while it

12  had some good things going for it, also, uh, in the

13  words of Truman, from his letter to Congress, "would

14  perpetuate injustices of longstanding against many other

15  nations of the world..." -- and jumping forward a little

16  bit -- "...and intensify the repressive and inhumane

17  aspects of our immigrations procedures.  The price is

18  too high and, in good conscience, I can't agree to

19  pay it.

20      And there were also -- you know, there also were

21  a few times where the masks flipped a little bit off the

22  face of this is racially neutral, at least, legislation,

23  with Representative Wood of Georgia noting during the

24  debate on McCarran-Walter, that, "It seems to me the

25  question of racial origins, though i am not a follower

1    of Hitler, there is something to it.  We cannot tie a
2    stone around its neck and drop it in the middle of the
3    Atlantic, just because it worked to the contrary in
4    Germany.  The fact still remains that the peoples of
5    western Europe have made good American citizens.  I
6    believe that possibly statistics would show that the
7    western European races have made the best citizens in
8    America."
9         And McCarran-Walter continued to privilege
10   northern and western Europeans, over all others, in
11   terms of the quotas that were assigned based on either
12   national origin or race.
13       Q.  One of the things that you touched on in talking
14   about that was, sort of, the different treatment of
15   Mexican Americans or Latinos from immigrants from, let's
16   say, like, northern Europe or Nordic countries, and --
17   which sort of harkens back to some of the treatment that
18   we had talked about at the border, that were at the
19   southern border.  They weren't at the northern border.
20   So going into this time period, do you still see --
21   like, for the example, with the Bracero program, this
22   sort of -- the way that people are treated at the
23   southern border, being very different from the way that
24   people are being treated at the northern border?  So is
25   that still --

1  A. You do still -- you do still see some

2 differences. And I think Dr. Lytle Hernandez already

3 spoke to some of those. But in terms of the admission

4 procedures for Braceros during this period, the need

5 for, you know, medical inspections, chest x-rays, other

6 things like that, because there continued to be, you

7 know, again, attributions that go back to the 1920s,

8 of -- you know, that Mexico was a dirty place, where

9 people lived in slums and were more predisposed towards

10 carrying illnesses. So, you know, that does carry

11 forward.

12  And you do see some of that. It's not as

13 pronounced, certainly, by the 1950s as what you see in

14 the 1920s. But, the 1920s is very openly and explicitly

15 racialized and racist. You get -- that gets a little

16 cleaned up, and some of the procedures are not quite as

17 invasive as what you were seeing in the period of the

18 1920s. But, you continued -- you continue to see a

19 different treatment of the two borders.

20  And again, that ability for pre-examination in

21 Canada, in 1945, Mexicans are excluded from that. So,

22 initially, there -- you know, there's this difficulty of

23 if you're Mexican and you can apply for pre-examination,

24 you still have to get up to Canada to go to one of

25 the -- to go to one of the consuls and get approved to

1  return back into the United States, as illegal entrant.

2  But after 1945 that is revised, and citizens of Mexico

3  are just excluded from that.  So they no longer can

4  even utilize what is extended to Canadians.  And the --

5  that that wouldn't end for Canadians until '61.

6      Q.  So one of the things that you had -- that

7  Professor Lytle Hernandez talked about also -- was the

8  sort of -- the difference between just straightup

9  exclusion, and then using Latinos and Mexican Americans

10  as the sort of temporary labor force that can be, um,

11  incarcerated or expelled at will, but could still be

12  utilized by American agriculture.

13      And one of the things we had talked about was,

14  in the Wetback Bill, was the sort of exemption of the

15  American employer from the -- essentially from harboring

16  an alien.  So, the employer was sort of cutout from this

17  because the employer still needed a, sort of, migrant

18  laborer.  But, is it your understanding also that an

19  illegal re-entry, let's say conviction, would also

20  cut off your path to that sort of permanency --

21      A.  Uh-huh.

22      Q.  -- that sort of creating roots, and sort of

23  funnel you in again to being this sort of temporary

24  source of racialized labor?

25      A.  Right.  And, you know, criminal convictions can

1  bar, you know, bar you from legal entry into the United

2  States.  And so the attachment of these, especially

3  felony convictions, was 1929.  Uh, to undocumented entry

4  means that, you know, in the period following 1929, and

5  if, you know, you cross back in after being deported,

6  then that, that makes it impossible for you to legally

7  immigrate at any point.

8        And there have always been exceptions, right?

9  You know, Dr. Lytle Hernandez talked about these kind

10  of push and pull factors.  But one thing that is -- one

11  exception that has traditionally been made in the,

12  in American immigration policy, has been an exception

13  for the responsibility of employers.  As I mentioned,

14  and as Dr. Lytle Hernandez mentioned, employers were

15  oftentimes knowingly employing undocumented immigrants.

16  Even during the period of the Bracero program, you had

17  employers who were still -- who are on record saying,

18  you know, it's still easier to go down to the southern

19  border and get workers, than it is to go through the,

20  kind of, red tape of all of this.

21        And the attempts to place some of the

22  responsibility on the shoulder of American employers

23  of undocumented immigrants have been either not present

24  at all in 1929, or relatively half-hazard in the years

25  following that.  I mean, there were employer sanctions

1  extended under the Immigration Reform and Control Act

2  of 1986, but those, those had so many loopholes, that

3  the fines were so low and the loopholes so big, that it

4  really didn't have much of a significant effect

5  on employers.

6          And also, of course, other things changed in

7  the 1980s and the 1990s in terms of forged documents and

8  other things like that.  But, you do have, you know --

9  the idea was that Mexicans were fine as long as they

10  came here only to work.  They were -- they were meant

11  to be a disposable labor force.  This is noted in the

12  1911 Dillingham Commission report, that:  "While

13  Mexicans are not easily assimilated, this is not of

14  great importance, as long as they return to their

15  native land in a short time."

16          And this was the point of the Bracero program,

17  right?  We'll bring them in.  We'll have them do the

18  labor that they're needed for, and then have it -- we

19  can make sure that they go back to Mexico.  The problem

20  with wetbacks is that there is no guarantee that they

21  go back to Mexico, right, because they are undocumented.

22  You don't know that they leave.  You don't have that

23  additional level of control over them.

24          And so there's a desire to preserve access to

25  this thing that American -- especially American cultural

1    interests say we need Mexican labor, right?  You have

2    cut off all these other potential spickets for labor

3    force, right?  You cut off access to Chinese labor.  You

4    cut off access to southern and eastern European labor.

5    And now what we have left are the Mexicans.  Or, as

6    Dr. Lytle Hernandez pointed out, or the blacks.  And

7    you don't want -- you know, you don't want the blacks

8    coming into Texas, so you say, well, we'll go with the

9    Mexicans.

10           And so they were viewed as disposable labor.  As

11   long as they returned, they didn't pose a racial threat

12   to the United States.  They didn't provoke those racial

13   anxieties.  It was when that control started slipping

14   during the period of 1950s, when you start to -- and

15   in the period leading up in 1929, right, when you have,

16   kind of, unfettered crossing between the United States

17   and Mexico, especially in terms of undocumented

18   entry.  But when you start to have the growth of the

19   undocumented population in the 1950s, this is when

20   you start to see the beginning of these, kind of, really

21   large-scale deportation actions, such as Operation

22   Wetback, and the discussion of the potential performance

23   of illegal immigrants in the United States.  And,

24   this idea that they are no longer that controllable

25   population.  Because part of what you want, right, out

1  of a racially inferior, but necessary labor force,

2  is you want to ensure that they, that they go back,

3  that they are here for as long as we need them.

4       And on the one hand, those temporary employment

5  programs worked for that.  And that is paired with this

6  idea -- you know, with the ability to designate them as

7  illegal and deport them when they are no longer needed,

8  or at least you try apply enough pressure to force them

9  to, kind of, self-deport, right?  Something that was

10  referenced by Mitt Romney in 2012, right?  This idea,

11  well, maybe if we just make this things bad enough,

12  all those illegal immigrants will just return to

13  Mexico.

14       And this harkens back, again, to the Mexican

15  re-patronization program.  And, again, is a

16  demonstration that none of these things occur in a

17  vacuum, without knowledge of what came before, right?

18  Lawmakers, in most cases, have some knowledge of the,

19  kind of, general arch of immigration policy --

20  especially if they're serving on some of these

21  committees.  Or, uh, I guess I shouldn't say that

22  they do.  If they don't, they should.

23  Q.  So I -- so you had talked about, a little bit

24  about, sort of, Operation Wetback, but I don't think --

25  I want to distinguish Operation Wetback from the

1    re-patronization of Mexicans that happened during the

2    Depression, and then the Braceros program.

3          And then talk a little bit about the exploitation

4    of migrant labor during the Braceros program, both by

5    Braceros and by undocumented immigrants.

6          That's three questions.

7     A.  Can you break that into pieces and chunks,

8    please?

9          I'll do my best to respond to that.

10         So, we didn't talk a lot about Operation Wetback.

11    I think Dr. Lytle Hernandez mentioned -- talked about

12    it a little bit.  But it was a -- you know, it was a

13    mass deportation program that was meant to address some

14    of these issues with the growth of the undocumented

15    population, and also supposed to be kind of a prod

16    to employers who were employing large number of

17    undocumenteds, that you need to kind of employ Braceros

18    and not undocumented immigrants.  But, the estimates are

19    that -- and it begins in 1954 -- the estimates are that

20    around 1.1 million people were deported under Operation

21    Wetback or returned -- although, again, you get into

22    kind of fuzzy numbers in some cases.  So I don't want to

23    be -- I will say that that number is -- that number is

24    probably not definitive, right?  It's an approximate.

25    But, it also utilizes -- again, to go back to this idea

1  of racial animus, it also utilizes a term that is,

2  you know, recognized as racially derogatory.  Again,

3  going back to that 1951 report that I cited earlier,

4  this idea that, you know, there was a recognition that

5  the term "wetback" carried all this baggage, and was

6  broadly applied to anybody of Mexican descent.

7      In addition, you know, there was a lot of

8  exploitation, both the Bracero program -- as Dr. Lytle

9  Hernandez pointed out, Mexico was a junior partner.

10  And in, in the 19 -- I think it was -- hold on.  Let me

11  find my -- let me look at my notes here.

12      In 1954, Mexico gave up its ability to

13  unilaterally blacklist employers who were exploiting

14  Mexican laborers.  So, in some cases, that exploitation

15  may take the form of a promised wage of $0.50 an hour,

16  and workers show up and, you know, they're told that

17  they're going to be paid $0.30 an hour; or, they're --

18  one of the things that was supposed to be provided for

19  Braceros was housing and, uh, some additional funds to,

20  kind of, feed themselves.  And in some cases, either the

21  housing was substandard, the food was not enough to

22  feed the number of people who were there, and so you

23  did have this exploitation of the program because there

24  just weren't a lot of consequences for violations of

25  the program.

1          You know, as I mentioned, in 1956, you have

2     1631 employers reported for violating the program,

3     and only 50 of them are removed.  So there's an

4     understanding of, like, what are you going to do?

5          Like, you went -- as a Bracero, you went through

6     this whole process to get this job, right, to improve

7     your life, or the life of your family, and now you're

8     here and they say, well, we're not going to pay you what

9     you were supposed to be guaranteed.  We're going to pay

10    you less than that.  If you don't like it, you can go

11    back to Mexico.  And so, you know, the mechanisms that

12    Braceros had at their -- you know, that they could use

13    to kind of leverage this agreement for their benefit,

14    uh, were more limited.

15         Now, were they as limited as they were for

16    undocumented immigrants?  Certainly not.  But, they

17    still were very limited.  And the legal status accorded

18    to them was based, in many ways, just on the need

19    for their labor, and not out of any desire to actually

20    protect them.

21    Q.  One thing I had learned, sort of, about the

22    Braceros that I didn't know before is, I guess, the

23    life of a Bracero was assigned $1,000 to his widow or

24    other family, but that it wasn't necessarily -- or I

25    guess -- or wasn't paid when a Bracero died on a farm

1   or a factory.

2         Do you know -- so, I guess, is it sort of your

3   general understanding that the protections that were

4   supposed to at least on paper be afforded to these

5   people coming from Mexico, just as a general matter,

6   were they actually protected in practice?

7   A.   I mean, I think there, you know, there is

8   variation there.  In some areas and with some employers,

9   perhaps the employers observed the terms of those

10  contracts more closely than other employers did.  But,

11  again, the ability for Braceros to take action -- I

12  mean, they could complain to the consulate.  They could

13  do things like that.  But, in many cases, you don't

14  see -- you don't see action taken on the part of the

15  government to ensure that employers are following the

16  terms of the contract.  And I think that's reflected

17  in that statistic, that this is just not being enforced

18  as much.

19        And so if you're an employer who, perhaps, is

20  shorting Braceros on wages, or providing unsafe or

21  substandard living conditions for them, you know,

22  their avenues to have that addressed are both uncertain

23  and relatively limited.

24              THE COURT:  All right.  Ms Gorman, I'm going

25  to interject.  I think that I should take a break to

```
1    allow everyone time to take a lunch break.
2              So, this is all very interesting.  As
3    someone who majored in history, I find it interesting.
4    But, I also don't want this to be out of control, in
5    the sense that it's not -- the hearing is not to have
6    a discussion or dissertation on just a general history.
7    When we return from the break, I would like to refocus
8    because earlier -- and I will have some follow-up
9    questions for Professor Gonzalez O'Brien after the
10   attorneys are finished, but just for my general thought,
11   earlier, Professor Gonzalez O'Brien began to talk about
12   the justification for the codification of Section 1326
13   in 1952, but then I didn't really get a clear answer, so
14   I would like to refocus on that issue.  And like I said,
15   I'll have some questions.  If you don't refocus, I'll
16   refocus you.
17             So let's take -- oh, did Ms. Gorman drop
18   off?
19             THE CLERK:  Yeah.
20             MS. GORMAN:  I'm here.
21             THE COURT:  We'll take our lunch break and
22   resume at -- let's resume at 1:30.
23             (Noon recess taken.)
24
25
```

```
1         Reno, Nevada, Tuesday, February, 2, 2021, 1:30 p.m.

2                              ---OoO---

3

4              THE CLERK:  Court is back in session.

5              THE COURT:  Ms. Gorman, are you ready to

6    resume?

7              MS. GORMAN:  I am, Your Honor.

8              May I resume?

9              THE COURT:  Yes.

10             MS. GORMAN:  Okay.

11                    DIRECT EXAMINATION (resumed)

12   BY MS. GORMAN:

13     Q.  So I guess to be more to the point, Professor

14   Gonzalez O'Brien, regarding the 1952 recodification,

15   is it your opinion, as a political scientist, that it

16   was motivated by racial animus?

17     A.  It is.

18     Q.  And can you tell me, as a social scientist, how

19   you reached that conclusion?  Looking at the historical

20   context and the legislative context?  Can you try to

21   summarize it?  And I know we've been through a lot of

22   it.  Sorry.

23     A.  Well, I think you have to look at a couple

24   things.  I think, first, you have to look at the context

25   in which, uh, Mexican immigration was being discussed at
```

1    that historical moment.  We talked about that a little

2    bit in regards to the Wetback Bill; also the reference

3    to wetbacks in that document by the Deputy Attorney

4    General.

5        So, I think it's important to understand it in

6    the context of that.  But it's, I think -- even though

7    it's recodified in 1952, I think the fact that there is

8    no debate on the prob -- the very overt problematic

9    aspects of its original codification in 1929, suggests

10   that there was nothing -- there was no problem seen

11   with the motivation for the original codification of

12   1326 in 1929.  Again, using language that was very

13   openly and explicitly racist, that made numerous

14   references to the necessity of preserving the kind of

15   purity of racial bloodlines in the United States, the

16   mongrelization of the Mexican or Latino bloodline.

17   So I think in understanding the recodification under

18   McCarran-Walter, it has to be done in the context both

19   of what came before it, but also what was occurring at

20   that historical moment, and at that moment in time.

21       And I think if you look at all of those things,

22   including the racial animus that was demonstrated in the

23   McCarran-Walter Act itself, in the continued assignment

24   of individuals of Asian descent to a kind of broad

25   category, and the assignment of national identities to

1   Europeans, which continued under McCarran-Walter, then I
2   think all of those things suggest that the decision to
3   pass this without debate, was largely driven by the same
4   things that drove the original codification of 1326;
5   and that was, in part, a desire to control access to
6   Mexican labor, and also a tendency to view Mexicans,
7   individuals from south of the Rio Grande, and at least
8   in the terms of the 1950s, the wetback, as a problematic
9   population.  And you don't see any significant debate
10  over -- you have a stretch between 1959 and 1952, where
11  you have 1326 in effect, and you don't see any debate
12  over that policy on its merits.
13       We've been doing this for over 20 years by that
14  point.  What are the merits of 1326?  Why should it
15  be recodified?  Is it serving the function it was
16  originally intended to serve -- even if we characterize
17  that as one of maintaining racial purity, but is it
18  serving the purpose that it is supposedly -- if we think
19  about it in race neutral terms, it is meant to serve
20  as a deterrent.  Is it just serving that deterrent
21  function?  You don't have a debate over that in 1952.
22       And, you, actually, don't have a debate over
23  that, really, in most of the either initial
24  codification -- or sorry -- the recodification in
25  '52, or the subsequent reenactments in legislation

1    going forward.

2         What is the purpose of this?  If it is racially

3    neutral, then does it serve its stated goals of acting

4    as a deterrent to undocumented immigration.

5              MS. GORMAN:  I don't know if the Court has

6    any follow-up questions as well -- and then I guess I --

7    and as part of that context if the, sort of, original

8    motivation is this compromise over eugenics, and having

9    a control over an exploitable labor force, was that

10   effective going forward when you talk about Mexican

11   re-patronization and the Bracero program, and the

12   utilization of those migrants as sort of a temporary

13   labor force?

14             THE WITNESS:  Yeah.  You know, one of the

15   points of the Undesirable Aliens Act was to create a

16   labor force in the United States that would serve

17   the interests of, um, usually southern agribusiness,

18   but the United States more broadly, but at the same

19   time have no permanence, be deportable, be controllable

20   and, therefore, offer a mechanism by which to preserve

21   the racial integrity of the United States, by ensuring

22   that these populations don't establish permanence, which

23   then can lead to (unintelligible) and other effects on

24   the racial purity of the nation.

25             MS. GORMAN:  Your Honor, I know if this

1 Court have any follow-up questions before I pass the

2 witness?

3         THE COURT:  Well, I'm going to let

4 Mr. Walkingshaw do his cross-examination.  And I'll

5 let you both exhaust your questions.  And if I find the

6 questions I have are not answered, I'll intervene.

7         Mr. Walkingshaw.

8         MR. WALKINGSHAW:  Thank you, Your Honor.

9         **CROSS-EXAMINATION**

10 BY MR. WALKINGSHAW:

11    Q.  Good afternoon, Professor O'Brien.

12    A.  Good afternoon.

13    Q.  I was going to say good morning.

14      So, Professor Gonzalez O'Brien, I believe you

15 mentioned at the outset of your direct testimony

16 that you have a written a few books on the subject of

17 immigration, correct?

18    A.  Uh-huh.

19    Q.  One of them is called <u>Handcuffs and Chain Link</u>,

20 correct?

21    A.  Yes.

22    Q.  Is it fair to say that that work is based

23 off a dissertation that you wrote, I believe it was

24 copyrighted in 2014, for your Ph.D thesis at the

25 University of Washington?

1    A.   That's accurate.  It's an expanded version of

2    what was submitted for my dissertation.

3    Q.   Yeah.  But much of the text is the same, correct?

4    A.   There's, uh -- I mean, I don't know -- I don't

5    know the exact percentage of text that is -- that

6    mirrors exactly what was in my dissertation.  It went

7    through a couple peer -- it went through a period of

8    peer review with the University of Virginia Press before

9    going to publication, so there were changes and then

10   there were expansions to certain segments based on some

11   of the reviews from the individuals who were sent a copy

12   of the manuscript.

13   Q.   I would like to ask you some questions about

14   those documents --

15   A.   Okay.

16   Q.   -- if I could.  So --

17   A.   If I may of clarify, are you asking me, also,

18   questions about my dissertation, my memory of which

19   is now quite foggy, since I submitted my dissertation

20   in 2014, and have really only read this in the form

21   of the subsequent publication of it.  That would be

22   Handcuffs and Chain Link.  I don't know how accurately

23   I can speak to exactly what appears in my dissertation

24   from 2014.

25   Q.   Fair enough.  I'll try to frame it as things you

1    wrote in the book.

2        So in the introduction of the book, you did

3    write that:  "The 1929 Act" -- uh, which I -- I'll use

4    a shorthand -- I'm going to use some shorthand terms for

5    the benefit of the court reporter.  And I'll try to

6    speak slowly -- but I'm going to call the Undesirable

7    Aliens Act of 1929, "the '29 Act."

8        Fair?

9    A.  Sure.

10    Q.  Do you understand?

11    A.  Yes.

12    Q.  Okay.

13    A.  I get it.

14    Q.  And I'll try to define terms as I go.

15        But you wrote that:  "The 1929 Act was

16    attributable to a few things, including the success

17    of immigration restriction in 1924" --

18    A.  Uh-huh.

19    Q.  Correct?

20    A.  Correct.

21    Q.  "Hardening notions of sovereignty following

22    World War I," correct?

23    A.  Correct.

24    Q.  "And the Great Depression," correct?

25    A.  Correct -- well, the beginning of the Great

1 Depression, yeah. The beginning of an economic

2 downturn.

3    Q. And you wrote that: "The Great Depression, like

4 most economic downturns, increased nativism," correct?

5    A. Yeah. You see an increase in nativism associated

6 with most economic downturns.

7    Q. Right.

8      That "it helped drive perceptions of economic" --

9 "the Great Depression," rather, "helped drive

10 perceptions of economic threat from immigration,"

11 correct?

12    A. Yeah.

13    Q. All right.

14      And in your dissertation and your book -- I

15 believe they're both the same on this point --

16    A. Yeah.

17    Q. You, uh, you write that: "The passage of the

18 1929 Act led to a 57-year period where there would be,

19 in your view, no congressional action on undocumented

20 immigration," correct?

21    A. Very little. I mean, I mention the Wetback Bill

22 in _Handcuffs and Chain Link_ in passing, as a kind of,

23 uh, you know, expansion of some of the things. But what

24 I'm talking about -- oh, sorry. I'm talking too fast

25 again.

1     What I'm -- you know, what I mean by that 57-year

2 period is that you don't see a significant overhaul

3 of how we really approach immigration until the

4 immigration -- the Immigration Reform and Control Act

5 of 1986.  So, you don't see a significant overhaul of

6 how undocumented immigration specifically is addressed.

7     Now, that is not to say legal immigration is not

8 addressed in 1952 with McCarran-Walter, or 1965, with

9 Hart and Celler; nor that there isn't -- there aren't

10 other pieces of legislation that occur over the

11 course of this period.

12     But in terms of significant legislation and

13 legislation that constituted a significant overhaul

14 of how we address undocumented entry into this country,

15 the argument that I make is that 1929 and 1986 are

16 two of the big moments in U.S. immigration policy

17 in terms of undocumented immigration specifically.

18 Q.  And, uh --

19 A.  I do think I make that point both in my

20 dissertation and in my book.

21 Q.  I believe that's correct.

22     So, fair to say then, based on your answer

23 just now, you view the 1986 Immigration Control and

24 Reform Act as a major overhaul of how we approach

25 undocumented immigrations in this country?

1     A.  I mean, yeah, the Immigration and Control Act was

2   a significant piece of legislation.  I mean, I think

3   that is, uh, in -- to borrow from Dr. Lytle Hernandez --

4   I think that is in the mainstream of writing on U.S.

5   immigration policy.

6     Q.  All right.

7         And for the benefit of the court reporter,

8   I'm going to refer to that act as IRCA, which is a

9   pronunciation of I-R-C-A.  Is that a fair -- do you

10   understand that --

11     A.  That's fair.

12     Q.  Okay.

13     A.  I like the tongue twisters better.  But, it's

14   probably easier for the court reporter.

15     Q.  Right.

16         And to summarize the -- and correct me if

17   I'm wrong here, but the thesis -- or one of the thesis

18   of your dissertation and your book is that IRCA was

19   an opportunity to re-envision how we approach or

20   documented immigration in this country, correct?

21     A.  Certainly.  Yeah.

22     Q.  And you refer to it in both documents as what's

23   referred to as a "critical policy failure," correct?

24     A.  Yeah.

25     Q.  And what you mean by that, among other things,

1    is that it failed to reduce the overall undocumented

2    population in the U.S., correct?

3       A.   Uh-huh.  Yes.

4       Q.   Thank you.

5       And just for the benefit of the court reporter,

6    if you could -- I know you caught it eventually -- but

7    if you could respond with a "yes" as opposed to a

8    "uh-huh."

9       A.   Yes.

10      Q.   And I will try to speak slower.

11      A.   Yes.  I agree.

12      Q.   All right.

13      And then the sort of further thesis of both

14    your dissertation and your, and your book, is that

15    this critical policy failure led to a return to

16    the criminalization of immigration itself.  So,

17    criminalizing the immigrants --

18      A.   Uh-huh.

19      Q.   -- as embodied in the -- what I'll call IIRIRA,

20    but the 1996 Act, correct?

21      A.   Yes.

22      Q.   And, I'm sorry.  What's the full name of the Act

23    that I'm referring to?

24      A.   The Illegal Immigrations Reform and Immigrant

25    Responsibility Act.

 1    Q.  Okay.  And I'll call that IIRIRA.

 2    A.  Okay.  I didn't write it, so you can call it

 3  whatever you want.

 4    Q.  Fair enough.

 5        Sorry.  Lots of terms here.  I'm trying to

 6  cutdown on fingers typing?

 7        And you referred to, in your direct testimony,

 8  that's the last time that Congress really addressed

 9  this issue as well, correct?

10    A.  Uh, as a point of clarification, that's the

11  last time a significant legislative package was passed

12  overhauling how undocumented immigration is addressed.

13  It certainly isn't the last time immigration is

14  addressed period, either legal immigration or illegal.

15  But, that's the last passage of a significant policy

16  that changes, kind of, the approach to undocumented

17  immigration, or addresses it in some manner.

18    Q.  Well, thank you for the clarification.

19        So as you discussed earlier, there were times

20  when Congress addressed legal immigration in this

21  intervening period, correct?

22    A.  Yes.

23    Q.  And as we've discussed, the 1952 Act is -- and

24  when I say "the 1952 Act," I'm referring to the

25  McCarran-Walter Act.  That's one of them, correct?

1     A.   Yeah.

2     Q.   That is the Act that passed -- I'm trying to

3   frame this in a way that we won't disagree about it --

4   but that's the Act that passed the, uh, 19 -- the 1326

5   provision that is in effect today, subject to further

6   amendment, correct?

7     A.   Right.  Correct.  The recodification of the -- of

8   the, uh, the Undesirable Aliens Act.

9     Q.   Okay.

10          And if you had written -- sorry.

11          You testified earlier that there is some

12   disagreement as to whether or not the McCarran-Walter

13   Bill was a progressive Bill, correct?

14     A.   Yeah.  I mean, I, I think in -- sometimes when

15   I've seen it referred to just in news stories and things

16   like that -- and some of the early encounters I had with

17   McCarran-Walter as a graduate student, if we want to go

18   all the way back to the yesteryears of my professional

19   experience, you know, the removal of racial restrictions

20   on immigration was seen as being a liberalization of the

21   immigration policy, right?  You were no longer saying

22   that you can't immigrate -- you can't come to this

23   country if you're Asian, right?  You cannot become a

24   citizen if you're Asian.  So, that did represent a

25   liberalization of immigration policy.  But, I think

1  that term is often stretched a little thin when

2  referencing McCarran-Walter, when you actually look

3  at the provisions of the Act itself.

4      Q.  All right.

5          So, fair to say you don't view it as progressive

6  though?

7      A.  I don't view it -- uh, I will say yes, but...  I

8  view the removal of racial restrictions as something

9  that is -- that was a good thing at that point in time.

10  I don't think, as a whole, that it is necessarily a --

11  or that it is a what I would call, or what I would label

12  as a progressive piece of legislation.

13          And when I say "progressive piece of

14  legislation," I want to clarify further that I'm

15  talking about this in terms of a racially progressive

16  piece of legislation.

17      Q.  All right.

18          Now, Mae Ngai -- Ngai, spelled N-g-a-i, for the

19  benefit of the court reporter -- writes in her book,

20  Impossible Subjects, about the McCarran-Walter Bill,

21  correct?

22      A.  She does.  Correct.

23      Q.  And you're familiar with her work, correct?

24      A.  Oh, I mean, if you've read my book, you know I

25  cite her frequently.

```
 1      Q.  Yes.

 2      A.  By the way, thank you for the royalty.

 3          But, anyway, go ahead and continue.

 4      Q.  You're very welcome.  I don't know what that

 5  comes out to, but --

 6      A.  Like, $0.75.

 7      Q.  Fair enough.

 8      A.  That would be a stick of gum these days.

 9      Q.  Right.

10          And in addition, in the summary of anticipated

11  testimony that you provided for this hearing, you also

12  referenced Ngai's work, correct?

13      A.  That's true.  Yeah.

14      Q.  Is it correct that in her book, Ngai says

15  that:  "Preserving the national origins quota was not

16  the central motivation for the McCarran-Walter Bill"?

17      A.  Uh, I believe so.

18          I mean, if you want to read me that particular

19  passage, you're welcome too.  I don't know what page it

20  appears on.

21      Q.  Sure.

22      A.  I, I didn't have a chance to reread all of

23  Mae Ngai's 350-plus-page book before testimony this

24  morning or on the lunch break.  So, my apologies with

25  my unfamiliarity with that specific passage.
```

1    Q.  Yeah.  That's okay.

2        Do you have a copy handy?

3    A.  Right there.

4    Q.  All right.

5    A.  The good thing about working from your home

6    office, slash, bedroom.

7        Anyway, go ahead.

8    Q.  Does the phrase that I read to you appear on

9    page 237 of the book?

10   A.  Now I have to look old by taking off my glasses.

11   I'm almost ready for bifocals at this point.

12       Okay.  Yes.  What paragraph are you referencing?

13   Q.  Oh, boy.  Um --

14   A.  You didn't highlight it?

15   Q.  I really should have.

16       All right.  So, it's the first paragraph.

17   A.  Are you talking at the top of page 237?

18   Q.  Yeah.  It's the first -- it's not a full

19   paragraph, but it's the first paragraph.  If you go

20   four full lines up from the bottom, the sentence

21   beginning with the word --

22            COURT REPORTER:   Wait.  Beginning with the

23   word what?

24   BY MR.  WALKINGSHAW:

25   Q.  Does it say, "preserving the national origins

1   quota was not the central motivation for the Bill"?

2       A.   It does say that.

3       Q.   And does it continue, "maintaining the status quo

4   hardly required such major review and revision of the

5   code"?

6       A.   That's true.

7       Q.   And does it follow, "McCarran saw revision of

8   the nation's immigration laws as a tool in the United

9   States' urgent battle against communism"?

10      A.   That's accurate.  Yes.

11      Q.   Is it fair to say that the 1952 law received

12  political support for a variety of reasons?

13      A.   Yeah.

14      Q.   Earlier you referenced -- you were having

15  discussion as to whether or not the Bill was racially

16  progressive, and you referenced the elimination of the

17  bar on Asian immigration, correct?

18      A.   Uh, the elimination of the qualification under

19  Johnson-Reed, that the only people who could utilize

20  the quotas that were assigned to Asia, had to be people

21  who could become citizens of the United States, which

22  were not people of Asian descent at that point in time.

23      Q.   Right.

24           And Secretary of State, Dean Acheson supported

25  this Bill because it eliminated this provision, correct?

1     A.  Uh, to my knowledge.  Again, I haven't -- I --

2  you could reference that specific passage, if you'd

3  like.  I won't claim to know that off the top of my

4  head.

5     Q.  Okay.  It's on the following page, 238.

6     A.  Okay.

7     Q.  I promise we won't do much more of this.

8        So, the second full paragraph, second paragraph:

9  "Secretary of Dean Acheson..."

10     A.  Yep.

11     Q.  So that's where the sentence begins.

12     A.  I got it.

13     Q.  "Secretary of State, Dean Acheson, supported

14  the McCarran-Walter Act because its elimination of the

15  racial bar to citizenship, promises to resolve a, quote,

16  serious irritant of longstanding in the U.S./Japanese

17  relations," end quote.

18     A.  Yeah.

19     Q.  Would you agree with that?  Would you agree with

20  that statement?

21     A.  Would I agree with the statement, or would I

22  agree that that appears on page 238 of Mae Ngai's book?

23     Q.  Well, let's take them in turn.

24        Do you agree with the statement?

25     A.  I agree with the statement that that is why

1   that particular individual supported that piece of

2   legislation.

3       Q.   Okay.

4       Now, the McCarran-Walter Bill was preceded by --

5   you've mentioned in your prior testimony -- well, let me

6   back up and I'll withdraw the question and I'll try to

7   reframe it in a way that makes sense.

8       You've referenced in your prior testimony,

9   reports that have been compiled prior to the passage

10  of immigration laws, correct?

11      A.   Yes.  I have referenced a couple reports, as well

12  as, I think, a couple academic works from the period of

13  the 1950s.

14      Q.   And there was one done prior to the

15  McCarran-Walter Act, right, a report?

16      A.   I mean, there were lots of reports done.  Which

17  one are you referencing?  Are you talking about the, uh,

18  the Wetback in the Lower Rio Grande Valley?

19      Q.   No.  I believe there was a comprehensive report

20  that was about --

21      A.   Are you referencing the Wickersham Commission

22  report in 1931?

23      Q.   I'm referring to the Senate judiciary

24  Subcommittee report that ran about 900 pages.

25      A.   Of what year?

1    Q.  Well, I hate to break the book out again, but

2    it's back on page 237 -- I promise this is the last

3    one.

4    A.  Well, at least we're only going between two

5    pages here.

6    Q.  So back to the first paragraph --

7    A.  Yep.

8    Q.  -- following the sentence that says:  "McCarran,

9    a conservative and devout Catholic from Nevada, was

10   a dedicated anti-communist and, quote, warrior --"

11   A.  Uh-huh.

12   Q.  "-- but that 100-page report submitted by the

13   subcommittee, and the accompanying 200-page draft

14   omnibus Bill introduced by McCarran in 1950, and the

15   legislation that Congress ultimately passed in 1952,

16   have been considered most notable for their preservation

17   of the national origins support system."

18   A.  Okay.  Yeah.  It did preserve the national quota

19   system, although it changed the references point to the

20   census of 1920, I believe, instead of 1890, which was

21   the reference for Johnson-Reed.

22   Q.  So a few questions on that.

23        First, have you read that report that Ngai

24   references at page 237?

25   A.  I haven't read the 900-page report,

1     Q.  Okay?

2     A.  You know, if -- since you've read <u>Handcuffs and</u>

3     <u>Chain Link</u>, you know that I don't go into a great

4     amount of detail on McCarran-Walter, since it was, in

5     the history of undocumented immigration, uh, this

6     recodification in 1952 is something that is done very

7     much without debate, as we've covered in my testimony.

8     And so I did not read the 900-page report from the

9     Judiciary Committee.

10    Q.  Okay.

11        And the national origins quota system that that

12    sentence that we read referenced, that's no longer a

13    part of immigration law, correct?

14    A.  Uh, it is.  You don't get rid of national origins

15    quotas until 1965.

16    Q.  Right.  I'm sorry.  I mean, today, it's no longer

17    part of -- like you said, the national origins quota

18    system was eliminated in congressional legislation in

19    1965, correct?

20    A.  Yes.

21    Q.  Right.  So, today, if someone is trying to

22    immigrate to the U.S., they're not subject to any

23    quota with respect to their national origin, correct?

24    A.  They are not.

25    Q.  In fact, the 1965 Act included an explicitly

1   anti-discriminatory provision that banned consideration

2   of national origin, ancestry, or race, correct?

3       A.   That's true.   That doesn't mean there were

4   country level caps that were still imposed.   There was

5   a 20,000, uh -- 20,000 per year quota that was put on --

6   that was applied to Mexico in 1976.

7       Q.   All right.

8           I would like to shift perspective for a little

9   bit to IRCA, if we could.

10      A.   Okay.

11      Q.   Well, if you think it's --

12      A.   I love revisiting my first book, so --

13      Q.   Got it.

14          So, again, you view this as a significant shift

15  in the way that American law treated the, I guess what

16  we could call the problem of undocumented immigration?

17      A.   I mean, I think the way that I reference it in

18  my book is that I think this represented the potential

19  for a significant shift.   You did see the first amnesty

20  program that was part of the Immigration Reform and

21  Control Act -- or, sorry, IRCA -- in 1986.   And you did

22  see some shifts in language at this point in time.

23      Q.   Right.

24          With respect to the shifts in language, you wrote

25  that: "The debate over IRCA differed significantly from

```
1   earlier debates on undocumented immigration in 1929,
2   right?
3       A.  That's correct.  I mean, we would -- you know,
4   we would hope that the debate on immigrations shifts
5   from one that is, uh, strictly talking about the racial
6   purity of the United States, to something different by
7   the 1980s.
8       Q.  And you reference in your book a floor statement
9   by Representative Fish as expressing -- well, you
10  believed "it was a feeling no doubt shared by many, that
11  IRCA represented an opportunity to address immigration
12  control in a way that was not driven by nativists or a
13  reaction to the (unintelligible)," correct?
14      A.  That's correct.
15      Q.  You say that, "The floor statements reflected a
16  significant shift from the way in which Mexican and
17  undocumented immigration was discussed in the 1924 and
18  the 1928 Acts," correct?
19      A.  That's correct.
20      Q.  I believe we've touched on this briefly, but
21  IRCA did fail to reduce the influx of undocumented
22  immigrants, correct?
23      A.  Correct.  You have the passage of an amnesty
24  program, and then you have the beginning of the surge in
25  undocumented immigration.  And I forget -- I don't have
```

1  the charts in front of me.  But you have a surge in

2  undocumented immigration around the early part of the

3  1990s, I believe.

4      Q.  Okay.

5          And I'll throw out some numbers here that I've

6  taken from your book.  Let me know if you disagree with

7  them.

8          After IRCA, the undocumented population dropped

9  from 3.2 million in 1986, to 1.9 million in 1988,

10 correct?

11     A.  Yes.  The size of -- the estimated size of the

12 undocumented population -- and I want to be careful

13 to clarify that language because by virtue of being

14 undocumented, it is also a population that can be

15 difficult to measure in terms of its full size.

16     Q.  Right.

17     A.  So those are the estimated size of the

18 undocumented populations as represented in my book,

19 yes.

20     Q.  And by 1990, the estimated undocumented

21 population had risen above three million, correct?

22     A.  That's correct.

23     Q.  And by 1996, the estimate had risen to five

24 million, correct?

25     A.  That's correct, based on whatever member -- or I

1    think, what really fancy chart that I have in there.

2        Q.   Right.

3            1996 was when IIRIRA, the I-I-R-I-R-A was

4    enacted, correct?

5        A.   Correct.

6        Q.   And you mention in your book a number of

7    motivating factors.  And I believe you reference a

8    scholar named Don Johnson who identified them, but

9    you refer to them in your book, correct?

10       A.   I think so.  I don't specifically remember

11   Don Johnston, but --

12       Q.   Okay.

13           So one of the things you mention is the failure

14   of IRCA to stem the illegal immigration --

15       A.   Right.

16       Q.   The other was the passage of NAFTA?

17       A.   Right.

18       Q.   And that's the North American Free Trade

19   Agreement?

20       A.   That's correct.

21       Q.   Which you write, "focused the public's attention

22   on immigration and its effect on the U.S. economy,"

23   correct?

24       A.   Correct.

25       Q.   You also reference the 1993 World Trade

1  Center bombing?

2      A.  I have no -- I have no recollection of

3  referencing that, but, um -- I don't know if you're

4  referencing my dissertation or my book, but I don't

5  recall that off the top of my head, and I don't

6  recall the context for referencing that off the

7  top of my head.

8      Q.  Okay.  You also --

9      A.  My apologies for not recalling it, but when

10 you -- you know, I have a little distance since that

11 was written.

12         But, anyway, go ahead.  Continue.

13     Q.  If I e-mailed you a copy of your dissertation

14 and pointed you to the page, would you be able to say

15 whether or not it was fairly characterized?

16     A.  If it appears in my book, I would be -- I think

17 it is more relevant to the testimony that I'm offering

18 today, since, again, my book went through the -- the

19 manuscript submitted as my dissertation went through

20 multiple rounds of peer review before being released as

21 my book; and, therefore, as a dissertation is not what

22 I can -- is not a publication, nor is it something that

23 I would consider a final version of my work.  That is,

24 essentially, a draft version.  That is a dissertation,

25 but it is not a publication.

1      Q.  Okay.

2          It's hard to e-mail it to you since there's a

3  digital copyright provision for the benefit of your

4  royalties.  Maybe we'll just move along.

5      A.  Well, I mean, I have my book, but I don't -- I

6  don't get any royalties from my dissertation --

7  although, you know, if you want to send me $0.75, I'll

8  take it.

9      Q.  Sure.

10         So you do have a copy of your book?

11     A.  Yeah.  Somewhere.

12     Q.  Okay.  So the phrase that I'm referring to does

13  appear in your book.

14     A.  Okay.

15     Q.  The sentence --

16     A.  Hold on one second.  Let me pull it up.

17     Q.  You have it --

18     A.  I also have a pdf of it.

19     Q.  Okay.

20     A.  So, uh -- and my apologies to -- my camera --

21  give me one second.  I just lost my monitor, so --

22             MS. GORMAN:  Personally, I'm losing a thread

23  because I don't know what people are referring to.  If

24  somebody could share a screen, or if Mr. Walkingshaw

25  could share his screen so I can -- I'm trying to --

```
 1              MR. WALKINGSHAW:  I will try.  I have the
 2   Kindle version of the Professor's book, which was cited
 3   in the motion.  Let me see if I can find a way to share
 4   my screen.
 5              Can you Control F in your pdf?
 6              Oh, dear, we lost his video.
 7              THE WITNESS:  Yes.  Give me one second.
 8   I'm trying to correct my video.  My monitor cut out.
 9   I'm trying to do a quick fix on that, but I can still
10   hear you.  Hold on.
11              Okay.  What am I -- what page did you
12   reference?
13   BY MR. WALKINGSHAW:
14      Q.  So it's hard with the Kindle version because it
15   doesn't have pages, but if you can search within the
16   document for the phrase "the 1993 bombing."
17      A.  Let's see.
18      Q.  I'm afraid I'm unable to share my screen.
19      A.  And I'm down a monitor.
20              Um, yes, "the 1993 bombing of the World Trade
21   Center by" -- whoop.  Am I getting it back now?
22      Q.  Yes.
23      A.  Now it's over here.
24              Okay.  Let me just switch this over real quick,
25   and then I'm looking at the right screen.
```

```
 1                THE CLERK:  Mr. Walkingshaw, give it a try

 2      now to try and share your screen.

 3                MR. WALKINGSHAW:  All right.  One moment.

 4                THE WITNESS:  Okay.  I can read the passage

 5      if you'd like, since I have it right here.

 6                MR. WALKINGSHAW:  Sure.  That would be

 7      great.

 8                THE COURT:  Well, before you do that, I'm

 9      just trying to -- he's sharing the screen?

10                MR. WALKINGSHAW:  I'm sorry, Your Honor.  I

11      can take it down if it's preferable.

12                Did Your Honor have a question?

13                THE COURT:  I'm trying to understand this

14      line of questioning.  You're asking if Professor

15      Gonzalez O'Brien referenced the 1993 bombing of the

16      World Trade Center?

17                MR. WALKINGSHAW:  As a driving factor for

18      the passage of the 1996 IIRIRA Act.

19                THE COURT:  And I think that the answer

20      earlier was that he wasn't sure if he did.  And that's

21      what you were trying to demonstrate, is that it was

22      referenced?

23                MR. WALKINGSHAW:  Yes.  That he identified

24      it as one of the driving factors of the passage of

25      IIRIRA.
```

```
 1              THE WITNESS:  If I may offer a point of
 2    clarification.  I mean, all of this that is cited in
 3    that paragraph, both the North American Free Trade
 4    Agreement and the bombing of the World Trade Center,
 5    is talking about the environment at the time
 6    preceding the passage and the debate other the
 7    Illegal Immigration Reform and Immigrant Responsibility
 8    Act, or IIRIRA, or I-eera (phonetic), or however --
 9    whatever we're calling it right now.  So, I -- what
10    is your -- what is your question relating to that
11    particular passage?
12    BY MR. WALKINGSHAW:
13       Q.  So you have identified the World Trade Center
14    bombing as an event that made the passage of this Bill
15    more likely, correct?
16       A.  It was an event, at least the identification
17    of the individual, the suspect in that case as someone
18    who was believed to be an immigrant, did heighten public
19    fears around immigration, I think is the point that I'm
20    making there.
21       Q.  Okay.
22              And you also reference in your book -- I believe
23    you referenced this on direct -- a statement by John
24    Doolittle during the debates over IIRIRA, regarding a
25    drive-by shooting in his district where the perpetrator
```

1  was an undocumented alien.  He served his sentence.

2  And then he was back within one week after he was

3  deported.

4      Correct?

5     A.  Correct -- well, I don't know that I referenced

6  it that explicitly, but I did mention it in passing.

7  Yes.

8     Q.  Right.

9      And I believe you also referenced a statement

10 by an Iowa legislator who referred to a stabbing by

11 a previously deported, undocumented immigrant at a

12 party, correct?

13    A.  Correct.

14    Q.  Okay.

15     I will try and cease sharing my screen at this

16 point.  I think we've more than --

17     Or, Peggie, have I stopped sharing my screen?

18         THE CLERK:  You have.

19         THE WITNESS:  You're good.

20         MR. WALKINGSHAW:  Okay.

21 BY MR. WALKINGSHAW:

22    Q.  You teach immigration and border politics,

23 correct?

24    A.  Uh, I have.  Yes.

25    Q.  Yeah.  And at Highline -- I'm sorry.  Is it

1  Highline College or University?

2     A.   It's Highline College.  It's a community college

3  in Washington, where I was before taking the job at

4  San Diego State.

5     Q.   You taught comparative government there, correct?

6     A.   Yeah.  I mean, at a community college, you teach

7  whatever classes they tell you to teach because there

8  are only four classes that are offered.

9     Q.   Gotcha.

10         And it's true --

11     A.   Actually, as a point of clarification, I did not

12  teach immigration and border policy at Highline.  I

13  taught a racial and ethnic politics class, I believe.

14  But I don't recall teaching an immigration and border

15  policy class.

16     Q.   Oh, I'm sorry.  I don't believe that I said at

17  Highline, but have you taught immigration and border

18  politics generally.

19     A.   Yes.  Yes.

20     Q.   Okay.

21         And at Highline you did teach comparative

22  government, even though it's, perhaps, one of only

23  four classes that they offer in political science?

24     A.   It is.  And if you're going to ask me questions

25  regarding comparative government, that is not one of

1    the areas of my expertise, so, uh -- I, I am happy to

2    say I taught that class, based on my limited expertise

3    in comparative government, but it is not one of my areas

4    of specialization.

5        Q.  Okay.

6        Do you know if other countries around the

7    world criminalize entry to their borders without

8    authorization?

9        A.  Some do.  There is a wide range of immigration

10   policies worldwide in regards to undocumented entry,

11   and there's a wide range of policies that are used by

12   countries to address it.  And I think, also, uh, to

13   give that question a little additional context, you also

14   have to look at not only the penalties for entry, but

15   the opportunities for normalization of status after

16   that, um, initial act of undocumented entry.  And some

17   countries do provide more opportunities to normalize

18   status than the United States does.  Although, again,

19   I'm not an expert in comparative government, nor is that

20   the area that I write in.

21       Q.  Right.

22       But, isn't it true that a substantial majority of

23   countries around the world criminalize entry into their

24   borders without authorization?

25       A.  Are you planning on citing a specific number?

1    Because I don't know what would -- I don't know that

2    I can say that a majority do, without looking at the

3    immigration policies of all of the individual countries

4    in the international system, and also then having a

5    debate around what you would identify as "criminalize

6    undocumented entry."

7         Q.   Okay.

8              So, fair to say you don't know then?

9         A.   I know that immigration policies from country

10   to country vary in how they treat undocumented entrants.

11        Q.   But, you don't know whether or not a majority

12   or minority of those policies include a criminal penalty

13   for entry into the country without authorization?

14        A.   I don't.  If you've quantified that, I would love

15   to see a chart.  I can use it in my classes.

16        Q.   I'm scared to do more screen sharing, and so

17   perhaps I'll just move on.

18             So, I think I only have a little more.  I would

19   like to ask you some questions about the term -- the

20   term "wetback."

21        A.   Uh-huh.

22        Q.   You discussed it in your direct testimony,

23   correct?

24        A.   That's correct.

25        Q.   And it's not the first time you've been asked to

```
 1   provide expert testimony on the meaning of its -- on the
 2   meaning of that term, correct?
 3       A.  Uh, that's correct.
 4       Q.  Right.
 5           You've testified in a hearing last week in Oregon
 6   on the same subject, correct?
 7       A.  Yeah.  I testified -- I mean, you know, my
 8   testimony was not just to define the term "wetback,"
 9   but --
10       Q.  That's true.
11       A.  -- but I believe I did offer -- that testimony
12   was partial testimony that was then cut short.  So my
13   recollection of what exactly I discussed over the course
14   of that testimony is, um, is a wee bit foggy in terms
15   of where the stopping point was.
16       Q.  Okay.
17           This happened last Thursday, right?
18       A.  To my recollection, yes.
19       Q.  Right.
20           And I mean --
21       A.  I mean it's COVID time so, you know, everything
22   kind of ebbs and flows, and days of the week lose their
23   meaning.  But, yes, Thursday.
24       Q.  Sure.
25           And it was for a hearing on a motion very much
```

1    like this one, correct?

2        A.   That's correct.  Yeah.

3        Q.   I mean, can you think of any differences, aside

4    from the district and the defendant, from the two

5    motions that you're aware of?

6        A.   Not off the top -- I mean, I would have to look

7    at them side by side.

8        Q.   Right.

9        A.   I mean, I'm not going to pretend to have a

10   perfect recollection of both motions as were filed.

11       Q.   Sure.  But, you know, nothing major pops out

12   to you?

13       A.   They're similar motions based on my recollection

14   of the two.

15       Q.   Okay.

16       A.   Again, how similar they are and how -- in terms

17   of the actual text offered, I don't feel like I can

18   confidently say.

19       Q.   Okay.

20            You were asked at that hearing to discuss the

21   meaning of the term "wetback" as it was used in the

22   early 1950s, correct?

23       A.   Uh-huh.  Correct.

24       Q.   And in response, you stated, "The term was used

25   largely to denote anyone who had entered the United

1    States illegally," correct?

2        A.  Correct.

3        Q.  You stated that, "The term was used rather

4    broadly without any kind of national designation,"

5    correct?

6        A.  Correct.  Meaning, you know -- by which I meant

7    -- and I'm not sure if you're going to offer this

8    part of my testimony either, or if this was part of

9    my testimony -- but in terms of this being a designation

10   made solely to Mexicans versus anyone from, say,

11   Central America, who also crossed illegally, that

12   term would have been applicable to them as well.

13       Q.  All right.

14           And it refers, exclusively, to people in the

15   country without any documented status, correct?

16       A.  The term "wetback" does.  Yes.

17       Q.  Right.

18           And, again, the term originates from -- I believe

19   you covered that in your direct testimony.

20           Are you familiar with Cesar Chavez?

21       A.  No.  I've never heard of him before -- yeah.

22       Q.  Okay.

23           Uh, he was a Mexican-American labor organizer,

24   correct?

25       A.  Yes.

```
 1          Yeah, and I already know where you're going with

 2   this, but continue.

 3      Q.  Okay.  Well, let's get there and then I think we

 4   should -- ought to be done.

 5          He was considered a civil rights hero for many

 6   Mexican Americans, correct?

 7      A.  Correct.

 8      Q.  And in fact, in the 1950s and '60s and '70s,

 9   isn't it true that Cesar Chavez, himself, referred to

10   undocumented strikebreakers who were in the country

11   illegally as wetbacks?

12      A.  That's true.

13      Q.  Okay.

14          And he wasn't referring to Mexicans in general,

15   was he?

16      A.  He was drawing a distinction between legal

17   Mexicans and illegal Mexicans.

18      Q.  Right.

19          You wouldn't say that Cesar Chavez bore a racial

20   animus against Latinx people, would you?

21      A.  I would not.

22      Q.  Okay.

23              MR. WALKINGSHAW:  Those are all the

24   questions I have at this time.

25              So, at this point, Your Honor, I'd pass
```

1    the witness.

2                    **REDIRECT EXAMINATION**

3    BY MS. GORMAN:

4        Q.  So, Professor, that covered a lot.  Most of which

5    I have not read.  But just to be -- to be very clear,

6    when you're referring to -- because I, likewise,

7    listened to your testimony last week in the District

8    of Oregon -- is it fair to say you testified for several

9    minutes and then time ran out?

10       A.  That seems accurate.  Again, I don't remember

11   the exact number of minutes, but I didn't testify for

12   very long.  I was having unfortunate audio issues, which

13   I've since addressed with this neat little thing right

14   here.

15       Q.  Is there a difference in the use of, of a racial

16   -- of what could be a racial slur for one group, and not

17   for another group?

18       A.  I think there is.

19       Q.  As in -- okay.

20       A.  I think to contextualize my answer to the

21   previous question about Cesar Chavez, and about, uh,

22   the positions of some Mexican Americans, more broadly,

23   in regards to the undocumented population or to

24   wetbacks, uh, Mexicans in the United States have

25   long had issues with their own status.  And so there

1    are some divisions that you see, both at the time that

2    was referenced earlier in regards to Cesar Chavez,

3    but I also think there are -- there continue to be

4    some division on this question -- or on the issue of

5    undocumented immigration because, as I mentioned,

6    with -- as I mentioned with that 1951 report on the

7    wetback in the Rio Grande Valley, this attribution of

8    inferiority and criminality to the wetback was seen by

9    Mexican Americans as something that was generalized

10   to them as well -- because it was generalized to them.

11   And again, that is what I mean by this is a racialized

12   term.  This is a term that was used to characterize

13   people who appeared as if they could be undocumented,

14   regardless of their actual legal status or citizenship.

15   And so there, there is some -- there is some necessary

16   nuance to that.

17       Q.  And is it true that when you talk about Operation

18   Wetback, that actually included both Mexicans who had

19   legally entered the country and Mexicans who had entered

20   without permission?

21       A.  That's correct.

22       Q.  And, you know, you were left with this sort of

23   question about Cesar Chavez, and you touches on, I

24   think, something very -- an important part of that

25   history, which we didn't go into too deeply, but is

1   it your understanding since Cesar Chavez was very much

2   a, uh, an advocate of worker's rights in general, humane

3   treatment of workers?

4       Is that fair?

5   A.  Yes.

6   Q.  And during periods in American history, were

7   undocumented and Braceros actually used to break strikes

8   by agricult -- by farm interests and farm owners?

9   A.  That's correct.

10   Q.  And I want to make sure, if there's any

11   additional context that you wanted to add to that,

12   uh, you know, feel free to.  But those are just, sort

13   of, points that I noticed from the government's

14   cross-examination.

15       Was there anything further regarding that

16   terminology?

17   A.  Yeah.

18       So, uh -- so, you know, there -- again, there

19   were -- there has been, to a certain extent, this

20   playing off of the undocumented population and the

21   either legal Mexican population or Latino population,

22   and American citizens, and these tensions between

23   groups because, again, Mexican -- undocumented Mexicans

24   could be used as strikebreakers.  They were seen as

25   contributing to notions of racial inferiority of

1 Mexicans generally; essentially, of giving Mexican

2 Americans a bad name.  And so the context of

3 undocumented immigrants, and the context of the

4 term "wetback" and/or "illegal immigrant," has to be

5 understood through the lens of both how white America

6 interpreted those terms, but also how those were used

7 to categorize not just the immigrants, not just those

8 who were here without status, but to characterize an

9 entire group of people.  Because at the end of the

10 day, that was -- those were racial attributions.

11 There was no way for anybody to tell if somebody

12 was undocumented or legal or a citizen of the United

13 States.  And a lot of the activity on the part of

14 Mexican Americans, or legal Mexicans, and a lot of

15 the hostility toward some of the undocumented community,

16 was because there was a fear that that would be

17 generalized to the Mexican population as a whole, and

18 that would further lower the status of Latinos in the

19 United States as a group.

20 Q.  You know, another point that you had hat I

21 think was brought to your attention, was the use of

22 anecdotal testimony in congressional debates.  I

23 want you to comment further about the use of these

24 anecdotal -- of these anecdotes by lawmakers of violent

25 crimes committed by undocumented immigrants, to further

1   a general anti-immigrant agenda, and whether or not that

2   is intentioned with the empirical literature or not.

3      A.  Yeah.  So what you see sprinkled throughout the

4   congressional debate, you know -- and I go into this

5   quite a bit with the Illegal Immigration Reform and

6   Immigrant Responsibility Act, or IIRIRA, but what you

7   see is you see these instances, the use of the example

8   of the drive-by shooting, uh, these anecdotal instances

9   of criminality -- which this, again, you know, I'm not

10   downplaying the severities of that criminal behavior,

11   or the impact that that had either on the victims or

12   their families -- but that is essentially being used

13   in a way to characterize an entire population, when

14   the empirical support for immigrant criminality is

15   lacking, and when all contemporary examinations of

16   the criminality of illegal immigrants or undocumented

17   immigrants has found that undocumented immigrants

18   actually offend at lower rates than the native born

19   population.  And this is not something that was unknown,

20   even during the -- um, if I can pull this up for a

21   second, which I can't -- even during the debate of

22   McCarran-Walter, there was a correction on the part

23   of Representative Celler, when another member of

24   Congress -- and this is not specifically in reference

25   to Mexicans, but it is in reference to the kinds of

1     ideas that the foreign born are more inclined toward

2     criminality -- and Representative -- and Celler notes

3     that what you find, and what the FBI found -- and this

4     is in 1952 as well -- is the native born offend at

5     higher rates than the foreign born.  And this is

6     something that's been replicated over and over again

7     in multiple academic studies and, as I mentioned, in

8     numerous governmental publications and reports.  And,

9     yet, you continue to see it referenced.

10         You saw it referenced in the -- in the 1996, uh,

11     legislation during debate.  You also saw it referenced,

12     repeatedly, on the push on the part of President Trump

13     to crack down on sanctuary cities and things like this,

14     these references to tragedies; but, ultimately, to

15     anecdotal evidence of criminality on the part of the

16     undocumented population.

17         And, again, the criminality that we know tends

18     to be more, more generalized towards all people who look

19     like they could be undocumented immigrants because,

20     again, that term is a racialized one, and remains a

21     racialized one in this country.

22     Q.  The fact that -- I mean, there were the two,

23     sort of, notable examples, or several during that

24     administration, which I don't know if you're familiar

25     with, but one involved -- I think the first name of the

1    young woman might have been Mollie -- and her parents

2    came out and said don't use this tragedy to further a

3    racist agenda.

4          Do you recall, sort of that -- I understand this

5    post-dates this litigation, but --

6    A.   Right.  That was -- yeah, that was the murder

7    of Mollie Tibbetts in, I believe, in Iowa, by an

8    undocumented immigrant.  And this was picked up

9    as an example of the threat posed by undocumented

10   immigration, in much the same way that, Kathryn Steinle,

11   or Kate Steinle's death in San Francisco in 2015 was

12   used as an example of the threat posed by immigrant

13   criminality.  And this is something -- sorry.  I'm

14   moving my web cam.  I'm having -- there we go -- this

15   was something that you see referenced -- you see

16   referenced repeatedly in regards to both Mollie

17   Tibbetts, and Kathryn Steinle, but it was also something

18   that was part of Trump's general push in his campaign.

19   He brought the families of victims of undocumented

20   crime, he brought them on his campaign tour.  He had

21   them tell their story.

22         And, again, I am not saying these are not

23   tragedies, but this is -- the political reason for

24   this is it activates longstanding racial anxieties

25   in this country regarding nonwhite peoples, and

1  specifically Latinos.

2          THE COURT:  All right.  I forget --

3          THE WITNESS:  And at the same time --

4          THE COURT:  I'm sorry to interject.  I

5  forget what the original question was now and why we're

6  down this line of questioning.

7          Ms. Gorman, would you redirect.

8          MS. GORMAN:  Well, I think we can end it.

9  I think that the general point was -- that I was

10  at least attempting to conceptualize, was that

11  Mr. Walkingshaw had referenced this part of his

12  cross-examination, these anecdotal stories of violent

13  acts committed by undocumented immigrants, and to place

14  that in the context that those -- that these, sort of,

15  anecdotal pieces of evidence have sort of a long history

16  of being used to justify ultimately racists laws or

17  racist enforcement of laws, either facially neutral or

18  racially motivated laws.

19          THE COURT:  All right.  Do you have any more

20  in terms of your recross -- redirect, I mean?

21          MS. GORMAN:  I will mercifully say no,

22  other than, um -- yeah, I think I've -- I think we've

23  exhausted this.

24          And I guess just to be clear, there

25  was a lot of talk about IRCA, and I think -- and maybe

1   I misunderstood, but I guess it's my understanding, and

2   correct me if I'm wrong, but there was no amendment or

3   change to 1326 in IRCA, is that --

4           THE WITNESS:  No, there was not.

5           MS. GORMAN:  Okay.  So I think I

6   was confused by the testimony regarding IRCA

7   because -- okay.  That makes more sense then.

8       And, Your Honor, I don't know if this court had

9   additional questions or if we covered everything.

10          THE COURT:  Mr. Walkingshaw, do you have

11  more?

12          MR. WALKINGSHAW:  Your Honor, I don't

13  have any further questions, but I would ask the Court

14  for the opportunity to submit the transcript from

15  Professor Gonzalez O'Brien's testimony in the hearing

16  in Oregon on Thursday.  Obviously, it's only five days

17  ago, so that transcript hasn't been prepared yet.  But,

18  I think the Court should have the benefit of being able

19  to look at what Professor Gonzalez O'Brien said in that

20  proceeding because I believe there's some disagreement

21  between the parties as to what happened there.

22          MS. GORMAN:  And Your Honor, just if it

23  might help, I know that his testimony is going to

24  continue tomorrow in that proceeding, so we may just

25  want to get the transcript as a whole.  And I'm happy

1   to looking into providing that too.

2           THE COURT:  I'll address the post-hearing

3   issue in a moment.  I have some follow up questions for

4   Professor Gonzalez O'Brien.  And I may be jumping around

5   just a little.

6           Going back to your testimony from before

7   the break, where you indicated there was justification

8   for the codification of Section 1326 in the 1952 Act,

9   I believe, I thought you testified that the

10   McCarran-Walter Act itself did not contain any

11   discussion of Mexican entry into the United States

12   because that was not part of that Bill, but there

13   was continued attributions of criminality to illegal

14   immigrants.  And as evidence of that, you referenced

15   the utilization of the term wetbacks to describe

16   undocumented immigrants as Mexicans.

17           Is that -- am I --

18           THE WITNESS: Correct.

19           THE COURT:  -- summarizing all that

20   correctly?

21           THE WITNESS:  Yeah.  Um, and, you know,

22   what I was referencing with the term "wetback," is if

23   you look at the debate over McCarran-Walter, at least

24   the debate that I've read over McCarran-Walter, uh, you

25   don't really see that come up.  That was a letter that

1    was -- that was put into the Congressional Record

2    in support of certain changes to the McCarran -- under

3    the McCarran-Walter, including some changes in language

4    to 1326.  And that was from Peyton Ford, the Deputy

5    Attorney General, on behalf of the DOJ.  And in that

6    document, the term "wetback" is referenced.

7             But, again, in the McCarran-Walter debate,

8    broadly, most of the conversation is about the national

9    origins quotas, and about legal immigration into the

10   United States.  And you actually don't see Mexicans

11   referenced in the, kind of, broad congressional debate,

12   outside of this kind of throw away reference -- or not

13   throw away -- to this reference in the AG's, the deputy

14   AG's letter.  But, my understanding and my read of

15   the congressional debate over McCarran-Walter is that

16   Mexicans just didn't come up.

17            MS. GORMAN:  Your Honor, just to be -- for

18   clarification, in terms of McCarran-Walter, Mexico was

19   among the countries, when we're talking about legal

20   immigration, that was discussed in McCarran-Walter.

21            I just want to make a distinction between

22   1326 and, sort of, the Western Hemisphere quota --

23            THE WITNESS:  Right.

24            MS. GORMAN:  -- generally.

25            So I don't know if that provides -- at

1   least, for me, that provided some clarification.  I

2   don't know if that (unintelligible).

3           So Mexico was part of the conversation in

4   McCarran-Walter in terms of just the overall sort of

5   quota and system.  But with respect to illegal, or

6   with respect to 1326, that was what was the minimally

7   discussed provision in McCarran-Walter.

8           Is that a fair characterization?

9           THE COURT:  I'm sorry.  Are you asking --

10          THE WITNESS:  Are you asking me?

11          THE COURT:  -- Professor Gonzalez O'Brien a

12  question now?

13          MS. GORMAN:  Yeah.

14          THE WITNESS:  Yeah.  And most of the

15  discussion under McCarran-Walter is about, uh, the --

16  you know, the re-constitution of the natural origins

17  quotas, Asian immigration, and some of the issues that

18  were taken with the designation of Asian ancestry,

19  as what determined your -- what quota you could apply

20  to --

21          THE COURT:  I do see that --

22          THE WITNESS:  (Unintelligible).

23          THE COURT:  I'm sorry.

24          I do see that as a different issue and

25  I'm not asking questions about that.  So, I understand

1   that context.

2              MS. GORMAN:  I just wanted to be sure that,

3   yeah, the testimony wasn't characterized that Mexico was

4   not discussed at all.  I think I just wanted to make

5   sure that that was clear.

6              THE COURT:  So then after the lunch break,

7   when you opined that the codification was motivated, in

8   part, by racial animus, you identified several reasons

9   for you reaching that conclusion.  And I believe you

10  testified that even though there was -- it was codified,

11  there was no debate on the -- and I'm quoting -- overt

12  problematic aspects of the original enactment of the

13  statute in 1929.  And also there was no debate over

14  the merits of the Act because it was in effect for -- I

15  don't want to do the math -- between 1929 and 1952.  For

16  a lengthy period of time --

17              THE WITNESS:  Correct.

18              THE COURT:  -- as to whether or not the

19  statute serves important policy.

20              So I guess my question is, all that may be

21  good, while it may be good to have, kind of, a policy

22  examination, I don't know that the absence of that

23  suggests any racial animus.  So my question for you

24  is if you're aware of other instances where Congress

25  re-codified a statute and did do so with robust debate

1    over what may have been overt problematic aspects of

2    the original enactment.

3                Do you have an example.

4                THE WITNESS:  Well, we see that debate with

5    the McCarran-Walter Act, I mean the debate over national

6    origins, and the kind of racial aspects of the, of

7    the limits placed on quotas for southern and eastern

8    Europeans.  You see that in 1965 with debate over the

9    Hart-Celler Act, and the elimination of national quotas,

10   and the acknowledgement that the national quota system

11   had been one that was very clearly and explicitly meant

12   to privilege certain groups based on perceptions of

13   superiority and inferiority, particularly -- you

14   know, especially with 1924.  But, also, you see the

15   continuation of that with the McCarran- Walter Act,

16   and the insertion of tables during committee testimony,

17   the insertion of tables showing that the largest quotas

18   will still go to northern and western Europeans.

19                So, I think you certainly see that debate.

20   And you see that debate in regards to the quotas that

21   were applicable to the age of specific triangle under

22   McCarran-Walter.  And so that debate occurs.  And I

23   think that's one of the -- you know, that's one of

24   the reasons that I'm willing to say that this is a

25   demonstration of racial -- of continued racial animus,

1    is that you're acknowledging in the debate over

2    the McCarran-Walter Act, members of Congress are

3    acknowledging that there are problematic racial aspects

4    to the 1924 Johnson-Reed Act, which comes five years

5    before the Undesirable Aliens Act, and yet they choose

6    to not only recodify the 1326, but to recodify it, uh,

7    without any examination.

8              THE COURT:  Was there support for the

9    recodification or the codification of Section 1326?

10             I guess I would charact -- is it correct

11   to characterize it as a codification?  Because 1326 as

12   a statute, Section 1326 was really codified in 1952,

13   right?

14             So, my question is was there support for

15   that recodification of Section 1326 during the debate

16   in 1952?

17             THE WITNESS:  I did not come across -- in

18   my reading of the debate over the McCarran- Walter Act,

19   I did not come across any specific references to

20   either the -- you know, regardless of whether we're

21   characterizing it as a codification or recodification

22   of 1326, it was just not debated, at least in what I

23   have, uh -- what I have come across, and based on my

24   reading of the Congressional Record.

25             THE COURT:  So would it be fair to say it is

1  not clear that there was any particular groups

2  that supported or opposed the codification of

3  Section 1326 in 1952?

4          THE WITNESS:  There was no specific, uh --

5  there was no specific mention of it, again, outside of

6  some changes to the language that were suggested by

7  Peyton Ford in that letter.  Again, based on my reading

8  of the Congressional Record, there was no significant

9  debate over 1326.

10          MS. GORMAN:  Your Honor, may I ask a

11  follow-up question?

12          THE COURT:  You may when I'm finished.

13          Hang on.

14          Are you familiar with the ways in which

15  Section -- the statute changed, from 1929 to 1952, in

16  terms of the criminalization of re-entry?

17          THE WITNESS:  The language was changed a

18  little to allow for people who were apprehended outside

19  of -- I believe.  I would have to refer to the specific

20  language again -- but I believe that people who were

21  apprehended outside of instances of the Act of the area

22  that they had initially entered, illegally entered.  And

23  this was largely aimed at immigrants that had preceded

24  into the interior of the United States and were -- to

25  ease prosecutions of those individuals because, um, I

think as something that was mentioned in earlier
testimony, visa overstays and things like that had not
been criminalized in the same manner that the Act of
undocumented entry has been criminalized, and so the
language to that has been adjusted.  But, you know,
I'm -- based on my recollection of reading both
1929  and the final codification in 1929, and the
recodification then of 1326, as well as the 1326 as
it exists today, the differences are not wildly
significant in the, in the changes in language.

        But, again, I would have to say that, uh,
with complete confidence, I would actually have to
refer to those statutes.

        THE COURT:  That's why I asked if you're
familiar because I didn't compare the statute.  That
was a foundational question as to your familiarity,
and it sounds like you're not entirely -- you may be
familiar, but you're not -- you don't entirely recall
the difference between the two.  And I think that's
fair.

        Ms. Gorman, do you have follow-up questions?
I don't have any further questions for Professor
Gonzalez O'Brien.  Do you have any?

        MS. GORMAN:  I do.

        So, Professor Gonzalez O'Brien, you have

1  made -- you know, I want to be clear when we say, in

2  terms of what it means to debate something, versus

3  what it means to explicitly choose to carry something

4  forward.

5       So, is it your understanding that

6  explicitly, in 1952, there was an affirmative decision

7  made by that legislative body, to carry forward the

8  1952 Act of illegal re-entry?

9       THE WITNESS:  Yes.  I mean, they chose to,

10  you know, to codify or recodify what had been passed in

11  1929.  And that was part of the legislation, and members

12  of Congress are responsible for knowing what is in the

13  Bills that they're voting on.

14       MS. GORMAN:  So is there also -- and

15  you had gotten some questions from chief Judge Du

16  regarding -- and I'll refer to it as the "found-in

17  language."  So to the extent that this Bill was --

18  there was a decision to carry it forward, was there --

19  then there was this adoption of the found-in language

20  at the suggestion of the Deputy Attorney General?

21       Is that fair?

22       THE WITNESS:  That's fair.

23       MS. GORMAN:  And that adoption was

24  explicitly to make it easier to enforce the 1929 law,

25  by allowing prosecution of immigrants wherever they

1    were found, even if you couldn't establish where they

2    crossed.

3                Is that your understanding?

4                THE WITNESS:  That's correct.  That's my

5    understanding.  Yes.

6                MS. GORMAN:  And so I just want to be

7    very clear that the -- you know, the Congressional

8    Record, at least in Walter -- in McCarran-Walter, is

9    not silent on the point of illegal re-entry.

10               And then to just sort of reiterate that

11   one of the contexts of this sort of lack of, I guess,

12   robust debate, stands in contrast to robust debates

13   about other aspects of legal immigration.

14               Is that fair?

15               THE WITNESS:  That's fair.  And other

16   racialized aspects of immigration.

17               MS. GORMAN:  And part of the legislative

18   background also is the Wetback Bill that occurred two

19   months earlier.

20               Is that fair?

21               THE WITNESS:  That is fair.

22               MS. GORMAN:  And the Wetback Bill explicitly

23   carved out from the harboring of aliens employers?

24               THE WITNESS:  That is correct.

25               MS. GORMAN:  And that tension between

1    employers and the utilization of south of the border

2    migrants was the same sort of tension that we see

3    animating that debate in 1929.

4                    Is that fair?

5                    THE WITNESS:  That's fair.

6                    THE COURT:  Ms. Gorman, have you concluded

7    your follow-up questions?

8                    MS. GORMAN:  I think so, Your Honor.

9                    THE COURT:  Mr. Walkingshaw, do you have

10   any follow-up questions based on the questions I

11   asked and the additional questions that Ms. Gorman

12   asked?

13                   MR. WALKINGSHAW:  No, Your Honor.

14   Thank you.

15                   THE COURT:  All right.

16                   In terms of post-hearing briefs, let me

17   first address the question that Mr. Walkingshaw asked

18   about submitting Professor Gonzalez O'Brien's -- the

19   transcript of his testimony in a hearing, I assume

20   before the District of Oregon, on a similar motion to

21   dismiss a Section 1326 Count.

22                   I don't want testimony for the sake of

23   testimony.  So if you believe that Professor Gonzalez

24   O'Brien testified -- that the testimony somehow is

25   pertinent to his testimony today in terms of what's

```
 1    offered, or in terms of credibility or inconsistency,
 2    I'll allow it.  So, you can file it in your post-hearing
 3    briefs, submit the transcript, and point out what I
 4    should focus on.  I don't want the testimony to be the
 5    same testimony that I've heard already in this case.
 6              MR. WALKINGSHAW:  (Nodding head
 7    affirmatively.)
 8              THE COURT:  I would assume that much of --
 9    there will be much overlap because the issue is the
10    same.  Not that it's not very interesting, but I don't
11    need the records to be redundant.  So that's -- so to
12    the extent that you find that the testimony offered in
13    the other case will be somehow relevant for -- on the
14    issues raised or pertinent to determine credibility, I
15    will permit it.
16              And so if you need additional time because
17    Professor Gonzalez O'Brien is expected to testify
18    again on Thursday, then I will set the deadline for
19    post-hearing briefs to be submitted, and then I'm
20    going to close the briefing period so I can make a
21    decision on the motion.
22              So how much time do the parties think you
23    need to submit post-hearing briefs?
24              MR. WALKINGSHAW:  Uh, well -- I'm sorry --
25    if Ms. Gorman --
```

```
 1              THE COURT:  That's all right.
 2   Mr. Walkingshaw, you can go ahead and tell me since
 3   you were the one that asked for post-hearing briefs.
 4              MR. WALKINGSHAW:  Thank you, Your Honor.
 5              So we can order -- I do believe that
 6   having the transcript from this hearing is important
 7   to properly focus and present the issues.  We can order
 8   that on an expedited basis and I believe that will take
 9   one week to arrive.  Although, I don't know if Kathy is
10   in the room, she might be able to tell me otherwise.
11   But, I do think we will need a one week delay for
12   purposes of receiving that transcript.
13              I will order the Oregon transcript as soon
14   as possible.  I assume it won't take any longer.
15              If Ms. Gorman -- I don't plan on submitting
16   anything on testimony going forward in the Oregon
17   hearing, but if Ms. Gorman would like to that, I
18   believe -- and perhaps Professor Gonzalez O'Brien
19   can correct -- can let us know as far as scheduling,
20   but I believe that's scheduled to resume tomorrow.  But,
21   what I would suggest is build in a week to receive the
22   transcripts, and then perhaps three weeks to write
23   them?
24              THE COURT:  I'm sorry.  Three weeks to
25   what?
```

```
 1              MR. WALKINGSHAW:  To write the briefs.  So,
 2   perhaps, a month from now?
 3              MS. GORMAN:  I guess I want to be clear,
 4   Your Honor, in terms of Professor -- I would have to
 5   contact the District of Oregon, but I would assume
 6   that Your Honor would want the complete testimony of
 7   Professor O'Brien because I know he only testified for
 8   a few minutes.  And I don't know if that will change
 9   the timeline from the District of Oregon.  So, I
10   can check in with them too.
11              But I guess in terms of post-hearing
12   briefing, I want to know what areas this court would
13   like us to brief, I guess.
14              THE COURT:  I'll tell you that it's the same
15   area I've been struggling with, so I'll tell you what
16   they are.  And then Mr. Walkingshaw seems to think that
17   he would want the opportunity to offer any additional
18   arguments based on what's been presented so far and I'll
19   let him do that.
20              So, let me talk about timing.  I'll talk
21   about the page limit.  And I'll tell you the issues.
22              You want a 30-day deadline?  I may not
23   remember what I've heard already, so --
24              MR. WALKINGSHAW:  I'm open to other ideas,
25   Your Honor.  That seemed like it would be -- to review
```

 1    the transcript and then put forth the argument, that

 2    seemed appropriate.  But, I'm certainly open to if the

 3    Court has other ideas in mind, I don't mean to preclude

 4    the Court from suggesting an alternate schedule.

 5              THE COURT:  All right.  I'm going to give

 6    you until February 23rd to submit the post-hearing

 7    briefs.  So, both hearing briefs will be due the same

 8    day.

 9              The issue that's important for me is still

10    the issue of one of the questions I posed previously

11    at the hearing before; and that is, whether or not

12    the absence of any repudiation of the history that

13    led to the adoption of the statute in 1929 should be

14    construed as the defendant meeting his burden of

15    demonstrating that the codification in 1952 was

16    motivated by racial animus.

17              So that's a broad question, but I think it's

18    more nuance because I think it's important to focus on

19    the difference between the 1930 -- the 1929 version of

20    the statute, and the 1952 version of the statute.  And

21    you can argue it either way.  If there was not much,

22    as Ms. Gorman argued, there's not much changed to the

23    statute, other than adding a remedy that's more

24    punitive, then it would be easier for the defendant

25    to argue that the lack of any rejection of the prior

```
 1   history is indicia of racial animus; or, you can argue
 2   the opposite.  So I see the parties, both sides, can
 3   argue either way.
 4           What I'm looking for is, I guess, case
 5   law that would support your position, and so far I
 6   haven't seen any case law that supports either position,
 7   unfortunately.  So that's why it's still the same issue
 8   I've been struggling with from reading the initial set
 9   of briefs, even after the hearing, and through today.
10           I don't know that you will be able to shed
11   more light on that, but it's and issue I would like you
12   to think about it in terms of the post-hearing brief
13   that you wanted to submit.
14           There may be one more.  Let me look at my
15   notes on the issues.
16           Oh.  And I reiterate that to the extent
17   that the transcript of any of the experts who testified
18   today, to the extent they have testified in other
19   proceedings, I don't want the transcript just to be
20   informed that they've testified.  It will be only
21   relevant if it's relevant for my purposes.
22           MS. GORMAN:  Your Honor, I would just ask,
23   in terms of the District of Oregon transcript, since I
24   presume it's regarding Professor O'Brien -- or Gonzalez
25   O'Brien, that we have the complete transcripts.  And I
```

```
 1    just want to make sure that I can get those.
 2              THE COURT:  Well, if you're not able to get
 3    those, I don't want that to hold up my decision in this
 4    case.  So the deadline is what it is already, which is
 5    February 23rd.
 6              All right.  Any other questions that you
 7    have before I conclude the hearing?
 8              (No response.)
 9              THE COURT: So to summarize, post-hearing
10    briefs will be due on February 23rd -- oh, did I address
11    the page limit?
12              THE CLERK:  You didn't.
13              THE COURT:  I did?
14              MR. WALKINGSHAW:  No, Your Honor.
15              THE COURT:  I haven't?
16              MR. WALKINGSHAW:  I don't believe so, but
17    I might have missed it.  Peggie thinks you didn't.
18              THE COURT:  I would like to say 10 pages per
19    side as a limit because there's been exhaustive briefing
20    already.  I think 10 pages is fair.  If you, uh -- but
21    I'll accept comments if you think you need more than
22    10 pages.
23              MR. WALKINGSHAW:  Your Honor, I certainly
24    appreciate that a lot of ink has been spilled on this
25    case, not only the motion, the response, the reply,
```

```
 1    the supplements.  Uh, I can certainly try and keep it --
 2    I mean, and I'll let Ms. Gorman speak for herself -- I
 3    could certainly try to keep it at 10 pages.  My only
 4    worry is that -- and I think the Court -- and I think
 5    everyone appreciates this.  I mean, this is an important
 6    issue.  I think -- you know, this is, uh -- and it's
 7    a complex issue.  So, uh, I don't know.  I would maybe
 8    ask for 12?  But I don't want -- I don't want to overly
 9    negotiate the -- you know, and if Ms. Gorman thinks 10
10    is fine, I can curve my voracity to the extent possible.
11             MS. GORMAN:  Mess with the margins.
12             THE COURT:  In a way, I kind of invited a
13    debate -- or a request for more because I had said that
14    I would be open to suggestions.
15             I'm going to give you up to 15 pages.  I
16    would say the parties' briefs were about 30 pages, and
17    a lot of it relates to issues that I'm no longer
18    concerned about.  So, certainly, I think you could
19    do it in five, if not 10 pages, but I'm going to give
20    you up to 15.
21             MR. WALKINGSHAW:  Okay.
22             THE COURT:  That way, you're not reducing
23    the margin or making the font so small that you're
24    violating Local Rules and I can't read it.
25             All right.  15-page limit.
```

1          MR. WALKINGSHAW:  Actually, Your Honor, and

2    since you bring it up, I just do have a brief question

3    or just a point of clarification, if I could.

4          So I am taking the presumption that the

5    Court put on the record at the prior hearing, that the

6    Court is inclined to employ the Arlington Heights

7    framework.  I'll certainly answer the question the

8    Court asked.  I just want to make sure that I'm being

9    clear for the record that, you know, we've preserved

10   our positions as to the stan -- I'm happy to answer

11   the question.  I think it's, uh -- you know, that's the

12   brief I'm going to write.  I just don't want to be

13   construed as waiving any of our prior positions by

14   addressing those issues, if that makes sense.

15         And perhaps I'm being overly concerned here.

16   But since we're moving to post-hearing briefing, I just

17   want to make sure that those issues, you know, will be

18   ruled on in some form or other, if that's -- I won't

19   include the, you know, O'Brien, the deference stuff in

20   the new brief.  But, I just don't want to be construed

21   as waiving any of that by leaving it out of the new

22   brief, if that makes sense.

23         THE COURT:  You're inviting me to limit more

24   pages here because the nature -- so let's be clear for

25   the record.  Whatever arguments that both sides have

```
 1    already raised in the prior briefs, they're are deemed

 2    to be part of the record.  I am not construing that you

 3    waive any of the arguments by not addressing them in the

 4    post-hearing briefs.  I granted post-hearing briefs,

 5    primarily, because, Mr. Walkingshaw, you asked for it.

 6    And because you asked for it, I wanted you to have the

 7    full opportunity to brief the issue that I'm focusing

 8    on, that I just indicated.

 9              If you want to, you can also focus on

10    another issue that the government raised in the response

11    that was briefly addressed in the reply; and that is,

12    that whether if -- assuming that the defendant met his

13    burden under Arlington Heights, the burden then shifts

14    to the government, and the question whether the

15    government met its burden.

16              So, you can briefly address that issue

17    as well, if you want.  But not addressing issues you

18    have already addressed, will not be construed as you

19    waiving, unless you specifically conceded an issue,

20    which you did, with respect to the passage of the 1929

21    statute.

22              MR. WALKINGSHAW:  Thank you, Your Honor.

23    I appreciate that.  And I think that's entirely

24    correct.

25              The COURT:  All right.
```

1          Thank you everyone.  I'm going to conclude

2     the hearing then.

3

4          (Court Adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          -o0o-

2

3      I certify that the foregoing is a correct
       transcript from the record of proceedings
4      in the above-entitled matter.

5

       \s\ Kathryn M. French          February 5, 2021
6      _____        _____

7      KATHRYN M. FRENCH, RPR, CCR              DATE
       Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3          **I N D E X**

4

3    **DEFENDANT'S WITNESSES:**                          **PAGE:**

4

1) **KELLY LYTLE HERNANDEZ**

    Direct Examination By Ms. Gorman            18
    Cross-examination By Mr. Walkingshaw        37
    Redirect Examination by Ms. Gorman          62
    Recross-Examination By Mr. Walkingshaw      72
    Further Redirect Examination By Ms. Gorman  75

2) **BENJAMIN GONZALEZ O'BRIEN**

    Direct Examination By Ms. Gorman            80
    Cross-examination By Mr. Walkingshaw       133
    Redirect Examination by Ms. Gorman         167

# EXHIBIT R

# Declaration of Professor Benjamin Gonzalez O'Brien Regarding Racial Animus and USC 1326

November 2, 2021

I have been asked to make a declaration regarding the racial animus present in the initial codification of USC 1326 in 1929, as well as its subsequent reenactment in 1952. I am an associate professor of Political Science at San Diego State University and have written two books on U.S. immigration policy, *Handcuffs and Chain Link: Criminalizing the Undocumented in America* (University of Virginia Press) and *Sanctuary Cities: The Politics of Refuge* (Oxford University Press). Both of my books, as well a a number of my peer-reviewed journal articles address immigration in the United States, with a specific focus on undocumented entry. My first book, *Handcuffs and Chain Link* examined the importance of the 1929 *Undesirable Aliens Act* for the treatment of undocumented entry and how this act both reflected existing eugenicist beliefs regarding immigration from Mexico and Central America, but also shaped how undocumented immigrants were perceived in the decades to come.

USC 1326 was first codified in 1929 under a bill dubbed the *Undesirable Aliens Act*. This legislation, signed into law on March 4th, 1929, for the first time attached criminal penalties to the act of illegal entry (this would later become USC 1325) and reentry (USC 1326). The initial act of illegal entry was from this point forward a misdemeanor, punishable by imprisonment for one year, a $1000 fine, or both. Reentry after deportation, which would be re-enacted as USC 1326 in 1952, was henceforth a felony, punishable by a two year sentence, a $1000 fine or both.

The Undesirable Aliens Act was the culmination of a long push for restrictions on immigration from Mexico and Central America that had begun in the 1920s as the number of Mexican immigrants to the United States grew. Immigration from south of the Rio Grande river would become a target for white supremacists and eugenicists during this period, after immigration restrictionists realized a number of victories in late-nineteenth and early-twentieth centuries. The first big win for restrictionists in Congress had come in 1882, with the passage of the Chinese Exclusion Act, the first piece of immigration legislation prohibiting immigration based on race. This was followed by the implementation

1

of a literacy test in 1917, which was meant to weed out undesirable European immigrants, primarily from the Southern and Eastern parts of Europe, as well as the creation of an Asiatic barred zone that same year. The Chinese Exclusion Act and Asiatic barred zone of 1917 would reduce Asian immigration to a trickle, and were largely based on narratives of racial threat from those of Asian descent.

Restrictionists did not just want to see limits on Asian immigration though. There was also a desire to see immigration on the part of undesirable European groups reduced. Southern and Eastern Europeans, as well as the Irish, were often portrayed as being of a "whiteness of a different color", to borrow Matthew Frye Jacobson's phrase. [1] Groups like the Immigration Restriction League had long pushed for limits on "new" immigrant groups from Europe, who were seen as being of a lower racial stock than immigrants from the "old" countries, primarily Northern and Western Europeans. In 1907 the Dillingham Commission was formed with the purpose of examining the impact of the new waves of immigrants on the United States. The commission was made up of three members from the House, three from the Senate, with another three appointed by then-President Theodore Roosevelt. William Dillingham, senator from Vermont, served as chair. Henry Cabot Lodge, a member of the commission, was a known and outspoken eugenicist who believed that a whole range of traits were inherited or carried in the blood, which made the immigration of those from lower racial stocks a threat to the nation. Theodore Roosevelt also endorsed the pseudo-science of eugenics, which would become increasing popular in the early 20th century.

In 1911 the Dillingham Commission released its report, which spanned 42 volumes. The commission found that "new" immigrant groups from places like Serbia and Italy posed a burden to the United States across a number of different dimensions, including a greater propensity to criminal behavior, which the commission dedicated an entire volume to. Mexican immigration, which would not begin to surge until 1910 and the beginning of the Mexican Revolution, was largely ignored by the commission, though they did note that Mexican immigrants could become an issue in the future. In volume 36, the commission noted that, "Mexican immigrants are providing a fairly acceptable supply of labor...While the Mexicans are not easily assimilated, this is not of very great importance as long as most of them return to their native land after a short time." This highlights a basic tension that would become the basis for immigration policy throughout the 20th century, the need for Mexican labor and perceived racial threat posed by Mexican permanence in the United States.

After the release of the Dillingham Commission's report, eugenics would provide additional "scientific" evidence to grant greater legitimacy and urgency to immigration restriction in the first two decades of the 20th century. In 1910, the Eugenics Records Office, a research institute for the study of human heredity, was formed by Charles Davenport. Harry Laughlin was appointed superintendent of the ERO and would emerge as a central figure in the push for immi-

---

[1] Jacobson, Matthew Frye. Whiteness of a Different Color. Harvard University Press, 1999.

gration restriction in the United States, becoming assistant director under Davenport in 1921. Laughlin would offer expert testimony to Congress on a number of occasions, frequently before the House's Committee on Immigration and Naturalization, which was chaired by Albert Johnson of Washington, one of the key architects of the Johnson-Reed Act and the national origins quota system it would create, and one of Congress' most outspoken supporters of eugenics.

Laughlin would offer testimony before the House committee from April 16-17, 1920 titled, "The Biological Aspect of Immigration" where he would make a case for the use of immigration restriction to protect the racial purity of the United States. This was important because as Laughlin argued, "The character of the nation is determined primarily by its racial qualities; that is, by the hereditary physical, mental, and moral or temperamental traits of its people." At the conclusion of his testimony he was appointed the expert eugenics expert of the committee and a request was made for further studies into immigration and the racial stock of immigrants. The testimony of Laughlin, the Dillingham Commission report, and the influence of eugenicists like Albert Johnson in Congress would lead to the passage of the Johnson-Reed Act in 1924. This represented a huge victory for immigration restrictionists and eugenicists, who had long been advocating for curbs on Southern and Eastern European immigration. It created a national origins quota system for Europe based on two percent of the population present as of the Census of 1890, which was deliberately chosen to privilege Northern and Western European immigration. Additionally, Johnson-Reed created a system of racial quotas for those outside of Europe, with both Africa and Asia subject to a pan-ethnic regional quota, both of which were less than the quota of many European nations. In the case of Asian immigrants, Johnson-Reed also prohibited the immigration of any who could not naturalize, which Asian immigrants could not, meaning they could not even draw upon the regional quota for the Asia-Pacific region.

While Mexican immigration had largely been ignored in the Dillingham Commission report, it began to receive attention during the debate over the Johnson-Reed Act. Specifically, some members of Congress found it problematic that Mexico would not be subject to a quota under the act. Representative Patrick O'Sullivan of Connecticut argued, "I do not know what standard is used to measure desirability, but I do know the average Italian is much superior to the average Mexican as a full-blooded Airedale is to a mongrel. Yet this bill will permit every Mexican in Mexico to enter the United States, and the same bill would limit the number of Italians to 3,912." In the Senate, Senator Matthew Neely of West Virginia proclaimed, "On the basis of merit Mexico is the last country in the world to which we should grant special favor or extend a peculiar privilege...It is high time for us to realize that this is our country, and that it is our duty to defend it against all enemies. It is our duty to defend it not only against enemies in arms, but against the millions of physically, mentally,and morally inferior men and women scattered over Europe, Asia, Africa, Mexico, and the islands of the sea, who, as prospective immigrants, are awaiting the opportunity to rush our shore." Despite the racial animosity displayed toward Mexican immigrants in the debate over Johnson-Reed, Mexico was not included in

the quotas. This was due to resistance on the part of agribusiness, who wanted to maintain access to Mexican laborers. Rep. John Box of Texas, a long-time opponent of Mexican immigration and proponent of quotas for Mexico, explicitly noted that the inclusion of Mexico in Johnson-Reed's quotas could potentially lead to the entire bill being killed due to opposition from business interests.[2]

After the passage of Johnson-Reed in 1924, eugenicists and restrictionists like Rep. Box began to push for national quotas to be applied to Mexico. Box would introduce a number of bills to do just this beginning in 1926, despite the continued opposition from agricultural and business interests. Faced with the drive to restrict access to Mexican labor, some groups threatened that, "...if we are deprived of this source of labor we must immediately bring negroes from the southern states or Porto Rico."[3] Those who wanted Mexican immigration restricted leaned heavily on eugenics in making their argument, with Rep. Robert Green of Florida proclaiming that, "Another reason why the quota should apply to any country south of the Rio Grande is because their population in the main is composed of a mixture of blood of White, Indian, and Negro. This makes this blood a very great penalty upon the society which assimilates it."[4] Similarly, Box would argue that the purpose of the nation's immigration laws was to prevent, "...the lowering of the ideals and the average of our citizenship," before specifically singling out the "Mexican peon" as a threat to the racial purity and cohesion of the nation.[5]

The language used by members of Congress in many ways echoed the Congressional testimony given by Harry Laughlin of the Eugenics Record office. In 1922 Laughlin testified before the House Committee on Immigration and Naturalization in a hearing titled, "Analysis of America's Melting Pot". Laughlin presented a number of statistics to the House committee that were meant to demonstrate the threat posed to the racial stock of America by various immigrant groups. While Congress itself was more interested during this time in Southern and Eastern Europeans, Laughlin noted that Mexican immigrants were ranked fourth in all types of social inadequacy, which included criminality, feeblemindedness, insanity, propensity to disease or illness, and physical disabilities. He noted that these traits were carried in the blood or "germ plasm" and that, "We in this country have been so so imbued with the idea of democracy, or the equality of all men, that we have left out of consideration of blood or natural inborn hereditary mental and moral differences. No man who breeds pedigreed plants and animals can afford to neglect this thing..."[6] In 1928, the year immediately preceding the passage of the Undesirable Aliens Act, Laughlin would once again be called to testify before Congress, this time in a hearing titled, "The Eugenical Aspect of Deportation". Laughlin pointed out that, "...deportation is the last line of defense against the contamination of American family stocks by alien hereditary

---

[2] 65th Congressional Record, 6478
[3] U.S. Senate, Hearings before the Committee on Immigration, 1928
[4] 69th Congressional Record, 2462
[5] 69th Congressional Record, 2818
[6] Analysis of America's Melting Pot, Hearings before the Committee on Immigration and Naturalization, House of Representatives, 67th Congress

degeneracy."[7] He would later point out that, "Immigration can be made to improve the quality of the American people, but if the present standard is not raised and rigidly enforced, and if the aliens of degenerate or inferior stock who are found within our borders, especially those who will become the parents of future Americans, are not deported, then, depending on the number of such cases, immigration will tend to work not toward the improvement but toward the degeneration of the American people." Albert Johnson was the chair of the Committee on Immigration and Natural-ization and both John Box and Robert Green were members at the time of Laughlin's testimony and Johnson in 1930 would ask that Laughlin be made an immigration agent. Eugenicists, both inside and outside Congress, increasingly saw Mexican immigration as a racial threat to the nation and the language of men like Laughlin would be drawn on heavily in arguing for quotas to be applied to Mexico, though this would fail to gain traction time and again in the period following Johnson-Reed.

Instead, other approaches would be used to try and limit the number of Mexican nationals entering the United States. The Border Patrol was formed in 1924 and Mexican immigrants were subjected to a number of unpleasant procedures for legal entry in the hope that this would serve to limit Mexican immigration via administrative means. A head tax was imposed on entry in the post-WWI period, and those entering from the southern border were also subjected to humiliating and degrading nude inspections and delousing baths, often using caustic chemicals, and their clothes fumigated with zyklon-B. These same procedures were not applied to the northern border, since Canadian im-migrants were not seen as potential vectors for disease, which was explicitly linked by eugenicists during this period to race.[8]

None of this served to sufficiently limit Mexican immigration though and thus in 1929 a compromise was struck with agribusiness. Instead of a quota on Mexico, Senator Coleman Livingstone Blease of South Carolina introduced Senate Bill 5094, which would be nicknamed the "Undesirable Aliens Act". Instead of a quota on Mexico, this bill criminalized undocumented entry (1325) and reentry (1326), making the former a misdemeanor and the latter a felony. Blease himself was an outspoken White supremacist and someone who had defended lynch mobs are necessary for liberty, and who supported a constitutional amendment prohibiting miscegenation. He was also a staunch restrictionist, stating in 1930, "So far as I am concerned, I believe in keeping the doors shut against all immigration, in keeping them all out..."[9] The debate around the Undesirable Aliens Act would be driven by eugenicist narratives of racial inferiority and threat, something which Rep. John J. O'Connor of NY noted was inherent in the bill itself. He pointed out that, "I fear there is a spirit pervading our country today reflected in these immigration bills that is a menace to the country

[7]The Eugenical Aspects of Deportation: Hearings Before the Committee on Immigration and Naturalization, House of Representatives, Seven-tieth Congress

[8]Stern, Alexandra Minna. "Buildings, boundaries, and blood: Medicalization and nation-building on the US-Mexico border, 1910-1930." Hispanic American Historical Review 79.1 (1999): 41-81.

[9]72 Cong. Rec. 7512-13

- a spirit of intolerance and bigotry not only to religions but to races."[10] The report on the Undesirable Aliens Act by the House Committee on Immigration and Naturalization included a letter expressing opposition from the ACLU to the criminalization of undocumented entry, though this was ignored.

Eugenicist narratives were common in the debate over the *Undesirable Aliens Act* in the House, led by men like Robert Green and John Box. Green argued that criminals in the United States were largely foreign-born, while Box would go further, unleashing a tirade steeped in eugenics to justify the bill. "They are badly infected with tuberculosis and other diseases; there are many paupers among them; there are many criminals...they are objectionable as immigrants when tried by the tests applied to other aliens." while Rep. Roy Fitzgerald of Ohio charged that Mexican immigrants were, "poisoning the American citizen."[11] The Undesirable Aliens Act would be passed with little opposition in either house of Congress and become law on March 4th, 1929, representing the first codification of what would become USC 1326.

While the law technically applied to undocumented entry from the northern OR southern borders, there was little mention of the Canadian border during the debate over the *Undesirable Aliens Act*. Indeed, even groups like the Immigration Restriction League had noted that because Canadians were of similar racial stock, no quotas were necessary.[12] The omission of any real discussion of illegal entry from Canada from debate on the Undesirable Aliens Act made the racial animus behind the law clear, as would the loopholes that would be created for illegal entrants from Canada. In 1935, those who had entered the United States illegally from the northern border could apply for "pre-examination" while in the United States. Initially meant for those for whom deportation would cause a hardship, such as undocumented entrants with an American spouse or children, individuals would apply and be cleared for legal entry while in the US, then have to voluntarily return to Canada, where they then could be issued a visa at the nearest American consul.[13] Immigrants from Mexico would explicitly be excluded from this policy in 1945 and even prior to this the policy was never applied equally. As it was an agreement between the US and Canadian governments, even if Mexican immigrants were allowed to apply, they would still have to travel to Canada in order to normalize their status. Thus, deportation and the penalties for undocumented entry/reentry were never just about how an immigrant entered the United States, but also their race. In the case of Europeans or Canadians who had entered the US illegally from Canada, a path was provided to normalize their status. Between 1935 and 1959, approximately 58,000 pre-examination requests were made and most were also granted.[14] On the other hand, between 1929 and 1939

---

[10] 70th Congressional Record, 3526
[11] 70th Congressional Record, 3620
[12] Ngai, Mae M. Impossible Subjects: Illegal Aliens and the Making of Modern America. Princeton University Press, 2014.
[13] Ibid.
[14] Ibid.

approximately 44,000 Mexican immigrants were charged under the *Undesirable Aliens Act* for illegal entry.[15]  Thus, while some undocumented immigrants from Canada were provided a means of relief and path to normalizing their status, this was not extended to those from the southern border, primarily Mexican and Central Americans.

Nineteen twenty-nine would also mark the beginning of a program of Mexican repatriation that would last seven years until 1936.  Mexican reparation was a combination of federal, state, and local programs meant to encourage Mexicans in the United States to "voluntarily" return to Mexico.  Mexican nationals were threatened with forcible deportation and raids were announced in advance, with arrests highly publicized to increase fear in Mexican communities.  In the El Monte area of Los Angeles, approximately 300 people, largely if not exclusively members of Latinx communities, were questioned and asked to provide proof of legal entry.[16]  As with the Undesirable Aliens Act, Mexican repatriation was exclusively focused on Mexicans, legal and illegal, citizen and immigrant, and would result in an estimated two million Mexicans being "repatriated".  Not all of those who were returned to Mexico were immigrants though, and in 2005 California passed the "Apology Act for the 1930s Mexican Repatriation Act" which formally acknowledged that, "These raids targeted persons of Mexican ancestry, with authorities and others indiscriminately characterizing these persons as 'illegal aliens' even when they were United States citizens or permanent legal residents."  Furthermore, of those who were forced to return to Mexico, the Apology Act estimates that 60% were American citizens. This was likely deliberate, as one of the problems with immigrants from "undesirable" races was their ability to have children who would become American citizens by virtue of the Fourteenth Amendment, with eugenicists like C.M. Goethe, a California businessman who corresponded with Harry Laughlin, noting in 1933 that, "It is this high birthrate that makes Mexican peon immigration such a menace. Peons multiply like rabbits...".  While there was a continued push for quotas on Mexican immigration, continued resistance from business-interests made this impossible to achieve, especially in the face of renewed demands for Mexican labor as the country emerged from the Great Depression.

In 1942 a new chapter would open in the relationship between the United States and laborers from Mexico in the form of an agreement between the two countries, the bracero program.  This set up a process for bringing Mexican labor into the United States, which many industries were even more dependent on after the U.S. entered WWII in Dec. of 1941. Under the bracero program, applicants would pay a fee, go through inspection, and then be contracted to an employer who was supposed to provided a guaranteed wage, housing, and funds for meals and general subsistence. Braceros could work for a period of six months after which they had to return to Mexico, unless their visa was renewed.

[15]Hernández, Kelly Lytle. City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771–1965. UNC Press Books, 2017.

[16]Hoffman, Abraham."Stimulus to repatriation: The 1931 federal deportation drive and the Los Angeles Mexican community." Pacific Historical Review 42.2 (1973): 205-219.

This was meant to supply a stream of cheap, disposable labor for American companies and, importantly, laborers that would return to Mexico. While there were supposed to be some minimum guarantees for braceros in terms of wages and living accommodations, Mexico was a junior partner in the agreement, in 1954 dropping its ability to unilaterally blacklist employers who were in violation of the terms of the bracero contract. In 1956, only 50 of more than 1500 employers who were in violation of the terms of the program were removed.[17] Yet the bracero program also helped to exacerbate undocumented entry, as there was both more demand than there were available spots, as well as a far larger number of immigrants who wanted to enter the US to work. Some employers also preferred undocumented labor, as it was easier to access, especially for those in border regions, involved less red tape, and was often cheaper since the employer did not have to guarantee a wage or minimum standards for accommodations.

In the 1940s and 1950s, as the explicit eugenics of the 1920s and 1930s became less socially acceptable, the language around Mexican immigrants shifted, with braceros largely portrayed as a non-threatening disposable labor force, while undocumented immigrants were labeled "wetbacks" for their method of entry across the Rio Grande river. Mexican labor was always seen as invaluable and unthreatening as long as there were guarantees that those individuals would return to Mexico when their labor was no longer needed. The "wetback" on the other hand, was not guaranteed to return and were seen as a threat to the racial purity of the country. While the eugenicist language of the Johnson-Reed or Undesirable Aliens Acts was no longer present to the same extent, the same attributions used to characterize Mexican immigrants in earlier decades were now attached to the figure of the "wetback". This allowed for charges of racism to be circumvented, while still using the same racialized traits to describe a population that had entered without inspection. One study divided the "wetback" into two groups, one set of docile agricultural workers who accepted, "...good or bad treatment, starvation wages, diarrhea and other sickness for his children...and unsanitary living conditions," while a second group, the "pachucos" were criminals, drug dealers, smugglers, prostitutes, and homosexuals.[18] These attributions of criminality, illness, and deviant behavior were based on race, not legal status, with a 1951 study of Mexican immigrants noting that, "...no careful distinctions are made between illegal aliens and local citizens of Mexican descent. They are lumped together as Mexicans and the characteristics that are observed among the wetbacks are by extension assigned to the local people."[19]

In 1952, just three months before the passage of the McCarran-Walter Act, Senate bill 1851 was introduced and nicknamed the "Wetback Bill". This was anti-harboring legislation that attached criminal penalties to the sheltering or transport of undocumented immigrants, but in the Congressional debate over the bill, the continued animus toward Mexican immigrants, as well as the racial attributions attached to the figure of the Mexican immigrant were

---

[17]Ngai, 2004

[18]Idar, Ed and Andrew C. McLellan. What Price Wetbacks. Austin, Texas State Federation of Labor (AFL) (1953).

[19]Saunders, Lyle and Olen Leonard. The Wetback in the Lower Rio Grande Valley of Texas. University of Texas - Austin (1951).

made clear. As with past legislation, the Wetback Bill primarily targeted those from the southern border, and initially applied exclusively to Mexican immigrants, before some in Congress questioned whether this raised issues of constitutionality. Senator George Aiken of Vermont questioning whether Congress could, "discriminate constitutionally against the aliens of one particular nation," before noting that while it should apply to all illegal entrants, he knew, "...of no instances of illegal employment of Canadians."[20] During debate, Senator Harley Kilgore of WV used language to describe the "wetback" population that largely mirrored earlier eugenicist reflections on Mexican immigration. He argued that, "Practically every State in the Union has the wetback problem. Some of these people cannot meet the standards of immigration. They may be criminals."[21] The argument of eugenicists and members of Congress that Mexican immigrants had a greater propensity for criminal behavior had long served as a justification for restriction and example of the threat this group posed, despite the fact that this had been refuted by a report from the National Commission on Law Observance and Enforcement, also known as the Wickersham Commission, in 1931. The commission had been formed by President Herbert Hoover in 1929 because of growing concerns about crime in the United States, but unlike the Dillingham Commission was not made up of members of Congress but a number of experts from various fields such as law, criminology, and the social sciences. Because of the longstanding attribution of criminality to the foreign-born, the Wickersham Commission dedicated an entire volume of their report to immigration and crime. Mexican immigration was specifically examined, with the Wickersham Commission finding no support that Mexican immigrants were more inclined to criminality. The commission found that higher incarceration rates in some areas among the Mexican immigrant population were often due in part to ignorance of Prohibition laws, as well as racial profiling on the part of local law enforcement. In one passage, the report notes that, "It was frequently observed that peace officers shared the prejudices toward Mexicans of other members of the community in which they live...The effect of this is to doubtless increase arrests of Mexicans relative to arrests of native-born Americans, quite independent of criminality."[22] While the figure of the "wetback" was characterized as a threat to the country, employers, as with past legislation, were provided a carve out as employment would not constitute harboring. It must also be noted that while Mexican undocumented immigrants were characterized as "wetbacks", a derogatory term that carried all the racial baggage of the earlier period of eugenics, undocumented entrants from the northern border could still apply for pre-examination, which was available until 1961.

The passage of McCarran-Walter Act on June 27, 1952, which reenacted USC 1326, represented a reform of existing immigration laws in some ways, but also maintained much of the racial animus present in the earlier Johnson-Reed Act. The national origins quotas of Johnson-Reed were increasingly seen as problematic in the wake of WWII and the Holocaust, and as counter to US interests as the Cold War began. While the McCarran-Walter Act did re-

---

[20]98th Congressional Record, 799

[21]98th Congressional Record, 793

[22]National Commission on Law Observance and Enforcement, Report on Crime and the Foreign-born, Government Printing Office (1931)

move racial prohibitions on naturalization and immigration, it did little to change the racial quotas of Johnson-Reed. The Asia-Pacific region still received only a small number of quota spots when compared to European nations, and McCarran-Walter also required those of Asian ancestry, regardless of citizenship, to draw on the regional quota. During the debate some even lamented the end of eugenics as a result of the horrors of Nazi Germany, with Rep. John Wood of Idaho noting that, "It seems to me the question of racial-origins, though I am not a follower of Hitler, there is something to it. We cannot tie a stone around its neck and drop it into the middle of the Atlantic just because it worked to the contrary in Germany. The fact still remains that the peoples of Western Europe have made good American citizens...I believe that possibly statistics would show that the Western European races have made the best citizens in America."[23] Truman would veto the legislation because of its discriminatory aspects, in his letter to Congress stating that while he approved of the removal of racial restrictions on naturalization and immigration, "... now this most desirable provision comes before me embedded in a mass of legislation which would perpetuate injustices of long standing against many other nations of the world, hamper the efforts we are making to rally the men of East and West alike to the cause of freedom, and intensify the repressive and inhumane aspects of our immigration procedures. The price is too high, and in good conscience I cannot agree to pay it."[24] While the bill would pass over the veto of the president, the racially discriminatory nature of its immigration quotas of the bill was at least discussed.

This was not the case with USC 1326, which was reenacted with no debate or discussion of the racial animus underlying its initial codification in 1929. This animus was still on display though, with the regular references during the 98th Congress to "wetbacks" and continued attribution of racialized traits to Mexican immigrants, though now this cloaked by referencing their legal status. The only real reference to 1326 in the debate around McCarran-Walter's reenactment was in the form of a letter from Attorney General Peyton Ford, who wanted the term "found in" to be added to make prosecutions easier since the original codification suggested that the reentry point needed to be established in order to determine the proper venue for prosecutions. This letter included a reference to the "wetback", a term Pat McCarran himself used in discussing Mexican immigrants and the potential inclusion of provisions the Wetback Bill in the new omnibus legislation. He noted that, "We changed the language a little to meet the wetback situation, which applies to the southern section of the country."[25] Pat McCarran himself was a known racist and anti-Semite with members of Congress from Nevada in 2020 sending a letter to the state legislature and governor asking that Las Vega's airport, McCarran International, be renamed and that the former senator's statue be removed from the National Statuary Hall in DC. Clark County, the site of McCarran International, agreed in 2021 to change the name of the airport to Harry Reid International.[26]

---

[23] 98th Congressional Record, 4314
[24] Truman, Harry. Veto of Bill to Revise the Laws Relating to Immigration, Nationalization, and Nationality. June 25th, 1952
[25] 98th Congressional Record, 5320
[26] https://www.reviewjournal.com/news/politics-and-government/clark-county/clark-county-backs-mccarran-name-change-to-harry-reid-international-airport-2281859/

While 1326 received scant attention during the debate over the McCarran-Walter Act, the repeated use of the term "wetback" to describe Mexican immigrants and the racialized aspect of this designation demonstrate that racial animus toward Mexicans and Latinx individuals more broadly continued to be present during its reenactment. The historical record clearly demonstrates that Mexican nationals, as well as those from Central America, were the regular targets of racially-motivated legislation. USC 1326 was never intended as racially-neutral policy, but was instead about controlling immigration from one border, and one group of people, in particular. Entrants from the northern border were, through pre-examination, differentiated from those from the southern border. Members of Congress, and even restrictionist groups like the Immigration Restriction League, made it clear that undocumented entry from the north was not seen as a problem because those immigrants were like "us". They were white and thus they could be assimilated, while those crossing the southern border were criminalized and characterized as "wetbacks". USC 1326 has never been subject to a debate of its origins and the racial animus present, nor the actual merit of the policy. Congress and President Truman chose to address the racially-motivated aspects of national origins quotas, particularly the racial quota for the Asia-Pacific region, even if these were ultimately preserved, but did not extend the same courtesy to Mexican or Central American immigrants who continue to make up the largest percentage of sentenced federal offenders for immigration violations, demonstrating the continued disparate impact of the nation's immigration laws.

# EXHIBIT S

**Professor Kelly Lytle Hernández**
Department of History
Department of African-American Studies
Department of Urban Planning
University of California, Los Angeles
6265 Bunche Hall, Box #951473
Los Angeles, California 90095-1473
hernandez@history.ucla.edu

## EDUCATION

Ph.D., Department of History, University of California at Los Angeles, 1998 - 2002

B.A., Department of Ethnic Studies, University of California at San Diego, 1992 - 1996

## ACADEMIC POSITIONS

Director, Ralph J. Bunche Center for African American Studies at UCLA, July 1, 2019 to present

Tom Lifka Endowed Chair in History (UCLA), July 1, 2019 to present

Interim Director, Ralph J. Bunche Center for African American Studies at UCLA, July 1, 2017 to June 30, 2019

Professor, departments of History, African American Studies, and Urban Planning, July 1, 2017 to present

Associate Professor, Department of History, University of California at Los Angeles, 2010 - 2017

Director, UCLA Public History Initiative, 2012 - 2014

Associate Director, National Center for History in the Schools, 2010 - 2012

Associate Director, Chicano Studies Research Center, University of California at Los Angeles, 2008 - 2010

Assistant Professor, Department of History, University of California at Los Angeles, 2004 - 2010

University of California President's Postdoctoral Fellow, Department of Ethnic Studies, University of California, San Diego, 2002 - 2004

Research Fellow, Center for U.S.-Mexican Studies at the University of California, San Diego, 2001 - 2002

Research Fellow, Center for Comparative Immigration Studies at the University of California, San Diego, 2001 - 2002

Visiting Scholar, Immigration and Naturalization Service Historical Library, Washington, D.C., 2000

1

**MAJOR RESEARCH PROJECTS**
*Bad Mexicans* (forthcoming from Norton Books)

Million Dollar Hoods ([milliondollarhoods.org](milliondollarhoods.org))

*City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771 – 1965* (University of North Carolina Press, April 2017).

*MIGRA! A History of the U.S. Border Patrol* (Berkeley: University of California Press, 2010).

**AWARDS and PRIZES**
Commendation from the Los Angeles County Board of Supervisors for work on incarceration and immigration (November 19, 2020)

2019 John D. and Catherine T. MacArthur Fellow

2019 Catalyst Award. Awarded CADRE for Million Dollar Hoods

2018 Local Hero Award (KCET). Awarded for Million Dollar Hoods as well as historical scholarship on the rise of mass incarceration in Los Angeles.

2018 John Hope Franklin Prize for most outstanding book in American Studies. Awarded by the American Studies Association for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 Athearn Book Award for the best book on the history of the twentieth-century American West. Awarded by the Western History Association for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 American Book Award for excellence in American literature. Awarded by the Before Columbus Foundation for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 FREEDOM NOW! AWARD. Awarded for Million Dollar Hoods by the Los Angeles Community Action Network.

2018 John A. Rawley Prize for best book in U.S. race relations. Awarded by the Organization of American Historians for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017)

2015 Louis Knott Koontz Award for best article published in *Pacific Historical Review*, American Historical Association – Pacific Coast Branch. Awarded by the Board of Editors of the *Pacific Historical Review* to "Hobos in Heaven: Race, Incarceration, and the Rise of Los Angeles, 1880 -1910."

2010 Clements Book Award, Clements Center for Southwest Studies, Southern Methodist University. Awarded for *MIGRA! A History of the U.S. Border Patrol.*

Honorable Mention, 2010 Lora Romero First Book Prize, American Studies Association

Honorable Mention, 2010 John Hope Franklin Book Prize, American Studies Association

2007 Oscar O. Winther Prize for the best article published in the *Western Historical Quarterly* (2006). Awarded by the Board of Editors of the *Western Historical Quarterly* to "The Crimes and Consequences of Illegal Immigration: A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* (Winter 2006), 421-444.

2007 Bolton-Kinnaird Prize in Borderlands History. Awarded by the Western History Association to "The Crimes and Consequences of Illegal Immigration: A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* (Winter 2006), 421-444.

Norris F. Hundley Dissertation Prize (UCLA), 2002.

**<u>SELECTED ESSAYS and ARTICLES</u>**
Kelly Lytle Hernández, "The Rise of Mass Incarceration in Los Angeles," in Care First, Jails Last: Health and Racial Justice Strategies for Safer Communities (Los Angeles County Alternatives to Incarceration Work Group Final Report, February 2020)

Kelly Lytle Hernández, guest editor for "Carceral West," a Special Volume of *Pacific Historical Review* (January 2019)

Kelly Lytle Hernández, "Reforming Deportees: Imprisonment and Immigration Control during the 1930s," *Beyond the Borders of the Law: Critical Legal Histories of the North American West*, eds., Katrina Jagodinsky and Pablo Mitchell (University of Kansas Press, 2018), 263-280.

Kelly Lytle Hernández, Khalil Gibran Muhammad, and Heather Ann Thompson, co-editors and co-authors of "Constructing the Carceral State," in "Constructing the Carceral State," a Special Volume of the *Journal of American History* (June 2015).

"Hobos in Heaven: Race, Incarceration, and the Rise of Los Angeles, 1880 -1910," *Pacific Historical Review* v. 83, n. 3 (August 2014), 410-447.

"The Deportees: Mexican Immigration and the Rise of U.S. Immigration Control during the 1920s," in Rafael G. Alarcón Acosta and Fernando Saúl Alanís Enciso, ed. *Historia de la Migración Mexicana a Estados Unidos. Visiones Comparadas* (Siglo XIX, 2013).

"Amnesty or Abolition? Felons, Illegal Immigrants and America's Unfinished Abolition Movement," *Boom: A Journal of California* (Winter 2012), 54-68.

"Borderlands and the Future History of the American West," *Western Historical Quarterly* v 42, n 3 (Autumn 2011), 325-330.

Interchange participant, "Latino History: An Interchange on Present Realities and Future Prospects," v 97, n 2 *Journal of American History* (September 2010), 424-463.

"Mexican/Central American Migration to the United States," *OAH Magazine of History* v 23 (October 2009), 25-30.

Kelly Lytle Hernández and Pablo Yankelevich, eds. "Dossier 1: The Archive," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

Kelly Lytle Hernández and Pablo Yankelevich, "An Introduction to el Archivo Histórico del Instituto Nacional de Migración," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

"Persecuted Like Criminals: The Politics of Labor Emigration and Mexican Migration Controls during the 1920s and 1930s," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

"The Crimes and Consequences of Illegal Immigration:  A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* v 37, n 4 (Winter 2006), 421-444.

"Ni blancos ni negros: mexicanos y el papel de la patrulla fronteriza estadounidense en la definición de una nueva categoría racial, 1924-1940," *Cuicuilco* v 11, n 31 (Mayo-Agosto 2004), 85-104.

*Mexican Immigration to the United States, 1900 – 1999: A Sourcebook for Teachers*, published by the National Center for History in the Schools (Fall 2002).


**POLICY REPORTS  and ARTICLES**
Co-author, "Immigration Enforcement at the Orange County Jail," (Million Dollar Hoods), June 11, 2019

Co-author, "Bookings into the Los Angeles County Jail (2010-2016): A Million Dollar Hoods White Paper prepared for the Los Angeles County Alternatives to Incarceration Work Group," (Million Dollar Hoods), June 11, 2019

Co-Author, "The Los Angeles Police Department's Metropolitan Division," (Million Dollar Hoods, April 2, 2019.

Co-author, "Women in the Los Angeles County Jail: An Analysis of LASD Booking Data (2010-2016)," (Million Dollar Hoods), January 8, 2019

Co-author, "Policing Our Students," (Million Dollar Hoods), October 30, 2018.

Co-author, "The Price of Freedom: Bail in the City of L.A.," (Million Dollar Hoods), May 14, 2018.

Co-author, "Policing the Unemployed in Los Angeles," (Million Dollar Hoods), May 2, 2018.

Co-author, "Race, Cannabis, and Recent Disparities in Cannabis Enforcement by the LAPD," (Million Dollar Hoods), February 28, 2018.

Co-author, "Access to Freedom: Caged L.A.," *Items: Insights from the Social Sciences* (Social Science Research Council), February 20, 2018

Co-author, "Policing the Houseless 2.0," (Million Dollar Hoods), December 5, 2017

Co-author, "The Price for Freedom: Bail in the City of Los Angeles," (Million Dollar Hoods), December 5, 2017

Co-author, "Policing the Houseless," (Million Dollar Hoods), October 10, 2017

"How Crossing the U.S.-Mexico Border Became a Crime," *The Conversation*, April 30, 2017.

"Largest Deportation Campaign in U.S. History is No Match for Trump's Plan," *The Conversation*, March 8, 2017.

"America's Mass Deportation System is Rooted in Racism," *The Conversation*, February 26, 2017

**SELECTED BOARDS and PROFESSIONAL SERVICE**
National Book Award, 2019 Literature for Justice Committee, April 2019 to present

Society of American Historians, elected member, 2019 - present

Los Angeles Civic Memory Working Group, 2019 - present

Appointed by Supervisor Hilda Solis to the Los Angeles County Alternatives to Incarceration Workgroup, co-chair of the Data and Research Committee, March 2019 to March 2020.

Chair, American Talent Initiative Faculty Committee (UCLA)

Committee Member, Time to Degree Taskforce (UCLA)

Foundation Board Member, ACLU of Southern California, March 2018 – present

UC Systemwide Faculty Advisory Committee, UCLA representative, UC President's Postdoctoral Fellowship Program, 2017 to present

Editorial Board Member, *The Journal of American History*, March 2017 – present

Program co-chair with Andrew Graybill (Southern Methodist University) and Katherine Benton-Cohen (Georgetown University), Western History Association 2017 Annual Meeting, current

Editorial Board, David J. Weber Series in New Borderlands History, University of North Carolina Press, 2012 – present

*American Quarterly,* Managing Board, 2010 – 2014

*Western Historical Quarterly,* Editorial Board, 2011 – 2014

*LABOR: Studies in Working-Class History of the Americas*, Contributing Editor, current

Distinguished Speaker, Western History Association, 2012-2016

Distinguished Lecturer, Organization of American Historians, 2011 - present

Organization of American Historians, member and 2013 Program Committee member

## SELECTED MEDIA INTERVIEWS

Interview for *Factually! With Adam Conover,* episode title, "The Racist Roots of America's Immigration Laws." Originally aired on February 18, 2020.

Interview for United States of Anxiety (WNYC), episode title, "Fragility in Liberty." Originally aired February 20, 2020.

"LAUSD Plans to Expand List of Offenses Eligible for Diversion to Reduce Racially Disparate School Arrests," WitnessLA, October 7, 2019

"San Diego Native Wins MacArthur "Genius" Grant," Midday Edition, KPBS San Diego, October 3, 2019

"Los Angeles Working to Expand Diversion Programs to Further Reduce Student Arrests and Increase Services," LAUSD Press Release, October 1, 2019.

Live television interview about MacArthur grant, Univision, September 30, 2019.

Live radio interview about MacArthur grant on Press Play with Madeleine Brand, KCRW, September 26, 2019

"Rebel Historian Who Reframes History Receives MacArthur Genius Grant," All Things Considered," National Public Radio, September 25, 2019.

"MacArthur Genius Grant Winners of 2019: The Full List," New York Times, September 25, 2019

"Who's behind the law making undocumented immigrants criminals? An 'unrepentant white supremacist," *Washington Post*, June 27, 2019.

Live radio interview on Worldview with Steve Bynum on WBEZ (Chicago), June 27, 2019.

"Million Dollar Hoods: Why L.A. Cages More People than Any Other City," *Justice Not Jails*, July 4, 2018.

"Councilmember Harris-Dawson Joins Community Groups to Urge State and Local Officials to End Cash Bail: *New study from UCLA's Million Dollar Hoods Project highlights the disproportionate Price for Freedom,"* Los Angeles Sentinel, May 17, 2018.

 Mother's Day Bailout press conference (Skid Row, Los Angeles), May 10, 2018

"We Live as Second-Class Citizens: What It's Like to Face Border Patrol Agents Every Day," *The Guardian,* May 3, 2018.

"Many Latinos Answer Call of the Border Patrol in Age of Trump," *Los Angeles Times*, April 23, 2018.

Mexican Americans and the History of U.S. Anti-Cannabis Laws, *Mitu* (first posted February 2018)

"The American Detention Machine," *The Atlantic*, February 23, 2018

"The Double Punishment for Black Undocumented Immigrants," *The Atlantic*, December 30, 2017 (interviewee)

On-camera interview, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, C-SPAN Book TV (2017)

"Life on a Million Dollar Block," six-week "Off the Block" series for KCRW (NPR affiliate) based on Million Dollar Hoods mapping project. September/October 2016.

Interviews with the following outlets in response to Donald Trump's deportation and border enforcement strategy: *Los Angeles Times, New York Times, Washington Post, The Intercept,* and *FactCheck.org.*

"A Two-Minute History of Operation Wetback" . CNN. First aired January 2016.

Podcast, "The Carceral State," *Journal of American History*.  Conducted June 2015.

On-air interview, "States, Feds Battle over Border Control," *The World* hosted by Marco Werman for Public Radio International. Interview conducted in July 2010.

On-camera interview for History Channel production entitled, "El Camino Real" on the history of the Spanish mission system in California.  Interview conducted on August 11, 2005

Consultant and on-camera interview for History Channel production entitled, "The Border Patrol." Interview conducted spring 2001.


**SELECTED TALKS, PRESENTATIONS, AND LECTURES**
Guest Speaker, American Civil Liberties Union of Southern California, October 4, 2019

City of Inmates book talk, The Bail Project (Los Angeles), June 25, 2019

Nation of Settlers, Build Power! Launch Party (Hollywood), May 16, 2019

Million Dollar Hoods, Institute for Research on Labor and Employment (UC Berkeley), May 14, 2019

Keynote, Nation of Settlers, Teaching History Conference (UCLA), May 3, 2019

Keynote, City of Inmates book talk, Los Angeles County Alternatives to Incarceration Workgroup Retreat, April 26, 2019

Keynote, Million Dollar Hoods, Oberlin College, April 24, 2019

Keynote, Immigrant Detention Conference, University of Maryland, March 28, 2019

Keynote, Immigration Conference, California State University, Sacramento, March 7, 2019

Panelist, The Future of Incarceration, The State of Black California Conference (Sacramento, CA), February 27, 2019

City of Inmates book talk, Marquette University, February 21, 2019

City of Inmates book talk, University of Wisconsin - Madison, February 22, 2019

Keynote, Mass Deportation/Incarceration, LatinoJustice, November 16, 2018

Panelist, "Sorry to Bother You" Screening at UCLA, November 6, 2018

Panelist, Men's Empowerment Conference hosted by KJLH and Senator Bradford at California State University, Dominguez Hills, September 8, 2018.

Keynote, New Left Coast Forum hosted by *L.A. Progressive* at Los Angeles Trade Tech, August 24, 2018.

Panelist, People Power Conference sponsored by the Community Coalition (South Central Los Angeles), June 9, 2018.

Presentation, "The Facts and Fictions of Latinos and the U.S. Criminal Justice System," LatinoJustice convening at UCLA, May 29, 2018

*City of Inmates* book talk, California Historical Society (San Francisco, CA), May 23, 2018.

*City of Inmates* book talk for Los Angeles Department of Public Health, May 31, 2018.

Guest Presentation, Women and Incarceration in LA, for A New Way of Life Fundraiser (Los Angeles), May 19, 2018.

Press conference on money bail. Sponsored by Community Coalition (South Central Los Angeles), May 15, 2018.

Comments, Dream Mentor Program organized by the Miller Center at the University of Virginia (Charlottesville, CA), May 10, 2018.

Keynote, Caughey Foundation Lecture at the Autry Museum (Los Angeles, CA), April 29, 2018

Keynote, Public Records and the Movement to End Mass Incarceration, California Public Records and Open Meetings Conference (Los Angeles, CA), April 27, 2018

Book talk, *City of Inmates*, University of North Texas (Denton, TX), April 26, 2018.

Book talk, *City of Inmates*, Pan-African Studies Department at California State University, Los Angeles (Los Angeles, CA), April 23, 2018.

Book talk, *City of Inmates*, Main Museum (Los Angeles, CA), April 19, 2018.

Book talk, *City of Inmates*, Cerritos Community College (Los Angeles, CA), April 19, 2018.

Panelist, Crimmigration, Organization of American Historians Annual Meeting (Sacramento, CA) April 12, 2018

Keynote, Death by Police conference at University of Illinois at Urbana-Champagne, April 11, 2018

Public Talk, Labor and the Crisis of Mass Incarceration, United Food and Commercial Workers Local 770 (Los Angeles, CA), March 15, 2018

Book talk, *City of Inmates*, University of California, Berkeley, March 14, 2018.

Book talk, *City of Inmates*, California State University, Channel Islands, February 28, 2018.

Moderator for a public conversation with Patrisse Khan-Cullors and Asha Bandele, *When They Call You a Terrorist: A Black Lives Matter Memoir* (2018) at The California Endowment (Los Angeles, CA), February 14, 2018

Book talk, *City of Inmates*, Immigration History Research Center, University of Minnesota, January 25, 2018.

Moderator for a public Conversation with Heather Anne Thompson, *Blood in the Water: The 1971 Attica Uprising and its Legacy* at the Los Angeles Public Library, January 18, 2018.

Panelist, District 2 Town Hall, hosted by JusticeLA and White People for Black Lives, (Hollywood, CA), January 11, 2018.

Book Talk, *City of Inmates*, University of Southern California (Los Angeles, CA), January 10, 2018.

Panelist, #SocialJustice with Common and Kareem Abdul-Jabbar (Los Angeles, CA), January 6, 2018

Project Talk, Million Dollar Hoods, UCLA Medical School, December 15, 2017

Book Talk, Watts Labor Community Action Center, December 14, 2017.

Expert Witness, Civil Society Meeting on Criminalization of Poverty and Homelessness with United Nations Special Rapporteur on Extreme Poverty and Human Rights
Professor Philip Alston, (Los Angeles, CA), December 4-5, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, California State University, San Bernardino, (San Bernardino, CA), November 28, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles* ACLU-Southern California (Los Angeles, CA), November 19, 2017.

Presenter, UCLA Luskin Center for History and Policy, November 15, 2017.

Keynote Speaker, Eqbal Ahmed Symposium, Hampshire College (Amherst, MA), November 9, 2017.

Panelist, Historians and Activism, Western History Association (San Diego, CA), November 3, 2017.

Closing Speaker, Race and Capitalism Conference, UCLA, October 20, 2017.

Presenter, UCLA Criminal Justice Faculty Workgroup, October 18, 2017.

Panelist, Beyond the Bars Conference, University of California, Los Angeles, October 14, 2017.

Presenter, The Racial and Sexual Politics of Migrancy and Border Control, University of Michigan Centennial Event, October 13, 2017

Keynote Address/Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Latino Studies University of Michigan (Ann Arbor, MI), October 12, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Warren Center at Harvard University (Cambridge, MA), September 19, 2017.

LAPD Recruit Training Session. Los Angeles, CA, August 14, 2017.

Million Dollar Hoods, Building Healthy Communities – Long Beach, California, August 9, 2017

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Book Soup (Hollywood, CA), August 6, 2017.

Plenary Panel, Labor and Working Class History Association 2017 Meeting (Seattle, WA), June 22, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Skylight Books (Los Angeles, CA), May 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, University of California, San Diego, May 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Claremont College of Theology (Claremont, CA), May 2, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Eso Won Book Store (Los Angeles, CA), April 26, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Occidental College (Pasadena, CA), April 25, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, California State Univeristy, Dominguez Hills, April, 20, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Tarleton College (Texas), April 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Southern Methodist University (Dallas, Texas), April 17, 2017.

Keynote, Western History Association Lecture at University of Oklahoma. April 13, 2017.

Keynote, National Humanities Center, March 30, 2017.

Presenter, Laying Down the Law Symposium at University of Nebraska at Lincoln, November 16-17, 2017.

Million Dollar Hoods, South Central (Los Angeles) Re-Entry Coalition, September 11, 2016.

Million Dollar Hoods, California Endowment, September 18, 2016.

Plenary Session/Podcast, "Behind the Scholar's Studio: Inside the World of Latino Studies," American Historical Association – Pacific Coast Branch. August 6, 2016.

Public Lecture, "Caged Birds: Immigration Control and the Rise of Mexican Imprisonment in the United States," Franklin and Marshall College. Lancaster, Pennsylvania. March 21, 2016.

Presenter, Immigration since 1965 Conference hosted at University of Texas, Austin. March 4-5, 2016.

Public talk, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Puget Sound University. February 29, 2016.

Discussant, UCLA Emerging Immigration Scholars Conference. February 26, 2016.

Keynote Address, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Caged/Uncaged Graduate Student Conference. University of California, Los Angeles. January 29, 2016.

Keynote Address, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Borderlands Conference, University of Texas at El Paso. November 6, 2015.

Lecture, "The Colonial Origins of the Carceral State," From the Color Line to the Carceral State: Policing, Prisons, and Surveillance in the 20th and 21st Centuries conference, Stony Brook University and Fairfield University. October 27-28, 2015.

Panelist, "Legal Borderlands," Annual Meeting of the Western History Association. October 24, 2015.

Panelist, "Reforming Deportees: Race, Incarceration, and the Settler State during the New Deal Era," Annual Meeting of the Western History Association. October 22, 2015.

Public Talk, "The History of Race and Policing in Los Angeles," LAPD Trust Talks organized by the Downtown Clergy Council, Skid Row. October 3, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," plenary panel, Annual Meeting of the Organization of American Historians. St. Louis, Missouri. April 18, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," Immigration Conference, Columbia University. April 4, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," Department of History, Yale University. March 31, 2015.

Panelist,  "Is there an LA School of Western History?" Western History Association Annual Meeting. Newport Beach, California. October 17, 2014.

Presenter, "Borderlands," NEH-Newberry Workshop. Chicago, Illinois. June 23, 2014

Lecture, "Caged Birds: Conquest and the Rise of Mexican Incarceration," University of California, Davis Law School. September 11, 2014.
Public Lecture, "Caged Birds: Conquest and the Rise of Mexican Imprisonment," University of California, Santa Barbara. May 20, 2014.

Public Talk, "Caged Birds," Linfield College. McMinnesville, Oregon. May 6-7, 2014.

OAH Distinguished Lecture at University of Missouri. April 24, 2014.

Panelist, Mass Incarceration/Mass Deportation," UCLA Labor Center. April 19, 2014.

Discussant, UCLA-COLEF Migration Conference. November 22, 2013.

Keynote Discussant for Douglas Blackmon's Talk, "Slavery by Another Name," Historians Against Slavery Conference. Cincinnati, Ohio. September 19, 2013.

Workshop for K-12 History teachers on California History. UCLA History-Geography Project. June 13, 2013.

TAH-OAH Public Talk, "A History of U.S. Immigration Control." Rockford, Illinois. January 26, 2013

TAH workshop, "California Under Three Flags," UCLA History-Geography Project. January 22, 2013.

OAH Distinguished Lecturer Public Talk, "Hoboes in Heaven: Race, Manifest Destiny, and the Rise of Los Angeles," Purdue University. March 7, 2013.

Public Talk, "The Invention of Immigrant Detention," University of California, Berkeley, Boalt Law School. March 20, 2014.

Book Talk, *MIGRA! A History of the U.S. Border Patrol,* at the Center for the Study of the Pacific Northwest, University of Washington, Seattle. May 17, 2012.

Keynote Address, "Amnesty or Abolition? Felons, Illegals, and America's Unfinished Abolition Movement," Immigration Policy and Reality Symposium, San Jose State University, April 13, 2012.

Working Paper, "Rebellion from the Jail: A History of Community, Incarceration, and Revolution in Los Angeles, 1900 – 1910," Sunbelt Prisons Conference, Southern Methodist University, March 24, 2012.

Book Talk, *MIGRA! A History of the U.S. Border Patrol* at the Center for Comparative Immigration Studies at the University of California, San Diego. February 21, 2012.
Public Lecture, "Hobos in Heaven: Tramps, Chain Gangs, and the Rise of Los Angeles," University of Indiana. February 26, 2012.

Public Talk, "Amnesty or Abolition: Felons, Illegals, and America's Unfinished Abolition Movement," Boxcar Books, Bloomington, Indiana. February 26, 2012.

Conference Paper, "Rebellion from the Jails: A History of Incarceration and Community in Los Angeles, 1907-1910," Sunbelt Prisons workshop, University of Colorado, Boulder. September 15-16, 2011

Keynote Address, Latino/a Scholars Luncheon, 2011 American Historical Association-Pacific Coast Branch Meeting. Seattle, Washington. August 11, 2011.

K-12 Teacher Training, "History of Immigration Control," Denver, Colorado School District. July 11, 2012. Los Angeles, California.

Panel Participant, "Prison State: Incarceration in California," UCLA Department of History, Why History Matters series. Autry Museum. May 11, 2011.

Panel moderator, conference for the UC Center for New Racial Studies. UCLA. April 22, 2011.

Presenter, "*MIGRA! A History of the U.S. Border Patrol*," Critical Race Studies Symposium – Race and Sovereignty. UCLA Law School. April 2, 2011.

Book Talk, "*MIGRA! A History of the U.S. Border Patrol*," Arizona State University. March 25, 2011.

Keynote Address, "Beyond Borders: Migration and the Next California," Symposium to celebrate the launching of *Boom: A Journal of California* (University of California Press). Davis, California. March 10, 2011.

Presenter, "Hoboes in Heaven: Tramps, Convict Labor and the Rise of Los Angeles, 1880-1910," Autry Western History Workshop. November 30, 2010

Panelist, "Hoboes in Heaven: Tramps, Convict Labor and the Rise of Los Angeles, 1880-1910," Latin American Studies Association. Toronto. October 8, 2010.

Book talk, "*MIGRA! A History of the U.S. Border Patrol*," UCLA Law School. October 4, 2010.

Panel moderator, Forty Years of Ethnic Studies at UCLA. May 13, 2010

Panelist, "Crossing Borders, Creating Borders: Nations, Migrants, and Constructions of Law," 2009 Annual Meeting of the Association of American Law Schools. San Diego, California. January 9, 2009.

Keynote lecture series, *Los caminos de la exclusión: migración y racismo en la historia de los Estados Unidos de América.* Sponsored by Sociedad y Estado en el México Moderno del Posgrado de Historia y Etnohistoria de la Escuela Nacional de Antropología e Historia y el Proyecto de Investigación "Nación y Extranjería en México." Mexico City. December 7-11, 2009.

K-12 Teacher Training, "U.S.-Mexico Relations: Immigration Policy," UCLA History-Geography Project's Teaching American History Summer Institute.  Glendale, California. July 17, 2008.

Panel Participant, "Immigration Control in the Carceral Era," invited presentation at University of Texas at Austin.  22nd Annual Hemann Sweatt Civil Rights Symposium. March 26, 2008.

K-12 Teacher Training, "Gold Rush to Gold Rush:  African American Migration to California, 1848 to 1944," presentation for the National Center for History in the Schools.  University of California, Los Angeles.  August 17, 2007.

K-12 Teacher Training, "The Long Civil Rights Movement: New Strategies in Teaching the Civil Rights Movement," presentation for the UCLA History-Geography Project's Teaching American History Summer Institute.  Glendale, California. July 28, 2007.

Training Workshop, "Where Do We Go From Here?:  New Strategies in Teaching Late Twentieth Century American History,"  2007 OAH Community College Workshop at El Camino Community College. Torrance, California.  June 23, 2007.

K-12 Teacher Training, "A History of the Problem of Illegal Immigration at the U.S.-Mexico Border," presentation for the Latin American Immigrants and Mobile Communities in the United States Conference for Teachers, sponsored by the UCLA Latin American Center. April 20, 2007.

K-12 Teacher Training, "The Making of MexAmerica: Race, Migration, and Incorporation in the 19th and 20th Centuries," presentation for the National Center for History in the Schools at the University of California, Los Angeles.  January 19, 2007.

Chair, "Smuggling in the Southwest Borderlands:  State Regulation and Resistance," panel at the 2007 Annual Conference of the Western History Association. Oklahoma City, Oklahoma. October 3-6, 2007

"The Crimes and Consequences of Illegal Immigration: A Cross-Border Examination of Operation Wetback, 1943-1954," presented at the Annual Conference of the Organization of American Historians held from April 19-22, 2006 in Washington, DC.

"Negotiating the Barrier: Migration Control and Social Order between the U.S. and Mexico during the Bracero Era, 1942 – 1964," presented at the Latin American Studies Association 2004 Conference held from October 7-9, 2004 in Las Vegas, Nevada.

"Constructing the Criminal Alien:  A Historical Framework for Analyzing Border Vigilantes at the Turn of the 21st Century" presented at the Center for Comparative Immigration Studies at the University of California, San Diego. La Jolla, California. October 7, 2003.

"Distant Origins: The U.S. Border Patrol and the Mexican Roots of Race in the United States, 1924-1965" presented at the XI Reunion de Historiadores Mexicanos, Estadounidenses y Canadienses. Monterrey, Mexico. October 1-4, 2003.

# EXHIBIT T

# Benjamin Gonzalez O'Brien

**Associate Professor of Political Science**
**San Diego State University**
5500 Campanile Dr.
San Diego, CA 92182
Phone: (619)594-3072
Email: bgonzalezobrien@sdsu.edu

## Education

Ph.D., Political Science                    2014, University of Washington

M.A., Political Science                     2009, University of Washington

M.A., Political Science                     2007, University of Victoria

B.S., Political Science & Psychology        2001, University of Oregon

1

**Benjamin Gonzalez O'Brien**                                                  **Curriculum Vitae**

## Teaching Positions

August 2018-present                          Associate Professor
San Diego State University                   Political Science


2014-2018                                    Professor (Tenured) [1]
Highline College                             Political Science


2013-2014                                    Lecturer
University of Washington-Tacoma              Political Science


2007-2013                                    Teaching Assistant
University of Washington                     Political Science


## Publications

### Refereed Books

1) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2019. *Sanctuary Cities: The Politics of Refuge* Oxford, England: Oxford University Press, in press.


2) **Gonzalez O'Brien, Benjamin**. 2018. *Handcuffs and Chain Link: Undocumented Immigration and the Politics of Criminality*. Charlottesville, VA: University of Virginia Press.

---

[1]Highline does not have academic ranks for tenured faculty.

Benjamin Gonzalez O'Brien                                              **Curriculum Vitae**

## Refereed Journal Articles

1) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2021. "Is Distance to Drop Box an Appropriate Proxy for Drop Box Treatment? A Case Study of Washington State." *American Politics Research*
https://doi.org/10.1177/1532673X211022192

2) **Gonzalez O'Brien, Benjamin**, Matthew Barreto, and Gabriel Sanchez. 2020. "They're All Out to Get Me! Assessing Inter-Group Competition Among Multiple Populations." *Politics, Groups, and Identities*.
https://doi.org/10.1080/21565503.2019.1629305

3) McGuire, William, **Benjamin Gonzalez O'Brien**, Katherine Baird, Benjamin Corbett, and Loren Collingwood. 2020. "Does Distance Matter? Evaluating the Impact of Drop Boxes on Voter Turnout." *Social Science Quarterly*, Vol 101(5): 1789-1809.
https://doi.org/10.1111/ssqu.12853

4) **Gonzalez O'Brien, Benjamin**, Elizabeth Hurst, Justin Reedy, and Loren Collingwood.2019. "Framing Refuge: Media, Framing, and Sanctuary Cities." *Mass Communication and Society*, Vol 22(6): 756-778.
https://doi.org/10.1080/15205436.2019.1685106

5) **Gonzalez O'Brien, Benjamin**. "Sanctuary Cities". In Oxford Bibliographies in Latino Studies. Ed. Ilan Stavans. New York: Oxford University Press, 26 Feb. 2020.
https://www.oxfordbibliographies.com/view/document/obo-9780199913701/obo-9780199913701-0141.xml

6) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2019. "Covert Cross-Racial Mobilization, Black Activism, and Political Participation Pre-Voting Rights Act." *Florida Historical Quarterly*, vol. 97(4): 435-463.

7) Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Joe Tafoya. 2019. "Partisan Learning or Racial Learning: Opinion Change on Sanctuary City Policy Preferences in California and Texas." *Journal of Race, Ethnicity, and Politics*, vol. 5(1): 92-129.
https://doi.org/10.1017/rep.2019.25

8) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2019. "Public Opposition to Sanctuary Cities in Texas: Criminal Threat or Latino Threat?" *Social Science Quarterly*, vol. 100(4): 1182-1196.
https://doi.org/10.1111/ssqu.12632

9) Collingwood, Loren, Stephen El-Khatib and **Benjamin Gonzalez O'Brien**. 2018. "Sustained Organizational Influence: The American Legislative Exchange Council and the Diffusion of Anti-Sanctuary Policy." *Policy Studies Journal*, 44(3): 735-773.

3

https://doi.org/10.1111/psj.12284

10) Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Sarah Dreier.  2018.  "Evaluating Ballot Initiative Support for Legalized Marijuana: The Case of Washington." *International Journal of Drug Policy*, Vol. 56 (June): 6-20.

https://doi.org/10.1016/j.drugpo.2018.02.010

11) Collingwood, Loren, William McGuire, **Benjamin Gonzalez O'Brien**, Katie Baird and Sarah Hampson. 2018. "Do Drop Boxes Improve Voter Turnout? Evidence from King County, Washington." *Election Law Journal*, Vol. 17(1): 58-72.

https://doi.org/10.1089/elj.2017.0450

12) **Gonzalez O'Brien, Benjamin**, Loren Collingwood, and Stephen Omar El-Khatib.  2017.  "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration" *Urban Affairs Review*, Vol. 55(1): 3-40.

https://doi.org/10.1177/1078087417704974

13) Barreto, Matt, Betsy Cooper, **Benjamin Gonzalez O'Brien**, Chris Towler, and Christopher Parker. 2012. "The Tea Party in the Age of Obama: Mainstream Conservatism or Out-Group Anxiety?" *Political Power and Social Theory*. 22:1(Jan): 105-137.

https://doi.org/10.1108/S0198-8719(2011)0000022011

## Refereed Book Chapters

1) Gonzalez O'Brien, Benjmain.  "Reacting to Refuge: Presidential Responses to Sanctuary Policies under the Reagan, Bush, and Trump administrations." In Monica Verea (ed.) *Trump: Anti-Immigrant Rhetoric, Actions, and Policies 2017-2019*: 67-98. Mexico City: CISAN/UNAM.

## Non-Refereed Book Chapters

1) Barreto, Matt, Gabriel Sanchez and **Benjamin Gonzalez O'Brien**.  2013.  "Rainbow Coalition in the Golden State? Exposing Myths, Uncovering New Realities in Latino Attitudes Towards Blacks." In Laura Pulido and Josh Kun (eds.) *Black and Brown Los Angeles: A Contemporary Reader*: 1-36. Berkeley, CA: University of California Press.

2) Barreto, Matt, Loren Collingwood, **Benjamin Gonzalez O'Brien**, and Chris Parker. 2011. "Tea Party Politics in a Blue State: Dino Rossi and the 2010 Washington Senate Election."  In William Miller and Jeremy Walling

**Benjamin Gonzalez O'Brien**                                      **Curriculum Vitae**

(eds.) *Tea Party Effects on 2010 U.S. Senate Elections: Stuck in the Middle to Lose: Tea Party Effects on 2010 U.S. Senate Elections*: 255-272. Rowan and Littlefield Publishing Group.

## Non-Refereed Publications

**Gonzalez O'Brien, Benjamin**. 2020. "Washington is safer because of its sanctuary status." *The Seattle Times*, January 1st, 2020.

**Gonzalez O'Brien, Benjamin**. 2019. "No, Ken Blackwell, sanctuary city policies aren't a threat to anyone". *The Hill*, October 24, 2019.
https://thehill.com/opinion/immigration/467294-no-ken-blackwell-sanctuary-city-policies-arent-threat-to-anyone

**Gonzalez O'Brien, Benjamin**. 2018. "The 1929 Law That Turned Undocumented Entry Into a Crime". *Zocalo Public Square*, November 27, 2018.
https://www.zocalopublicsquare.org/2018/11/27/1929-law-turned-undocumented-entry-crime/ideas/essay/

**Gonzalez O'Brien, Benjamin**. 2017. "The Trump team's mythology on sanctuary city crime rates". *The Seattle Times*, July 23rd, 2017.
https://www.seattletimes.com/opinion/the-trump-teams-mythology-on-sanctuary-city-crime-rates/

**Gonzalez O'Brien, Benjamin** and Loren Collingwood. 2017. "How conservative media and Jeff Sessions got it wrong on sanctuary cities". *The Hill*, July 14th, 2017.
https://thehill.com/blogs/pundits-blog/immigration/342043-how-conservative-media-and-jeff-sessions-got-it-wrong-on

Collingwood, Loren, **Benjamin Gonzalez O'Brien** and Stephen El-Khatib. 2017. "Jeff Sessions used our research to claim sanctuary cities have more crime. He's wrong." *Washington Post Monkey Cage*, July 14, 2017.
https://www.washingtonpost.com/news/monkey-cage/wp/2017/07/14/jeff-sessions-used-our-research-to-claim-that-sanctuary-cities-have-more-crime-hes-wrong/?utm$_term = .de1f041b8cb3$

Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Stephen El-Khatib. 2017. "Sanctuary Cities Do Not Experience an Increase in Crime". *Washington Post Monkey Cage*, October 3, 2016.
https://www.washingtonpost.com/news/monkey-cage/wp/2016/10/03/sanctuary-cities-do-not-experience-an-increase-in-crime/?utm$_term = .aecb2d3f1bf1$

Benjamin Gonzalez O'Brien                                                              **Curriculum Vitae**

## Participation in Professional Organizations

2019 *Local Democracy Academy* (June) Umea, Sweden. "Criminalizing Refuge: Sanctuary Cities and the Politics of Immigration in the United States"

2019 CISAN/UNAM *Trump: Anti-immigrant rhetoric, actions and policies 2017-2019 conference* (February) Mexico City, Mexico. "Reactions to Refuge: Presidential Responses to Sanctuary Policies under the Reagan, Bush, and Trump Administrations"

2018 *American Political Science Association Annual Meeting* (September) Boston, MA. "Framing Refuge: Media Coverage of Sanctuary Cities 1980-2017"

2018 *Election Sciences, Reform, and Administration conference* (July) Madison, WI. "Evaluating the Impact of Drop Boxes on Voter Turnout"

2018 *Western Political Science Association Annual Meeting* (March) San Francisco, CA. "Framing Refuge: Partisanship, Crime, and Media Coverage of Sanctuary Cities"

2017 *Law and Society Association Annual Meeting* (June) Mexico City, Mexico. "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration"

2017 *Western Political Science Association Annual Meeting* (April) Vancouver, BC. "Voter Turnout in King County Washington: Do Dropboxes Matter?"

2017 *Western Political Science Association Annual Meeting* (April) Vancouver, BC. "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration"

2016 *American Political Science Association Annual Meeting* (September) San Francisco, CA. "Inter-Group Attitudes Among Multiple Populations: Competition and Context"

2016 *Western Political Science Association Annual Meeting* (March) San Diego, CA. "Laughing Away Prejudice? Evaluating the Role of Comedy in Reducing Anti-Muslim Attitudes"

2016 *Western Political Science Association Annual Meeting* (March) San Diego, CA. "Gimme Shelter: The Myth and Reality of the American Sanctuary City"

2015 *Western Political Science Association Annual Meeting* (April) Las Vegas, NV. "IRCA, IIRIRA and the Cost of Critical Policy Failures"

**Benjamin Gonzalez O'Brien**                                                          **Curriculum Vitae**

2014 *Politics of Race, Immigration, and Ethnicity Consortium Meeting* (November) Eugene, OR. "Path Dependence and Immigration Policy in the 1920s"

2014 *Western Political Science Association Annual Meeting* (April) Seattle, WA. "Path Dependence and Immigration Policy in the 1920s"

2013 *American Political Science Association Annual Meeting* (September) Chicago, IL. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2013 *Midwestern Political Science Association Annual Meeting* (April) Chicago, IL. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2012 *Law and Societies Association Annual Meeting* (June) Oahu, Hawaii. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2012 *Western Political Science Association Annual Meeting* (March) Portland, OR. "The Undocumented Threat: Beliefs, Policy Preferences, and the Politics of Immigration."

2011 *Pacific Northwest Political Science Association Annual Meeting* (October) Seattle, WA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2011 *American Political Science Association Annual Meeting* (September) Seattle, WA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2011 *Politics of Race, Immigration and Ethnicity Consortium Meeting* (May) Davis, CA. "The Undocumented Threat: Beliefs, Policy Preferences and the Politics of Immigration."

2010 *International Society of Political Psychology Annual Meeting* (July) San Francisco, CA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2010 *Western Political Science Association Annual Meeting* (April) San Francisco, CA. "Declaring Sanctuary: Politics, History and the Enforcement of Immigration Policy."

2009 *Pacific Northwest Political Science Association Annual Meeting* (October) Victoria, BC. "Immigration Enforcement's Discontents: The Creation and Endurance of the American Sanctuary City."

2009 *Political Psychology and Immigration Conference* (April) Austin, TX. "Correcting Misperceptions: Undocumented Immigrants, Group Size and Political Attitudes."

**Benjamin Gonzalez O'Brien**                                    **Curriculum Vitae**

2009 *Western Political Science Association Annual Conference* (March) Vancouver, BC. "Correcting Misperceptions: Undocumented Immigrants, Group Size and Political Attitudes."

# Teaching

## Thesis or Comprehensive Exam Supervision

Spring 2019-Spring 2020: Cynthia Neira, Masters
Committee Member:        American Foreign Policy and Latin American Politics comprehensive examination

Fall 2020-Spring 2020: Jereme Umali, Masters
Committee Member:    Racial & Ethnic Politics comprehensive examination

## Courses Taught, San Diego State University

Introduction to American and California Government, Political Science 102
Politics of Race and Ethnicity, Political Science 333
The Legislative Process, Political Science 338
Immigration and Border Politics, Political Science 430

## Courses Taught, Highline College

Introduction to Political Science, Political Science 101
American Government, Political Science 202
Introduction to International Relations, Political Science 203
Comparative Government, Political Science 204
Racial and Ethnic Politics, Political Science 217

## Courses Taught, University of Washington-Tacoma

Introduction to American Politics, Political Science 202
Mass Media and Politics, Political Science 300
Politics of Race and Ethnicity in the United States, Political Science 317
United States Congress, Political Science 353
Advanced Campaigns and Elections, Political Science 405

**Benjamin Gonzalez O'Brien**                                                                                  **Curriculum Vitae**

## Service

### Service for the Department, San Diego State University

| | |
|---|---|
| 1) Fall 2019-present | Adviser, Washington Center Internship Program |
| 2) Fall 2019-present | Adviser, Sacramento Internship Program |
| 3) Fall 2019-present | Member, Diversity Planning Committee |
| 4) Fall 2019-present | Member, Graduate Committee |
| 5) Fall 2018-present | Department Secretary |
| 6) Fall 2018-Spring 2019 | Member, Scholarship Review Committee |

### Service for the College of Arts & Letters

| | |
|---|---|
| 1) Spring 2019 | Member, Critical Thinking Grant Committee |

### Service, Highline College

| | |
|---|---|
| 1) Fall 2017-Spring 2018 | Division Senator, Faculty Senate |
| 2) Fall 2015-Spring 2017 | Member, Graduation Review Committee |
| 3) Fall 2015-Spring 2016 | Member, Faculty Advising Committee |

9

**Benjamin Gonzalez O'Brien**                                    **Curriculum Vitae**

**Service to the Profession**

| | |
|---|---|
| 2019 | Session Leader, Local Democracy Academy |
| 2019 | Co-organizer, "Immigration Politics and Policy in the Age of Trump" conference at UCSD |
| 2019 | Reviewer, *State and Local Government Review* |
| 2019 | Reviewer, *Social Inclusion* |
| 2018 | Reviewer, *Urban Affairs Review* |
| 2018 | Panelist, 2018 Pearson-Chambers Symposium on the 2018 election, Univ. of San Diego |
| 2018 | Reviewer, *Urban Affairs Review* |
| 2018 | Reviewer, *Sociological Quarterly* |
| 2016 | Reviewer, *Politics, Groups, and Identities* |